Case No. 21-35085

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, ALASKA WILDERNESS LEAGUE, DEFENDERS OF WILDLIFE, NORTHERN ALASKA ENVIRONMENTAL CENTER, SIERRA CLUB, and THE WILDERNESS SOCIETY,
Plaintiffs-Appellants,

v.

BUREAU OF LAND MANAGEMENT, U.S. FISH & WILDLIFE SERVICE, U.S. DEPARTMENT OF THE INTERIOR, U.S. ARMY CORPS OF ENGINEERS, SCOTT DE LA VEGA, in his official capacity as Acting Secretary of the Interior, CHAD PADGETT, in his official capacity as State Director for the Bureau of Land Management Alaska, and DAVID HOBBIE, in his official capacity as Regional Regulatory Chief of the Army Corps of Engineers-Alaska District,
Defendants-Appellees,

and

CONOCOPHILLIPS ALASKA, INC.,
Intervenor-Defendants-Appellees.

On Appeal from the United States District Court
for the District of Alaska
Case No: 3:20-CV-00290-SLG

**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3(a)**
**(RELIEF REQUESTED BY FEBRUARY 12, 2021)**

Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org
bbrisson@trustees.org
blitmans@trustees.org

*Counsel for Plaintiffs-Appellants*

## CIRCUIT RULE 27-3 CERTIFICATION

I, Bridget Psarianos, certify the following facts to be true, pursuant to Circuit Rule 27-3 (a)(3):

1. I am the lead attorney for Plaintiffs-Appellants Sovereign Iñupiat for a Living Arctic, Alaska Wilderness League, Defenders of Wildlife, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society (collectively "SILA"). I have personal knowledge of the matters stated herein and, if called as a witness, could competently testify thereto. I submit this declaration in support of Appellants' Emergency Motion Under Circuit Rule 27-3 for an Injunction Pending Appeal.

2. Following are the telephone numbers, e-mail addresses, and office addresses of the parties' attorneys:

Counsel for Plaintiffs-Appellants:

Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org

bbrisson@trustees.org
blitmans@trustees.org

Counsel for Federal Defendants-Appellees:

Erika Kranz
U.S. Department of Justice
Environment & Natural Resources Division, Appellate Section
U.S. Department of Justice
P.O. Box 23795
Washington, DC 20026-3795
202-532-3379
Erika.Kranz@usdoj.gov

Counsel for ConocoPhillips Alaska, Inc., Defendant-Intervenor-Appellees:

Ryan P. Steen (Bar No. 0912084)
Jason T. Morgan (Bar No. 1602010)
James C. Feldman (Bar No. 1702003)
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500
ryan.steen@stoel.com
jason.morgan@stoel.com
james.feldman@stoel.com

3. SILA respectfully requests an emergency injunction to halt all construction activities associated with the Willow Master Development Plan project ("Willow"), which includes the opening of a gravel mine and building of a gravel road in Arctic wetlands in an area used for subsistence and recreation. Ice

road building to facilitate construction activities is underway and gravel mine construction will begin as soon as February 12, causing irreparable harm to SILA.[1]

4. On February 2 and 3, 2021, counsel for SILA notified all counsel of record by telephone and email of SILA's intent to file a Notice of Appeal and a Motion for Injunction Pending Appeal with the District Court.

5. The notice and motion were filed in the District Court on February 2, 2021, and a ruling sought on the motion by February 4, 2021. Ex. 28, Ex. 29. On February 3, 2021, the District Court issued an order requiring a response from Defendants and Intervenor-Defendants by close of business on February 4, 2021. Ex. 30. As of the time of this filing on February 5, 2021, the District Court has not issued an order on SILA's Motion for Injunction Pending Appeal. Because activities are underway and blasting will commence on February 12th, SILA cannot wait for the District Court to issue an order on the Motion for Injunction Pending Appeal. SILA could not have filed this motion earlier due to the need to wait for a ruling on its Motion for Injunction Pending Appeal in District Court.

---

[1] On November 17, 2020, Sovereign Iñupiat for a Living Arctic filed suit against the Bureau of Land Management (BLM), U.S. Fish and Wildlife Service and the Department of interior, and agency officials. SILA moved for a preliminary injunction on December 23, 2021. On February 1, 2021, the District Court denied the motion. *See* Ex. 27.

6. SILA is compelled to seek emergency relief in this case. If allowed to proceed, construction of a gravel mine and gravel road will irreparably harm fragile Arctic tundra, permanently alter wetlands, displace subsistence and recreational uses, and harm threatened polar bears. All grounds advanced in support of this motion were submitted to the District Court.

7. According to declarations filed in District Court, ConocoPhillips began ice road construction on February 2, 2021, will break ground at the Willow mine site on February 12, and begin gravel hauling and road construction on March 12, 2021. Ex. 24 at 8. On February 3, 2021, counsel for ConocoPhillips confirmed that this construction schedule is substantially unchanged and that ConocoPhillips did not intend to delay commencement of winter construction pending this appeal.

8. On February 2, 2021, counsel for SILA notified the Ninth Circuit Court staff via voicemail and email of SILA's intent to file an emergency motion seeking an injunction pending appeal in this Court should the District Court deny the motion for an injunction. That same day, counsel for SILA also notified counsel for all defendants of their intent to file this emergency motion should the District Court deny the motion or not act in the requested time period. Federal

Defendants indicted that they would file a response to the emergency motion. Counsel for Defendant-Intervenor-Appellees indicated via email on February 4, 2021, that their client opposes SILA's motion.

9. Counsel for SILA served all counsel of record a complete copy of this motion and exhibits via ECF or email today.

I declare under penalty of perjury that the foregoing is true.

Dated: February 5, 2021

*s/ Bridget Psarianos*
Bridget Psarianos
Attorney for Plaintiffs-Appellants

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants Sovereign Iñupiat for a Living Arctic, Alaska Wilderness League, Defenders of Wildlife, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society state that they have no parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States and that no publicly held corporation owns 10% or more of their stocks because they have never issued any stock or other security.

TABLE OF CONTENTS

CIRCUIT RULE 27-3 CERTIFICATION ............................................................ I
CORPORATE DISCLOSURE STATEMENT ................................................ VI
TABLE OF CONTENTS......................................................................... VII
TABLE OF AUTHORITIES ...................................................................... viii
TABLE OF EXHIBITS ...........................................................................XIII
INTRODUCTION ......................................................................................1
BACKGROUND .........................................................................................1
LEGAL STANDARDS ...............................................................................5
ARGUMENT ...............................................................................................6

I. WINTER CONSTRUCTION WILL CAUSE IRREPARABLE HARM. ............... 6
II. SILA IS LIKELY TO SUCCEED ON THE MERITS. .................................. 11
A. SILA Is Likely to Succeed on the Merits of Its NEPA Claims... 11
1. *The District Court erred in concluding SILA's NEPA claims are time barred. ..................................................................11*
2. *BLM failed to take a hard look at Willow and its impacts......15*
B. FWS Unlawfully Relied on Uncertain, Unspecific Mitigation Measures. ......................................................................... 18
III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR AN INJUNCTION.......................................................................... 21
IV. NO BOND SHOULD BE REQUIRED. ...................................................... 24

CONCLUSION..........................................................................................24
CERTIFICATE OF COMPLIANCE.........................................................24

# TABLE OF AUTHORITIES

PAGE(S)

FEDERAL CASES

*Alliance For The Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......................................... 6, 9, 23, 24

*Amoco Production Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) .......................................... 7, 22

*Blue Mountains Biodiversity Project v. Blackwood*,
161 F.3d 1208 (9th Cir. 1998) .......................................... 15

*Cal. Ex Rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
766 F.2d 1319 (9th Cir. 1985) .......................................... 24

*California v. Block*,
690 F.2d 753 (9th Cir. 1982) .......................................... 16

*Coal. for Clean Air v. S. Cal. Edison Co.*,
971 F.2d 219 (9th Cir. 1992) .......................................... 16

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) .......................................... 9

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) .......................................... 19, 20, 21

*Ctr. for Biological Diversity v. Salazar*,
804 F. Supp. 2d 987 (D. Ariz. 2011) .......................................... 19

*Estate of Bell v. Comm'r*,
928 F.2d 901 (9th Cir. 1991) .......................................... 13

*Feldman v. Ariz. Sec’y Of State’s Office*,
843 F.3d 366 (9th Cir. 2016) .......... 5

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
528 U.S. 167 (2000) .......... 8

*Friends of the Wild Swan v. Weber*,
767 F.3d 936 (9th Cir. 2014) .......... 6

*Great Basin Res. Watch v. BLM*,
844 F.3d 1095 (9th Cir. 2016) .......... 17

*Hunt v. Washington State Apple Advert. Comm’n*,
432 U.S. 333 (1977) .......... 8

*Lands Council v. Mcnair*,
537 F.3d 981 (9th Cir. 2008) .......... 6, 10, 24

*League of Wilderness Defs./Blue Mountain Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) .......... 23

*Marble Mountain Audubon Soc’y v. Rice*,
914 F.2d 179 (9th Cir. 1990) .......... 11

*Moapa Band of Paiute Indians v. U.S. Dep’t of Interior*,
747 F.2d 563 (9th Cir. 1984) .......... 11

*N. Alaska Envtl. Ctr. v. Hodel*,
803 F.2d 466 (9th Cir. 1986) .......... 23

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
668 F.3d 1067 (9th Cir. 2011) .......... 16, 18

*Nat’l Parks Conservation Ass’n v. Babbitt*,
241 F.3d 722 (9th Cir. 2001) .......... 23

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*,
23 F.3d 1508 (9th Cir. 1994) .......................................................................... 22

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018) ............................................................................ 9

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
137 F.3d 1372 (9th Cir. 1998) .......................................................................... 17

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................................ 21

*Or. Nat. Res. Council v. Goodman*,
505 F.3d 884 (9th Cir. 2007) ............................................................................ 23

*Or. Nat. Res. Council, Inc. v. Kantor*,
99 F.3d 334 (9th Cir. 1996) .............................................................................. 13

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ........................................................................................ 17

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
588 F.3d 718 (9th Cir. 2009) ......................................................................... 8, 24

*Save Our Sonoran, Inc. v. Flowers*,
408 F.3d 1113 (9th Cir. 2005) .......................................................................... 22

*Sierra Club v. Bosworth*,
510 F.3d 1016 (9th Cir. 2007) .......................................................................... 24

*Slaven v. BP America*,
973 F.2d 1468 (9th Cir. 1992) ............................................................................ 6

*United States v. Bonilla-Montenegro*,
331 F.3d 1047 (9th Cir. 2003) .......................................................................... 15

*United States v. Trident Seafoods Corp.*,
92 F.3d 855 (9th Cir. 1996) ........ 15

*United States v. Akers*,
785 F.2d 814 (9th Cir. 1986) ........ 7

*Winter v. Nat. Res. Defense Council*,
555 U.S. 7 (2008) ........ 6, 8

FEDERAL STATUTES

16 U.S.C. § 1536(a)(2) ........ 19

16 U.S.C. § 3113 ........ 8

42 U.S.C. § 6506a ........ 13

42 U.S.C. § 6506a(n)(1) ........ 12

42 U.S.C. §§ 6504(a), 6505(b)(1), 6506a(n)(2) ........ 13

PUBLIC LAWS

Pub. L. 94-258, § 104 (1976) ........ 13

Pub. L. 96-514 (1980) ........ 14

Pub. L. 109-58 § 347 (2005) ........ 14

FEDERAL REGULATIONS

40 C.F.R. § 1502.1 ........ 15

50 C.F.R. § 402.14(g)(8) ........ 20

FEDERAL REGISTER

73 Fed. Reg. 28,212 (May 15, 2008) .................................................................. 2

75 Fed. Reg. 76,086 (Dec. 7, 2010) ..................................................................... 2

84 Fed. Reg. 44,976 (Aug. 27, 2019)................................................................... 20

FEDERAL RULES OF APPELLATE PROCEDURE

Federal Rule of Appellate Procedure 8(a)(2)(E)................................................ 24

Federal Rule of Appellate Procedure 26.1 .......................................................... vi

Federal Rule of Appellate Procedure 32(a)(5) and (6) ...................................... 26

Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(F) ........................... 26

OTHER

Webster's New Collegiate Dictionary ............................................................... 12

# TABLE OF EXHIBITS

| Exhibit | Dist. Ct. AR/Doc. # | Date | Description |
|---|---|---|---|
| 1 | BLM AR 180222, BLM AR 182031, BLM AR 182061, BLM AR 182386 BLM AR 182398–99, BLM AR 182410–15, BLM AR 182449, BLM AR 182483–85, BLM AR 182493, BLM AR 182501–02, BLM AR182582, BLM AR 182586, BLM AR 182625, BLM AR 182916, BLM AR 183932, | Aug. 2020 | Excerpts of Bureau of Land Mgmt., Final Environmental Impact Statement for the Willow Master Development Plan (Aug. 2020) [Final EIS], Vols. 1, 4, 7. |

| | | | |
|---|---|---|---|
| | BLM AR 182935–40, BLM AR 182994–99, BLM AR 183035, BLM AR 183130, BLM AR 183226, BLM AR 185782–83 | | |
| 2 | BLM AR 186056–57, BLM AR 186081–82 | Oct. 2020 | Excerpts of U.S. Department of the Interior, Bureau of Land Management, Willow Master Development Plan Record of Decision (Oct. 2020) [ROD]. |
| 3 | BLM AR 167931–32, BLM AR 167936–37, BLM AR 167939–40 | Aug. 2019 | Excerpts of Bureau of Land Mgmt., Draft Environmental Impact Statement for the Willow Master Development Plan (Aug. 2019) [Draft EIS]. |
| 4 | BLM AR 178263, BLM AR178271, BLM AR 178275–77 | Mar. 2020 | Excerpts of Bureau of Land Mgmt., Supplemental Draft Environmental Impact Statement for the Willow Master Development Plan (Mar. 2020) [Supplemental Draft EIS]. |
| 5 | BLM AR 268946, | Nov. 2012 | Excerpts of Bureau of Land Mgmt., National Petroleum Reserve-Alaska |

| | | | |
|---|---|---|---|
| | BLM AR 269120, BLM AR 269146, BLM AR 269153, BLM AR 269163, BLM AR 269366–69 | | Integrated Activity Plan Final Environmental Impact Statement (Nov. 2012). |
| 6 | BLM AR 179233–52 | Feb. 2020 | Excerpt of Smith TS, Amstrup SC, Kirschhoffer BJ, York G (2020) Efficacy of aerial forward-looking infrared surveys for detecting polar bear maternal dens. PLoS ONE 15(2): e0222744. |
| 7 | FWS AR 635, FWS AR 678–79, FWS AR 719–720, FWS AR 726, FWS AR 748–51, FWS AR 764–66, FWS AR 797 | Oct. 19, 2020 | Excerpts of U.S. Fish and Wildlife Service, Biological Opinion for Willow Master Development Plan (Oct. 2020) [BiOp]. |
| 8 | FWS AR 14223, FWS AR 14225 | N/A | Excerpts of 298 scientific studies and other documents cited in the Final Biological Opinion |
| 9 | EX 31 [17-48] | Dec. 2020 | U.S. Army Corps of Engineers, Alaska District, Department of the Army Permit, Permit No: POA-2018-00190, Harrison Bay (Dec. 2020). |

| | | | |
|---|---|---|---|
| 10 | Ex. 27 | Mar. 26, 2020 | Public Notice of Application for Permit |
| 11 | Ex. 28 | Dec. 2020 | Bureau of Land Mgmt., Willow DNA Proposed Action (Dec. 2020). Available at: https://eplanning.blm.gov/eplanning-ui/project/2003923/510. |
| 12 | Doc. 40-4 | Jan. 20, 2021 | BLM Right-of-Way Grant to ConocoPhillips, Alaska, Inc. |
| 13 | Doc. 17-4 | Dec. 23, 2020 | Declaration of Rosemary Ahtuangaruak in Support of Plaintiffs' Motion for Preliminary Injunction |
| 14 | Doc. 17-5 | Dec. 23, 2020 | Declaration of Lisa Baraff in Support of Plaintiffs' Motion for Preliminary Injunction |
| 15 | Doc. 17-6 | Dec. 23, 2020 | Declaration of Jeff Fair in Support of Plaintiffs' Motion for Preliminary Injunction |
| 16 | Doc. 17-7 | Dec. 23, 2020 | Declaration of Aaron Isherwood in Support of Plaintiffs' Motion for Preliminary Injunction |
| 17 | Doc. 17-8 | Dec. 23, 2020 | Declaration of Adam Kolton in Support of Plaintiffs' Motion for Preliminary Injunction |
| 18 | Doc. 17-10 | Dec. 23, 2020 | Declaration of Sam Kunaknana in Support of Plaintiffs' Motion for Preliminary Injunction |
| 19 | Doc. 17-11 | Dec. 23, 2020 | Declaration of Siqiñiq Maupin in Support of Plaintiffs' Motion for Preliminary Injunction |
| 20 | Doc. 17-12 | Dec. 23, 2020 | Declaration of Dan Ritzman in Support of Plaintiffs' Motion for Preliminary Injunction |
| 21 | Doc. 17-13 | Dec. 23, 2020 | Declaration of Michael Wald in Support of Plaintiffs' Motion for Preliminary Injunction |

| | | | |
|---|---|---|---|
| 22 | Doc. 17-14 | Dec. 23, 2020 | Declaration of Nicole Whittington-Evans in Support of Plaintiffs' Motion for Preliminary Injunction |
| 23 | Doc. 17-15 | Dec. 23, 2020 | Declaration of M. Siobhan Fennessy, Ph.D., in Support of Plaintiffs' Motion for Preliminary Injunction |
| 24 | Doc. 27-4 | Jan. 15, 2021 | Declaration of J. Brodie |
| 25 | Doc. 40-6 | Jan. 21, 2021 | Declaration of Suzanne Bostrom, with Exhibits |
| 26 | Doc. 40-5 | Jan. 10, 2021 | Nelson, Kristen. "ConocoPhillips Has Funded FEED at Its Willow NPR-A Development." Petroleum News. January 10, 2021. |
| 27 | Doc. 44 | Feb. 1, 2021 | Order Denying Motion for Preliminary Injunction |
| 28 | Doc. 45 | Feb. 2, 2021 | Plaintiffs' Notice of Appeal |
| 29 | Doc. 46 | Feb. 2, 2021 | Plaintiffs' Motion for Injunction Pending Appeal |
| 30 | Doc. 48 | Feb. 3, 2021 | District Court Order for Briefing Motion for Stay |

## INTRODUCTION

Injunctive relief is necessary to avoid imminent, irreparable destruction of Arctic wetlands and tundra, and harms to wildlife and people, caused by ConocoPhillips Alaska, Inc.'s (ConocoPhillips) construction of the Willow oil and gas development project. Construction is underway. The Bureau of Land Management (BLM) adopted its environmental impact statement (EIS) and approved the Willow Master Development Plan (Willow) despite a lack of baseline data and information about Willow, in violation of the National Environmental Policy Act (NEPA). The U.S. Fish and Wildlife Service (FWS) issued a flawed Biological Opinion (BiOp) in support of the decision that violates the Endangered Species Act (ESA).

## BACKGROUND

At approximately 22.8 million acres, the National Petroleum Reserve–Alaska (Reserve) is the nation's largest single public land unit. Stretching across the Western Arctic, it provides rich habitat for wildlife, including two caribou herds that are important subsistence resources. It is a mosaic of tundra wetlands, "covered with lakes, ponds, and generally slow-moving streams." AR269146, AR269120 (Ex. 5). The Ublutuoch River and Fish Creek, which will be impacted by Willow, are significant coastal rivers and are important for wildlife and subsistence use. AR269120, AR269163 (Ex. 5). The Reserve's unique landscapes

and wildlife also provide opportunities for recreation, including floating its rivers, observing caribou migrations, and birding, and for scientific study. BLM AR269366–69 (Ex. 5); Ex. 15 at 5–7, 8, 12; Ex. 20 at 8–11; Ex. 21 at 4–6, 191. These rivers, lakes, wetlands, and floodplains provide many essential ecosystems functions. AR269146 (Ex. 5). Because of their importance BLM established "setbacks" prohibiting permanent oil and gas facilities and certain activities along many waterbodies. AR268946 (Ex. 5). Much of Willow's infrastructure encroaches on these setbacks. AR182586 (Ex. 1).

The Reserve also provides denning habitat for polar bears, which are a threatened species under the ESA and protected by the Marine Mammal Protection Act (MMPA). 73 Fed. Reg. 28212 (May 15, 2008); 75 Fed. Reg. 76086 (Dec. 7, 2010). The Southern Beaufort Sea (SBS) polar bear stock occurs in the area of Willow's activities and is its population is rapidly declining. AR000719–20 (Ex. 7). Climate change has reduced polar bear populations to a precarious state, which is worsening. 75 Fed. Reg. 76086. Industrial activities, especially aircraft and vehicle traffic, disturb polar bears. AR000749–50 (Ex. 7). Disturbance of maternal dens can cause premature den abandonment, adversely affecting cub survival. AR000749 (Ex. 7).

BLM began the NEPA process for Willow in 2018, releasing a draft EIS in

August 2019 and a supplemental draft EIS in March 2020. AR178263 (Ex. 4). As shown below, Willow is an extensive oil and gas production facility. Its infrastructure would cause direct, permanent loss of hundreds of acres of wetlands from fill and excavation, with thousands of acres of impacts extending well beyond the development footprint. Ex. 23 at 4–5, 12–13, 15. It includes a spiderweb of new gravel roads connecting to existing development to the east, a new oil and gas processing facility, up to five "satellite" drill pads with up to seventy wells each, an airstrip, 300+ miles of pipelines, and numerous waterway crossings. AR182410–82415 (Ex. 1). It also includes two gravel mine sites within the Ublutuoch River setback. AR 182413 (Ex. 1).



AR182386 (Ex. 1).

ConocoPhillips was required to obtain a permit under the Clean Water Act (CWA) Section 404 from the U.S. Army Corps of Engineers (Corps) to fill wetlands. The Corps was a cooperating agency on the EIS, which purported to fulfill the Corps' NEPA obligations. AR 167931–32 (Ex. 3). However, ConocoPhillips did not submit its CWA permit application until after the completion of the draft EIS. (Ex. 10).

In comments, SILA questioned what BLM and the Corps were permitting because ConocoPhillips had not applied for any permits and BLM lacked key project information. AR182994–999, AR183035 (Ex. 1). SILA raised concerns with the inadequate baseline and project design information, impacts analysis, and mitigation measures. AR182916, AR 182935–40, AR182994–999, AR183035 (Ex. 1).

In March 2020, the Corps noticed the CWA permit. Ex. 9 at 1. Four days later, BLM issued the supplemental draft EIS. AR178275–77 (Ex. 4). The supplemental draft EIS was limited in its scope, considering only three project changes; it did not evaluate the CWA permit nor the full set of project changes ConocoPhillips had made since the draft EIS. AR178263, AR178271 (Ex. 4). Like the draft EIS, the supplement did not adequately analyze impacts and mitigation or

address prior deficiencies. The final EIS contained the same flaws.

In October, BLM adopted its Record of Decision (ROD), approving ConocoPhillips' proposed action. AR186056–57 (Ex. 2). The ROD stated that it "complete[d] the required [final] EIS process and NEPA requirements for the subsequent issuance of BLM approvals, grants, and other authorizations necessary for development of all aspects of the Willow [project]." *Id.* Yet, BLM issued its ROD before ConocoPhillips had applied for key permits authorized by its decision. Ex. 11 at 1–2, 5.

Following consultation under the ESA, FWS issued a BiOp on Willow's effects to polar bears and their critical habitat. AR000635 (Ex. 7). FWS estimated Willow might seriously injure or kill two or more polar bear cubs over the project's life. AR000749 (Ex. 7). Nonetheless, FWS determined that Willow was not likely to jeopardize polar bears or destroy or adversely modify critical habitat. AR000764–66 (Ex. 7). FWS based these findings largely on its assumption that future MMPA permitting would mitigate impacts. *Id.*

## LEGAL STANDARDS

The standard for an injunction pending appeal is the same as a preliminary injunction. *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 367 (9th Cir. 2016) (en banc). Plaintiffs must establish: (1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; (3) that the balance of

equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Defense Council* (*Winter*), 555 U.S. 7, 20 (2008). Plaintiffs can obtain an injunction by showing "serious questions going to the merits … and the balance of hardships tips sharply in [their] favor" provided the other factors are met. *Alliance for the Wild Rockies v. Cottrell* (*Alliance*), 632 F.3d 1127, 1131 (9th Cir. 2011). The showing for serious questions is a lower bar than demonstrating likely success on the merits. *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014).

The District Court's denial of injunctive relief is reviewed for abuse of discretion. *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc), *overruled in part on other grounds by Winter*, 555 U.S. 7. The "district court abuses its discretion … if it bases its decision on an erroneous legal standard or clearly erroneous findings of fact." *Id.* (internal citations omitted). Conclusions of law, including questions of statutory construction, are reviewed "de novo." *Id*; *Slaven v. BP America*, 973 F.2d 1468, 1470 (9th Cir. 1992).

## ARGUMENT

### I. WINTER CONSTRUCTION WILL CAUSE IRREPARABLE HARM.

The District Court did not analyze Willow's irreparable harm to wetlands. Ex. 27 at 22. ConocoPhillips will imminently begin building a gravel road and convert an undisturbed 9-acre area of tundra to a gravel mine. Ex. 24 at 4–8. It is

undisputed that this winter's gravel mining and road construction will permanently alter wetlands and aquatic resources. Heavy equipment and blasting with dynamite would remove tundra and excavate soil from the 9-acre area, and the pit would be surrounded by an earthen berm. *Id.* at 5–6. ConocoPhillips also plans to build 2.8 miles of the road using heavy equipment, resulting in the fill and permanent alteration of those wetlands. *Id.* at 7–8. These activities will occur in characteristic denning habitat for polar bears. AR000726 (Ex. 7).

BLM's EIS acknowledged that gravel mining and gravel roads will "permanently remove or alter wetlands and wetland function." AR182501–02, AR182449, AR182483 (Ex. 1). As Dr. Siobhan Fennessy explains, Willow's road construction and gravel mining would irreparably harm wetlands, streams and rivers, and floodplains, and the diversity of functions and species they support. Ex. 23 at 4–15; *United States v Akers*, 785 F.2d 814 (9th Cir. 1986) (affirming preliminary injunction for wetland alteration). Once these harms occur this winter, they will be permanent; the areas will not be restored to their original condition and any restoration efforts would take decades, harming plaintiffs' interests. AR182493 (Ex. 1); Ex. 23 at 8–10; Ex. 21 at 5–7; Ex. 22 at 10-12. These harms, which are "permanent or of long duration," are irreparable. *Amoco Production Co. v. Vill. of Gambell (Amoco)*, 480 U.S. 531, 545 (1987), *abrogated in part on other*

*grounds by Winter*, 555 U.S at 20; *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) ("The likelihood of irreparable environmental injury without adequate study of the adverse effects and possible mitigation is high.").

These construction activities will cause substantial and permanent changes to the environment, which will harm SILA's members' and supporters' interests, including those who reside in the community of Nuiqsut.[2] The construction work will permanently alter important subsistence use areas that are currently undeveloped.[3] *See, e.g.*, AR182031, AR185782–83 (Ex. 1). SILA's members would be displaced from using these areas for hunting, fishing, and other activities important to their way of life, permanently harming those uses and interests. Ex. 18 at 3–7, 8 (describing subsistence impacts from winter exploration and construction); Ex. 13 at 4–7, 11–12 (noting construction causes "physical barriers" and displacement from subsistence use areas); *see also* AR180222 (Ex. 1)

---

[2] Because of the harms from BLM and FWS's actions, SILA has standing. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000) (standing test); *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 341–45 (1977) (same).

[3] Subsistence use refers to customary and traditional uses by rural Alaska residents of wild, renewable resources for a range of purposes, including food, shelter, fuel, clothing, tools, transportation, and in support of culturally significant practices, such as customary trade and sharing. 16 U.S.C. § 3113.

cont…

(describing displacement). BLM acknowledged the seriousness of these impacts in its EIS. *See* AR182061, AR185782 (Ex. 1) (stating Willow would "constitute a substantial restriction on subsistence access," "result in an extensive interference with Nuiqsut hunter access," and have sociocultural effects).[4] The actual and irreparable injuries from construction, which will harm the interests of SILA's members, warrant injunctive relief. *Alliance*, 632 F.3d at 1135.

The District Court abused its discretion by concluding that the project would not harm polar bears. Ex. 27 at 27. Showing irreparable harm under the ESA "should not be an onerous task." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015). SILA demonstrated a "definitive threat of future harm to protected species," as required for an injunction under ESA. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018). FWS found Willow could affect polar bears by "causing premature den or den site abandonment after cubs are born, which could cause the immediate death of cubs or reduced probability of survival over time," among other impacts. AR000748

---

[4] *See also* AR185783 (Ex. 1) (recognizing oil development has displaced Nuiqsut hunters, "subsistence use areas have shifted away from developed areas," and Willow would displace Nuiqsut's subsistence uses); AR182031 (Ex. 1) (noting "gravel mine site could be particularly disruptive to both caribou and hunters … [and] is directly west of Nuiqsut in an area commonly reached by hunters"; "hunters do harvest caribou in the area in winter and the presence of the mine could deflect caribou movement year-round").

(Ex. 7). FWS's recent study also recognized that lethal impacts to one polar bear from oil and gas would have more than a negligible population-level impact. FWS AR014225 (Ex. 6).

SILA identified numerous flaws in the BiOp that underestimate the likelihood of harm to polar bears, including that FWS's model overestimated the efficacy of den-detection technology. Ex. 27 at 25; *see also* AR179239 (Ex. 6) (study explaining den-detection technology only detects 45% of dens). The District Court assumed FWS's modeling accounted for the fact that such technology — relied on to avoid impacts to denning bears in advance of activities[5] — only detects 45% of dens. Ex. 27 at 25. But FWS's model assumed a 74% detection rate. AR014223 (Ex. 8). Even under FWS's incorrect den-detection rate, the agency estimated that Willow may seriously injure or kill a mean of 2.2 cubs over the life of the project. AR000797 (Ex. 7). By overestimating the percentage of dens that would be detected, FWS significantly underestimated the probability that undetected denning polar bears would suffer disturbance. The District Court's factual findings are clearly erroneous. *Lands Council*, 537 F.3d at 986.

ConocoPhillips' winter activities are likely to encounter polar bears because they will occur within designated critical habitat, as well as areas FWS identified

[5] Once dens are detected, FWS required a one-mile buffer to avoid disturbing denning bears. AR000748 (Ex. 7).

as characteristic denning habitat. Ex. 27 at 26; AR000726 (Ex. 7) (map of Willow with polar bear critical habitat and characteristic denning habitat adjacent to mine).

In sum, SILA has demonstrated a definitive threat of harm to polar bears, in addition to harms to wetlands and aquatic resources, and shown that this harms their members and supporters. Ex. 14 at 11, 13–15; Ex. 15 at 7–8; Ex. 16 at 7, 11; Ex. 25 at 21–24; Ex. 20 at 13–15; Ex. 22 at 10–13.

## II. SILA IS LIKELY TO SUCCEED ON THE MERITS.

The District Court abused its discretion in finding that SILA is not likely to succeed on the merits. The court erred in concluding that SILA's NEPA claims are likely time barred. Ex. 27 at 22. SILA is also likely to succeed on the merits of its NEPA and ESA claims, which the District Court did not reach. *Id.* at 27. At a minimum, SILA has raised "serious questions" on these claims.

### A. SILA Is Likely to Succeed on the Merits of Its NEPA Claims.

#### *1. The District Court erred in concluding SILA's NEPA claims are time barred.*

SILA's NEPA claims are not time barred. There is "a strong presumption in favor of judicial review of administrative actions." *Marble Mountain Audubon Soc'y v. Rice*, 914 F.2d 179, 181 (9th Cir. 1990). "[P]rohibitions against judicial review are … narrowly construed." *Id.* Such prohibitions "will not be found absent a clear command of the statute." *Moapa Band of Paiute Indians v. U.S. Dep't of*

*Interior*, 747 F.2d 563, 565 (9th Cir. 1984). There is no “clear command” here. The District Court concluded the statute of limitations in the Naval Petroleum Reserves Production Act (NPRPA) was ambiguous, but nevertheless held SILA’s claims were likely time barred. Ex. 27 at 17, 22. That is contrary to this Court’s strong presumption in favor of judicial review of administrative decisions.

The NPRPA statute of limitations does not apply. That provision requires any action challenging “the adequacy of any program or site-specific environmental impact statement … concerning oil and gas leasing” to be brought within 60 days after the notice of availability of such statement in the Federal Register. 42 U.S.C. § 6506a(n)(1). The plain language of that provision reflects Congress only intended the time bar to apply to leasing EISs — i.e., those analyzing the impacts of lease sales. The word “concerning,” which is defined as “relating to” or “regarding,” does not alter the scope of the provision because it still requires that any challenge relate to leasing. WEBSTER’S NEW COLLEGIATE DICTIONARY 231 (1981). Willow is a decision to approve development and production, not a leasing decision. The reference to programmatic and site-specific EISs also does not expand the scope of the provision since there can be both programmatic and site-specific leasing EISs. *See, e.g., Alaska v. Andrus,* 580 F.2d 465 (1978), *vacated in part by W. Oil & Gas Ass’n v. Alaska,* 439 U.S. 922 (1978).

The NPRPA reinforces that Congress viewed leasing as distinct from exploration and production. The statute of limitations is in a section titled "Competitive leasing of oil and gas" focusing on BLM's implementation of the Reserve's leasing program. 42 U.S.C. § 6506a. Congress expressly refers to the different oil and gas stages throughout the NPRPA, differentiating between leasing, exploration, development, and production. *See, e.g.*, 42 U.S.C. §§ 6504(a), 6505(b)(1), 6506a(n)(2). Congress is "presumed to act intentionally and purposely when it includes language in one section but omits it in another." *Or. Nat. Res. Council, Inc. v. Kantor*, 99 F.3d 334, 339 (9th Cir. 1996) (quoting *Estate of Bell v. Comm'r*, 928 F.2d 901, 904 (9th Cir. 1991)). Had Congress intended to encompass other stages in the statute of limitations, it could have expressly referred to those stages, as it did elsewhere. This context demonstrates Congress did not intend to foreclose judicial review of development decisions like Willow. At a minimum, the language does not provide the "clear command" required to overcome the presumption in favor of judicial review of administrative decisions.

The legislative history further supports this interpretation. When Congress adopted the NPRPA in 1978, it included a general prohibition on production and development and did not authorize a leasing program but did provide for a government-led exploration program. Pub. L. 94-258, § 104 (1976) (stating,

subject to a limited exception, "production of petroleum from the reserve is prohibited and no development leading to production of petroleum from the reserve shall be undertaken until authorized by an Act of Congress"). Congress opened the Reserve to leasing in 1980. Pub. L. 96-514 (1980). The legislative history from 1980 indicates Congress was focused on quickly shifting the government-led and financed exploration program to a private sector exploration and leasing program. S. REP. NO. 96-985, at 33–34 (1980); H.R. REP. NO. 96-1147, at 32–33 (1980). Congress included an accelerated timeline for a lease sale to occur within 20 months and simultaneously adopted the statute of limitations. Pub. L. 96-514 (1980). This indicates Congress was focused on accelerating the timeframe around leasing and exploration. There is no indication Congress mistakenly omitted "development" from those provisions. Rather, the bill reinforced that Congress distinguished between the various oil and gas stages, such as leasing, exploration, and production. *Id.* (referring to "any exploration or production" needing to comply with protective provisions). Had Congress intended the statute of limitations to apply to development and production decisions, it could have specified that in the statute, but it did not. Additionally, Congress did not rescind the general prohibition on production and development until 2005. Energy Policy Act of 2005, Pub. L. 109-58 § 347 (2005). The District Court's reading of

the statute and legislative history would render this prohibition on development and production, which Congress maintained in 1980, superfluous. *United States v. Bonilla-Montenegro*, 331 F.3d 1047, 1051 (9th Cir. 2003) (courts avoid "statutory construction that would render another part of the same statute superfluous"); *United States v. Trident Seafoods Corp.*, 92 F.3d 855, 862 (9th Cir. 1996) ("Congress must be presumed to have known of its former legislation and to have passed new laws in view of the provisions of the legislation already enacted."). The District Court's reliance on the statements of individual legislators to override the plain language of the statute is misplaced, as the "statements of individual legislators are entitled to little, if any, weight." *Coal. for Clean Air v. S. Cal. Edison Co.*, 971 F.2d 219, 227 (9th Cir. 1992).

Overall, the plain language, context, and legislative history show Congress did not intend the statute of limitations to apply to non-leasing decisions like Willow; there is no clear command sufficient to overcome the presumption in favor of judicial review.

*2. BLM failed to take a hard look at Willow and its impacts.*

Under NEPA, an agency must take a "hard look" at the direct, indirect, and cumulative impacts of a proposed action. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). This "hard look" requires a "full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1.

NEPA also requires agencies evaluate the site-specific impacts of an action prior to making an irretrievable commitment of resources. *California v. Block*, 690 F.2d 753, 761, 763 (9th Cir. 1982). An agency cannot take a hard look at impacts without site-specific information about the project and project area. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1084–85 (9th Cir. 2011).

BLM lacked critical project design and baseline information necessary to take a hard look at Willow's impacts. For aquatic impacts, the draft and final EIS did not adequately describe how major project elements, including seven major bridges and 200+ culverts, would be constructed or provide specific design information. AR182399 (Ex. 1); AR167939 (Ex. 3) (noting bridges would range from 40–500 feet). The handful of mitigation measures adopted for Willow further demonstrate that design work for key elements, including gathering baseline information for crossings, had not occurred — meaning BLM could not analyze the impacts of these components. AR186081–82 (Ex. 2). BLM stated it would require "annual surveillance" of such crossings "due to the lack of a basis of design for structures proposed." AR182932 (Ex. 1). But a promise to conduct future monitoring, after project approval, is inadequate under NEPA. *N. Plains Res. Council*, 668 F.3d at 1085. The Environmental Protection Agency pointed out BLM severely lacked site-specific information necessary to analyze impacts to

aquatic resources. AR183130 (Ex. 1); *see also* Ex. 23 at 5–6 (citing inconsistencies and gaps in data crucial for analysis). Brushing aside this lack of information, BLM stated that the public would have an opportunity to comment on the impacts to hydrological resources during the Corps' permitting process. AR183035 (Ex. 1). This fails to satisfy BLM's NEPA obligations and ignores that this EIS also covered the Corps' NEPA obligations and there would be no additional public comment period. *See Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1102–04 (9th Cir. 2016); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1378–80 (9th Cir. 1998).

The EIS also contained little to no information on the length or location of the proposed roads, the amount of gravel needed for each road, or the site-specific impacts from infrastructure placement. AR167936, AR167939 (Ex. 3); AR182411 (Ex. 1). The EIS only provided a wide range of the number of wells per pad, ignoring that the number of wells informs the size, infrastructure needs, and impacts of each pad. AR167937 (Ex. 3); AR182398 (Ex. 1) (estimating "40 to 70" wells per pad). Summarizing Willow's total infrastructure is not the same as analyzing the impacts. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Great Basin Res. Watch*, 844 F.3d at 1102–05. BLM stated it might do additional NEPA analysis later, after project specifics were established.

AR182995 (Ex. 3). But NEPA requires agencies ensure adequate data and project information exist to fully analyze the impacts before approving a project — not after. *N. Plains Res. Council*, 668 F.3d at 1085.

The supplemental draft EIS — prepared in response to ConocoPhillips' project changes — did not save BLM's deficient analysis. ConocoPhillips continued to make project changes throughout the NEPA process. AR178263 (Ex. 4) (listing project changes not analyzed in supplemental draft EIS). The supplemental draft EIS did not analyze many project changes and still lacked requisite baseline data regarding resources, including hydrology and wetlands. The final EIS suffered from the same flaws.

BLM must base its analysis on actual project information — not hypothetical, rough estimates of infrastructure or generalized descriptions of components — to take an adequate hard look. *N. Plains Res. Council,* 668 F.3d at 1085. Lacking this critical information, BLM could not and did not take a hard look at Willow's site-specific direct, indirect, and cumulative impacts. Despite this, BLM approved Willow. AR186056–57 (Ex. 2). BLM's approval of Willow without taking a hard look at its impacts violates NEPA.

### B. FWS Unlawfully Relied on Uncertain, Unspecific Mitigation Measures.

The ESA requires that a federal agency consult with FWS to ensure that its

action is not likely to jeopardize threatened or endangered species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2). FWS may rely on mitigation measures to reach a no-jeopardy or no-adverse-modification conclusion only where such measures are reasonably specific and certain to occur. *Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 1001 (D. Ariz. 2011) (internal citations omitted). This Court's recent holding in *Center for Biological Diversity v. Bernhardt* (*CBD*) controls this case under its facts and law: vague statements relying on future MMPA compliance are insufficient to support no-jeopardy and no-adverse-modification determinations. 982 F.3d 723, 743 (9th Cir. 2020).

FWS's BiOp acknowledges that Willow has the potential to harm polar bears. *Supra* 9–11. FWS nonetheless relied on unspecified, future permitting processes under the MMPA to make its ESA no-jeopardy and no-adverse-modification determinations. For example, FWS states past MMPA permitting for oil and gas activities ensured impacts to marine mammals have been negligible, and BLM's commitment to ensuring MMPA compliance for Willow is the "[m]ost important" factor limiting impacts to bears. AR000750–51 (Ex. 7); *see also* AR000723–24 (Ex. 7) (explaining MMPA's program for managing bear deterrence "reduces the need for lethal take"), AR000764 (Ex.7) (no-jeopardy determination

concludes Willow "contains protective measures that provide significant minimization of impacts to polar bears, most importantly BLM's commitment to ensure compliance with the MMPA"), AR000765–66 (Ex. 7) (explaining MMPA compliance ensures against adverse modification of critical habitat). But FWS does not identify the specific MMPA measures that will be applied and enforced for Willow. *Id*. FWS briefly summarizes the kinds of MMPA mitigation measures that "would be applied on a case-by-case basis" and lists eight non-specific "examples" based on the existing Beaufort Sea Incidental Take Regulation (Beaufort ITR). AR000678–79 (Ex. 7). This is insufficient under the law. *See CBD*, 982 F.3d at 747 (explaining future mitigation measures required on "case-by-case basis," and mitigation strategy's eventual MMPA approval is insufficient under ESA).[6]

Recent regulatory revisions do not alter the ESA's requirement that agencies provide — and FWS consider —specific, detailed information about mitigation measures to ensure its determinations are based on an informed, accurate effects analysis. The revision to 50 C.F.R. § 402.14(g)(8), FWS's regulation regarding ESA consultation, states FWS need not require a "demonstration of binding plans"

[6] Willow is subject to the same general MMPA mitigation requirements from the Beaufort ITR acknowledged but unanalyzed in *CBD*. 982 F.3d at 746 (explaining BiOp included generalized list of mitigation measures from Beaufort ITR). Moreover, as in *CBD*, the future MMPA authorizations FWS relies upon here are for 5-year periods, which is inappropriate for the 30-year project. *Id.* at 746.

that mitigation measures would be implemented. *See* 84 Fed. Reg. 44,976, 45,002–03 (Aug. 27, 2019) (rejecting "recommendation to create a heightened standard of documentation" and to require "financial assurances" for implementation). FWS did not eliminate the regulatory requirement that mitigation measures considered in an action be identified with certainty and specificity. In the final rulemaking, FWS reiterated that if proposed mitigation "fails to include the level of detail necessary for [FWS] to understand the action and evaluate its effects to listed species or critical habitat, then [FWS] will be unable to take into account those effects when developing [the BiOp]." *Id*. at 45,003.

As this Court explained, future MMPA compliance "does not preclude or preempt FWS's responsibility to include the mitigation measures that it relies upon in a [BiOp] under … the ESA. The agency cannot refer to future, unstated authorizations under the MMPA to fulfill its obligations under [the ESA]." *CBD*, 982 F.3d at 745.

In sum, SILA has shown a likelihood of success or, at a minimum, raised serious questions going to the merits.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR AN INJUNCTION.

The District Court did not rule on the balance of equities or public interest factors. Ex. 27 at 22, 27. When the government is a defendant, analysis of these

two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). When environmental injury is sufficiently likely the balance of harms will usually favor an injunction. *Amoco*, 480 U.S. at 545; *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1125 (9th Cir. 2005). Under the ESA, the balance of hardships and public interest always tip heavily in favor of protecting species. *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994).

Polar bears, caribou, wildlife, and subsistence resources of the northeastern Reserve are vital resources used and enjoyed by SILA, as well as Alaskans and citizens across the United States. Ex. 13 at 3–15; Ex. 14 at 8, 11–15; Ex. 15 at 2–12, 14–15; Ex. 17 at 6–7, 10–12; Ex. 25 at 15–19, 19–20; Ex. 18 at 2–11, 13–14; Ex. 19 at 7–11; Ex. 20 at 8–16; Ex. 21 at 4–6, 9–12; Ex. 22 at 4–6, 8–14, 16–17. The wetlands and floodplains that will be mined and filled provide essential habitat for fish and wildlife, including important subsistence resources. AR182582, AR182625 (Ex. 1). Gravel mining and road construction will permanently fill wetlands and waterways, forever altering the Reserve's sensitive ecosystems. Ex. 23 at 4, 6–11, 15–16. Because of the NEPA and ESA violations, and the irreparable harms that will occur, the balance of hardships tips sharply in favor of an injunction.

Any claims of economic harm are temporary and do not overcome this

irreparable environmental injury. *Alliance*, 632 F.3d at 1138–39. ConocoPhillips admits that some expenditures for this winter's work could be transferred to a future season. Ex. 24 at 12; *see also League of Wilderness Defs./Blue Mountain Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) (considering only economic harm when preliminary injunction is in place and describing delay and moving jobs to future years as "marginal harm"). ConocoPhillips has also not yet approved development of the entire Willow project, meaning long-term economic concerns are purely speculative. Ex. 26 at 1 (explaining only initial engineering and design is funded; broader funding decisions not expected until late 2021). Such temporary and speculative future economic concerns do not overcome the immediate irreparable harms to the Reserve and SILA. *See Or. Nat. Res. Council v. Goodman*, 505 F.3d 884, 898 (9th Cir. 2007) (finding "risk of permanent ecological harm outweighs the temporary economic harm that [the permittee] may suffer"); *Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) (holding loss of revenues "does not outweigh the potential irreparable damage to the environment"); *N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 471 (9th Cir. 1986) (stating "[m]ore than pecuniary harm must be demonstrated" to avoid an injunction).

It is well established that the public interest favors "preserving nature,"

"avoiding irreparable environmental injury," and ensuring compliance with the law, including NEPA and the ESA. *Alliance*, 632 F.3d at 1138; *see also S. Fork Band Council*, 588 F.3d at 728 (ensuring NEPA compliance is in public interest); *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033–34 (9th Cir. 2007) (same and citing cases). Further, where a plaintiff is likely to succeed on the merits, as SILA is, this Court has consistently held that "the public interest in preserving nature and avoiding irreparable environmental injury outweighs economic concerns." *Lands Council*, 537 F.3d at 1005.

## IV. NO BOND SHOULD BE REQUIRED.

This Court should not require a bond under Federal Rule of Appellate Procedure 8(a)(2)(E) because doing so would have a chilling effect on public interest litigants seeking to protect the environment, like SILA. *See Cal. ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985) (no bond); *see also* Ex. 14 at 16–17; Ex. 16 at 2–5; Ex. 17 at 12; Ex. 25 at 25; Ex. 19 at 13; Ex. 22 at 17–19.

## CONCLUSION

This Court should grant SILA's motion for an immediate injunction pending a final decision on the merits of this appeal and not require a bond.

Respectfully submitted this 5th day of February, 2021.


s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Brian Litmans (AK Bar No. 0111068)
Trustees for Alaska
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org
bbrisson@trustees.org
blitmans@trustees.org

Counsel for Plaintiffs-Appellants

CERTIFICATE OF COMPLIANCE

I certify that this Emergency Motion Under Circuit Rule 27-3 contains 5,130 words, excluding the items exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f). The brief's type size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6).

Signature: *s/Bridget Psarianos* Date: February 5, 2021