Jeremy C. Lieb
EARTHSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
jlieb@earthjustice.org

Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs-Appellants Center for Biological Diversity et al.*

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; FRIENDS OF THE EARTH; and GREENPEACE, INC.,<br><br>*Plaintiffs-Appellants,*<br><br>v.<br><br>BUREAU OF LAND MANAGEMENT; UNITED STATES FISH AND WILDLIFE SERVICE; UNITED STATES DEPARTMENT OF THE INTERIOR; SCOTT DE LA VEGA, in his official capacity as Acting Secretary of the Interior; and CHAD B. PADGETT, in his official capacity as Alaska State Director of Bureau of Land Management,<br><br>*Defendants-Appellees*,<br><br>and<br><br>CONOCOPHILLIPS ALASKA, INC.,<br><br>*Intervenor-Defendant-Appellee.* | **No. 21-35095 (consolidated with No. 21-35085)**<br><br>On Appeal from the United States District Court for the District of Alaska<br><br>No. 3:20-cv-00308-SLG<br>Hon. Sharon L. Gleason |

# PLAINTIFFS-APPELLANTS' EMERGENCY MOTION PER CIRCUIT RULE 27-3 (RELIEF NECESSARY BY FEBRUARY 12, 2021)

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 16. Circuit Rule 27-3 Certificate for Emergency Motion

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form16instructions.pdf*

**9th Cir. Case Number(s)** 21-35095 (consolidated with 21-35085)

**Case Name** Center for Biological Diversity v. Bureau of Land Management

I certify the following:

The relief I request in the emergency motion that accompanies this certificate is:

Plaintiffs-Appellants request that the Court enjoin implementation of Defendants-Appellees' approval of Intervenor-Defendant-Appellee ConocoPhillips Alaska Inc.'s (ConocoPhillips) Willow Master Development Plan (Project) in the National Petroleum Reserve-Alaska, including construction activities now ongoing and planned for this winter.

Relief is needed no later than *(date)*: February 12, 2021

The following will happen if relief is not granted within the requested time:

Ice road construction began earlier this week and ConocoPhillips has stated that it will begin gravel mining for the Project on February 12, 2021. Absent an injunction, the construction activities will damage tundra, disturb wildlife, and affect hunting and other uses of the Reserve in ways that cannot be undone.

I could not have filed this motion earlier because:

The district court denied Plaintiffs-Appellants' motion for preliminary injunction on February 1, 2021 (CR 43). Plaintiffs' filed a motion for injunction pending appeal in the district court on February 3, 2021, CR 44, which the district court has not yet decided.

I requested this relief in the district court or other lower court: ◉ Yes ○ No

If not, why not:

I notified 9th Circuit court staff via voicemail or email about the filing of this motion: ◉ Yes ○ No

If not, why not:

I have notified all counsel and any unrepresented party of the filing of this motion:

On *(date)*: February 4, 2021

By *(method)*: Email

Position of other parties: Oppose

Name and best contact information for each counsel/party notified:

Defendants-Appellees Bureau of Land Management et al.:
Erika B. Kranz, erika.kranz@usdoj.gov

Intervenor-Defendant-Appellee ConocoPhillips Alaska, Inc.:
Ryan P. Steen, ryan.steen@stoel.com

Complete listing of counsel names and contact information is attached.

I declare under penalty of perjury that the foregoing is true.

**Signature** s/ Jeremy Lieb **Date** February 5, 2021

*(use "s/[typed name]" to sign electronically-filed documents)*

## ATTACHMENT TO FORM 16, CIRCUIT RULE 27-3 CERTIFICATE

The names, office addresses, telephone numbers, and e-mail addresses of other counsel are as follows:

**Counsel for Defendants-Appellees Bureau of Land Management *et al.***

Erika Barnes Kranz
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7415
Washington, DC 20044
T: 202.532.3379
E: erika.kranz@usdoj.gov

Caitlin Marie Cipicchio
U.S. DEPARTMENT OF JUSTICE
Environmental and Natural Resources Division, Natural Resources Section
P.O. Box 7611
Washington, DC 20044
T: 202.305.0503
E: Caitlin.Cipicchio@usdoj.gov

Rickey Turner
U.S. DEPARTMENT OF JUSTICE
Wildlife and Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
T: 303.844.1373
E: rickey.turner@usdoj.gov

**Counsel for Intervenor-Defendant-Appellee ConocoPhillips Alaska, Inc.**

Ryan P. Steen
Jason T. Morgan
James C. Feldman
STOEL RIVES LLP
600 University Street, Suite 3600

Seattle, WA 98101
T: 206.624.0900
E: ryan.steen@stoel.com
E: jason.morgan@stoel.com
E: james.feldman@stoel.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants Center for Biological Diversity, Friends of the Earth, and Greenpeace, Inc. hereby state that none of them has any parent companies, subsidiaries, or affiliates that have issued shares to the public.

**TABLE OF CONTENTS**

CIRCUIT RULE 27-3 CERTIFICATE

CORPORATE DISCLOSURE STATEMENT .................................................. iii

INTRODUCTION ......................................................................................1

FACTUAL BACKGROUND........................................................................3

ARGUMENT ..............................................................................................5

I. Plaintiffs are likely to succeed on the merits.............................................5

A. The Reserves Act's statute of limitations does not apply here. ............5

B. BLM failed to adequately disclose and analyze the effects of greenhouse gas emissions...............................................................10

C. The FEIS failed to consider reasonable alternatives...........................13

II. Plaintiffs are likely to suffer irreparable harm without an injunction..........15

A. This winter's activities will cause immediate and irreparable harm to Plaintiffs' members...........................................................16

B. Gravel mining and road construction will cause irreparable harm to recreational, research, and aesthetic interests.......................20

C. The gravel road will make it more difficult for BLM to reach a different decision...........................................................................21

III. The balance of harms tips sharply in Plaintiffs' favor. ..............................22

IV. A preliminary injunction advances the public interest...............................24

CONCLUSION ..........................................................................................24

STATEMENT OF RELATED CASES .......................................................27

CERTIFICATE OF COMPLIANCE...........................................................27

## TABLE OF AUTHORITIES

### CASES

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ....................5, 23, 24

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) ....................15, 23

*BedRoc Ltd., LLC v. United States*,
541 U.S. 176 (2004) ....................6

*Center for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ....................2, 10, 11, 12, 13, 22

*Com. of Mass. v. Clark*,
594 F. Supp. 1373 (D. Mass. 1984) ....................7

*Davis v. Mineta*,
302 F.3d 1104 (10th Cir. 2002) ....................19, 22

*District of Columbia v. U.S. Dep't of Agric.*,
444 F. Supp. 3d 1 (D.D.C. 2020) ....................18

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ....................23

*East Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) ....................24

*Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*,
630 F.3d 1153 (9th Cir. 2011) ....................24

*Friends of Yosemite Valley v. Kempthorne*,
520 F.3d 1024 (9th Cir. 2008) ....................13

*Idaho Sporting Cong., Inc. v. Alexander*,
222 F.3d 562 (9th Cir. 2000) ....................23

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976) ....................8

*Landwatch v. Connaughton*,
905 F. Supp. 2d 1192 (D. Or. 2012) ....................21

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ....................23

*Love v. Thomas*,
858 F.2d 1347 (9th Cir. 1988) ....................10

*N. Alaska Envtl. Ctr. v. Hodel*,
803 F.2d 466 (9th Cir. 1986) ....................23

*N. Alaska Envtl. Ctr. v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006) ....................6

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018) ....................21

*Native Ecosystems Council v. U.S. Forest Serv.*,
418 F.3d 953 (9th Cir. 2005) ....................13

*Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*,
606 F.2d 1261 (D.C. Cir. 1979) ....................8

*Nielsen v. Preap*,
139 S. Ct. 954 (2019) ....................6

*Padash v. INS*,
358 F.3d 1161 (9th Cir. 2004) ....................8

*Scientists' Inst. for Pub. Information v. AEC*,
481 F.2d 1079 (D.C. Cir. 1973) ....................8

*Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*,
472 F.3d 1097 (9th Cir. 2006) ....................5

*Sierra Club v. Marsh*,
872 F.2d 497 (1st Cir. 1989) ....................22

*State of Alaska v. Andrus*,
580 F.2d 465 (D.C. Cir. 1978)........................................................................7

*Suffolk Cty. v. Sec'y of Interior*,
562 F.2d 1368 (2d Cir. 1977) ........................................................................7

*Westlands Water Dist. v. U.S. Dep't of Interior*,
376 F.3d 853 (9th Cir. 2004) ......................................................................13

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)...............................................................................5, 8, 22

**STATUTES**

42 U.S.C. § 4332.......................................................................................24

42 U.S.C. § 6504..................................................................3, 4, 6, 14, 15

42 U.S.C. § 6505.........................................................................................6

42 U.S.C. § 6506a ..................................................... 3, 5, 6, 7, 8, 9, 10, 14

Pub. L. No. 96-514, 94 Stat. 2964 (Dec. 12, 1980) ...................................8, 9

**REGULATIONS**

40 C.F.R. §1502.14(a)...............................................................................13

40 C.F.R. § 1506.13 (Sept. 14, 2020) .........................................................13

43 C.F.R. § 2361.0-5(f)...............................................................................15

43 C.F.R. § 3130.2 .......................................................................................9

43 C.F.R. §§ 3152.1 to 3152.7.....................................................................9

43 C.F.R. § 3152.2(b) .................................................................................14

43 C.F.R. §§ 3160.0-1 to 3165.4...................................................................9

**FEDERAL REGISTER NOTICES**

42 Fed. Reg. 28,723 (June 3, 1977) .........................................................4, 15

85 Fed. Reg. 49,677 (Aug. 14, 2020) ..............................................................4

## RULES

Federal Rule of Appellate Procedure 8(a) .................................................................1

Circuit Rule 27-3...................................................................................................1

## LEGISLATIVE HISTORY

126 Cong. Rec. S29485 (1980).............................................................................8

126 Cong. Rec. S29489 (1980).............................................................................9

## OTHER AUTHORITIES

*Concerning*, Merriam Webster Online Dictionary, www.merriam-webster.com/dictionary/concerning (last visited Feb. 5, 2021)............................7

*Gerund*, Macmillan Dictionary, https://www.macmillandictionary.com/us/dictionary/american/gerund (last visited Feb. 5, 2021) ........................................................................6

## INTRODUCTION

Pursuant to Federal Rule of Appellate Procedure 8(a) and Circuit Rule 27-3, Plaintiffs-Appellants (Plaintiffs) move to enjoin implementation of Defendants-Appellees' (BLM) approval of ConocoPhillips Alaska. Inc.'s (ConocoPhillips) Willow Master Development Plan ("Willow Project" or "Project") in the National Petroleum Reserve-Alaska (Reserve), including construction activities now ongoing and planned for this winter, pending appeal of the district court's denial of Plaintiffs' motion for preliminary injunction. Plaintiffs request a decision on this motion by February 12, 2021, the date ConocoPhillips has stated it will begin gravel mining for the Project. Ex. 24 ¶12.

The Willow Project will have far-reaching impacts across the Reserve and beyond. The Project may include, among other things, five drill sites, 37 miles of gravel roads, a gravel mine, up to 700 miles of ice-roads during construction, hundreds of miles of pipelines, air strips, and an operations center. Ex. 7 at 4. It could produce 590 million barrels of oil, adding approximately 260 million metric tons of greenhouse gases to the atmosphere over its 30-year life, *id.* at 3, 43—an enormous contribution to climate change, inconsistent with the urgent need to transition away from fossil fuels. The Project will disturb wildlife (including imperiled polar bears) destroy wetlands, and permanently alter traditional cultural

practices dependent on food resources like fish and caribou. Ex. 1 at 6-7; *infra* pp. 15-21.

Plaintiffs filed this lawsuit promptly, less than two months after BLM issued its record of decision (ROD) approving the Project, and immediately sought a preliminary injunction. CR 1, 9. In their motion to the district court, and again in this motion, Plaintiffs' have demonstrated that BLM's approval of the Willow Project is unlawful. Among other deficiencies, BLM's Final Environmental Impact Statement (FEIS) fails to account for foreign consumption of oil in its assessment of climate change impacts, an error this Court recently addressed and held unlawful in *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 740 (9th Cir. 2020), and fails to consider reasonable alternatives. Plaintiffs have demonstrated that an injunction is necessary to prevent irreparable harm from construction activities that will disturb wildlife and affect hunting and other uses of the Reserve.

In its decisions denying Plaintiffs' motion for preliminary injunction, the district court did not reach these issues. Instead, the court found that Plaintiffs should have filed this lawsuit within 60 days of the notice of availability of the FEIS for the Project, based on an incorrect interpretation of the applicability of the National Petroleum Reserves Production Act's (Reserves Act) statute of limitations. Ex. 25 at 22. But by its plain text, the provision applies only to

actions challenging environmental impact statements (EISs) "concerning oil and gas leasing." 42 U.S.C. § 6506a(n)(1). The EIS in this case evaluates an oil and gas development project, not oil and gas leasing. Because the Reserves Act's statute of limitations does not bar Plaintiffs' claims, and Plaintiffs have satisfied the other elements necessary to support an injunction, this Court should enjoin any on-the-ground activity in reliance on BLM's ROD while the appeal is pending.

## FACTUAL BACKGROUND

This litigation is about protecting the exceptional resources of the Reserve and preventing BLM from allowing an enormous, destructive project in this region to move forward without adequately considering its environmental consequences. The Reserve is an extraordinary and ecologically important landscape of lakes, ponds, rivers, floodplains, wetlands, upland areas, and sensitive coastal habitats. It is home to a diversity of species, including polar bears, brown bears, muskoxen, caribou, moose, and millions of migratory birds, among many other species. This landscape and wildlife are central to the livelihood and traditional practices of Alaska Native people living in the region. Ex. 1 at 1.

The Reserves Act requires the Secretary to protect and conserve the world-class wildlife and subsistence values of the Reserve any time the Secretary authorizes oil and gas leasing, exploration, or development. 42 U.S.C. §§ 6504(a), 6506a(b). Additionally, Congress designated certain areas, and authorized the

Secretary to designate others, for "maximum protection" of "subsistence, recreational, fish and wildlife, or historical or scenic value[s]." *Id.* § 6504(a). Pursuant to this authority, the Secretary designated areas around Teshekpuk Lake and the Colville River, among others, as Special Areas. 42 Fed. Reg. 28,723 (June 3, 1977).

The Willow Project represents a significant expansion of oil and gas development in the ecologically sensitive and culturally important northeastern portion of the Reserve,[1] including parts of the Teshekpuk Lake and Colville River Special Areas and adjacent to areas within the Teshekpuk Lake Special Area that are currently closed to oil and gas leasing. Ex. 7 at 20-21, 25. Public comments were submitted on BLM's draft and supplemental draft EISs detailing serious deficiencies in BLM's analysis, which, among other things, failed to fully examine the impacts of the Project on climate change and failed to consider reasonable alternatives. Ex. 1; Ex. 2; Ex. 20. On August 14, 2020, BLM released an FEIS that failed to correct these problems. 85 Fed. Reg. 49,677 (Aug. 14, 2020).

On October 26, 2020, BLM signed the ROD approving the Project. Ex. 8 at 11, 28. The district court denied Plaintiffs' motion for preliminary injunction on February 1, 2021, Ex. 25, and has not ruled on Plaintiffs' motion for injunction

[1] BLM did not permit any development projects on federal lands within the Reserve until 2015. Ex. 1 at 6.

pending appeal, filed on February 3, 2021. CR 45. ConocoPhillips began ice-road construction earlier this week, CR 51 at 6, and indicated it will start gravel mining on February 12, 2021, Ex. 24 ¶12.

## ARGUMENT

The standard for issuing an injunction pending appeal is similar to that for a preliminary injunction. *See Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006). A party seeking a preliminary injunction must show (1) a likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors relief, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Plaintiffs meet the requirements under either standard.

### I. Plaintiffs are likely to succeed on the merits.

#### A. The Reserves Act's statute of limitations does not apply here.

The Reserves Act's statute of limitations, 42 U.S.C. § 6506a(n)(1), does not bar Plaintiffs' challenge to the FEIS concerning the Willow Project. The provision's text is clear: it applies to EISs "concerning oil and gas *leasing*." *Id.*

(emphasis added). "Leasing" is the gerund form of the verb "to lease."[2] It describes a type of action. Thus, the limitation applies to EISs concerning the particular action of leasing—not all actions on "leases." *See Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) (stating that in interpreting a statute, "[w]ords are to be given the meaning that proper grammar and usage would assign them"). Further underscoring that "leasing" refers to a specific type of action, the Reserves Act distinguishes "leasing," from other oil and gas activities like "exploration," "development," and "production," with separate provisions and requirements for each type of activity. 42 U.S.C. § 6506a(a), (i), (n) (leasing); *id.* §§ 6504, 6505, 6506a(i)(3)(A), (j)(3), (k), (m) (exploration, development, production); *see N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 974, 977 (9th Cir. 2006) (describing different stages of decision-making under the Reserves Act). Since the text is clear, the inquiry should end there. *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). The FEIS at issue here concerns an action approving an oil and gas development, not leasing, and section 6506a(n)(1) thus does not apply.

The terms "any action," "concerning," and "site-specific" do not introduce ambiguity as to section 6506a(n)(1)'s scope, contrary to the district court's

[2] A "gerund" is a noun formed by adding "-ing" to a verb, that describes an action. *Gerund*, Macmillan Dictionary, https://www.macmillandictionary.com/us/dictionary/american/gerund (last visited Feb. 5, 2021).

conclusion. Ex. 25 at 15-17. The phrase "any action" refers to a lawsuit, not the proposed activity that is the subject of an EIS. 43 U.S.C. § 6506a(n)(1) ("any action seeking judicial review of . . . "). The preposition "concerning" that connects "environmental impact statement" with "leasing" is synonymous with "about." *Concerning*, Merriam Webster Online Dictionary, www.merriam-webster.com/dictionary/concerning (last visited Feb. 5, 2021) (cited in Ex. 25 at 16 n.65). It does not suggest that leasing EISs are a subset of the EISs subject to section 6506a(n)(1) (as a preposition like "including" would, for example). Nor does the reference to "program or site-specific" EISs suggest the provision applies beyond EISs for leasing actions. At the time Congress adopted section 6506a(n)(1), courts and agencies routinely referred to EISs for lease sales as "site-specific." *See Suffolk Cty. v. Sec'y of Interior*, 562 F.2d 1368, 1377 (2d Cir. 1977) (discussing programmatic and site-specific EISs and noting agency intent to "prepare a more detailed site-specific impact statement for each [lease] sale area"); *State of Alaska v. Andrus*, 580 F.2d 465, 468 (D.C. Cir. 1978), *vacated in part sub nom. W. Oil & Gas Ass'n v. Alaska*, 439 U.S. 922, (1978) (referring to a "site-specific EIS" for a proposed lease sale); *Com. of Mass. v. Clark*, 594 F. Supp.

1373, 1383 (D. Mass. 1984) (lease sale EIS found not to be sufficiently "site-specific").[3]

Section 6506a(n)(1)'s context and history also support Plaintiffs' interpretation. *See Padash v. INS*, 358 F.3d 1161, 1170 (9th Cir. 2004). Congress enacted section 6506a(n)(1) as part of its adoption of an "expeditious program of competitive leasing of oil and gas" in the Reserve. Pub. L. No. 96-514, 94 Stat. at 2964 (Dec. 12, 1980). However, it treated exploration and development differently. It did not expedite them, and it subjected them to additional requirements. *Id.* at 2964 ("geological and geophysical explorations" must meet information-sharing requirements); *id.* at 2965 ("exploration or production" must comply with requirements to protect surface resources in the Reserve's special areas).

The legislative history, consistent with that cited by the district court, *see* Ex. 25 at 20-21, indicates that this was because Congress saw expedited leasing as the means to facilitate a fast transition from federal to private oil and gas exploration in the Reserve. *See* 126 Cong. Rec. S29485 (1980) (Sen. Huddleston) (noting

---

[3] The opinions cited by the district court, Ex. 25 at 16-17 n.68 & 69, address EISs about waste management facilities (*Nat. Res. Def. Council*), liquid metal reactors (*Scientists' Inst. for Pub. Info.*), and coal development (*Kleppe*). Their equation of "site-specific" with "facilities" is a consequence of their inapposite context and sheds no light on Congress's use of the term in section 6506a(n)(1).

"language that authorizes leasing the reserve for private oil and gas exploration and development"); 126 Cong. Rec. S29489, S31196 (1980) (Sen. Stevens) (stating need to increase domestic oil supply and supporting expediting leasing and exploration). Accordingly, the 1980 rider focused on speedy leasing—requiring the first lease sale to be conducted within 20 months and providing for expedited judicial review of that and subsequent leasing decisions—but not exploration or development decisions. Pub. L. No. 96-514, 94 Stat. at 2964.[4]

That Congress would treat leasing and on-the-ground activity like development differently for purposes of a statute of limitations also makes practical sense. A significant amount of time might pass between leasing and on-the-ground activity. Expediting any review of leasing decisions provides early certainty to lessees that their leases are valid. No such limit is needed for later stages, because on-the-ground activity follows more quickly after the decision and anyone opposed to drilling would sue promptly.

[4] BLM's implementing regulations are also consistent with Plaintiffs' argument. Only its leasing regulations refer to section 6506a(n)(1)'s limitations provision, 43 C.F.R. § 3130.2; its exploration and development regulations do not, *id.* §§ 3152.1 to 3152.7 (governing oil and gas exploration), *id.* §§ 3160.0-1 to 3165.4 (governing oil and gas exploration, development, and production).

For all these reasons, section 6506a(n)(1) is unambiguous and does not bar Plaintiffs' challenge to the adequacy of the Willow FEIS here.[5]

### B. BLM failed to adequately disclose and analyze the effects of greenhouse gas emissions.

BLM violated the National Environmental Policy Act (NEPA) by failing to adequately disclose and analyze greenhouse gas emissions associated with the Willow Project. This Court recently struck down an Interior Department decision that made the same choice on the same core rationale and record in *Center for Biological Diversity v. Bernhardt* (*CBD*), 982 F.3d 723 (9th Cir. 2020). The Court's decision in *CBD* requires the same result here.

In *CBD*, the Court addressed a Bureau of Ocean Energy Management (BOEM) assessment of downstream greenhouse gas emissions from burning oil that would be produced at another proposed oil development project in Alaska's Arctic. To assess these impacts, BOEM predicted how the absence of oil and gas from the project would affect demand for energy and resulting greenhouse gas emissions. *CBD*, 982 F.3d at 736. Rather than assessing global emissions, however, it limited its analysis only to U.S. emissions. *Id.* Rejecting this self-imposed constraint, the Court concluded that "[e]missions resulting from the

[5] Even were the provision ambiguous, the "long recognized . . . presumption in favor of judicial review of administrative actions" would direct that the ambiguity resolve in favor of review. *See Love v. Thomas*, 858 F.2d 1347, 1355-56 (9th Cir. 1988).

foreign consumption of oil are surely a 'reasonably foreseeable' indirect effect of drilling." *Id.* at 738. It held that NEPA requires an agency to quantitatively evaluate these emissions unless it "thoroughly explain[s] why such an estimate is impossible." *Id.* at 739. Even then, it still has to "attempt to estimate the magnitude of such emissions." *Id*. at 740. BOEM's failure to comply with either requirement in the face of record evidence showing that an assessment was feasible was fatal to its EIS.[6] *Id.*

BLM conducted the same analysis here that the Court rejected in *CBD*. Using the same market-simulation approach, BLM undertook an analysis of how oil and gas that may be produced from the Willow Project would increase demand for energy and resulting greenhouse gas emissions. *Compare* Ex. 7 at 42-44, 102-03 (describing the use of BOEM's market simulation model to predict emissions consequences), *with CBD*, 982 F.3d at 736. Despite acknowledging that "the Willow [Project] would affect both domestic and foreign energy consumption," Ex. 7 at 106, BLM excluded foreign oil and gas consumption from this model on the same basis that *CBD* squarely rejected: that it lacked reliable data or methods to assess global emissions. *Compare* Ex. 7 at 106 ("This estimation would require

[6] The Court's analysis of this problem did not hinge on BOEM's prediction that building the project would reduce greenhouse gas emissions. That prediction "demonstrate[d] the need for further explanation," *CBD*, 982 F.3d at 737-38, but it did not establish or change the obligation to assess reasonably foreseeable effects of foreign emissions from drilling.

detailed data on proportional consumption changes and the most likely energy substitutions . . . for all countries worldwide."); Ex. 23 at 18 ("The issue is the uncertainty and lack of reliable data as to the likely distribution of demand changes among countries."); *id.* at 19 ("[I]nformation on which countries would consume less oil was not available."); *with CBD*, 982 F.3d at 737 (rejecting BOEM's assertion that it "did not have sufficiently 'reliable information on foreign emissions factors and consumption patterns'"); *id.* at 738 (rejecting BOEM's undocumented assertion that "'[e]xcluding the foreign oil and gas markets is reasonable' because '[o]il consumption in each country is different, and BOEM does not have information related to which countries would consume less oil'"). The Court in *CBD* relied on three reports, every one of which was before BLM here, that "confirm the effect of increasing domestic oil supply on foreign consumption and the feasibility of its estimation," 982 F.3d at 738-39 (citing studies also in the record here at Ex. 3; Ex. 10; Ex. 11); *see* Ex. 1 at 24-29 (citing reports); Ex. 20 at 4 (same). As in *CBD*, the record here "belies [the agency's] contention that it could not have summarized or estimated foreign emissions with accurate or credible scientific evidence." 982 F.3d at 738.

Because the record evidence and BLM's excuses for forgoing analysis of the Project's effect on global emissions are functionally indistinguishable from those this Court addressed in *CBD,* that opinion dictates the result here. Moreover, this

is a consequential error going to the heart of the FEIS. *See CBD,* 982 F.3d at 740 ("If [the agency] concludes that such emissions will be significant, it may well approve another alternative included in the EIS or deny the [approval] altogether.").

### C. The FEIS failed to consider reasonable alternatives.

BLM violated NEPA by failing to consider reasonable alternatives proposed by Plaintiffs. An agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action, 40 C.F.R. §1502.14(a),[7] including alternatives that would avoid or minimize harm to the environment. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 965 (9th Cir. 2005). An EIS must consider alternatives that are meaningfully different from one another "to allow for a real, informed choice." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1039 (9th Cir. 2008). "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004).

Here, the alternatives BLM considered are similar and do not allow for an informed choice about options with substantially greater protections. Instead, each action alternative considered in the FEIS would permit ConocoPhillips to construct

[7] The NEPA regulations in effect prior to September 14, 2020, apply here. *See* 40 C.F.R. § 1506.13 (Sept. 14, 2020).

the core infrastructure it proposed in the locations it proposed. Ex. 7 at 22, 30-32. BLM failed to consider reasonable alternatives proposed by Plaintiffs, including: Prohibiting permanent infrastructure in the Teshekpuk Lake and Colville River Special Areas, Ex. 1 at 15-16, which would limit impacts to these areas that have been designated for "maximum protection" of their surface values. 42 U.S.C. § 6504(a). And permitting drilling only during the winter season and eliminating permanent roads, which would mitigate disturbance to wildlife and subsistence users, and reduce well blowout risks. Ex. 1 at 15.

BLM's justifications for excluding consideration of these alternatives are arbitrary. BLM asserts that it may not consider alternatives that require different configurations of drill sites or otherwise limit ConocoPhillips' plans because ConocoPhillips has a right to "extract all the oil and gas possible within the leased areas." Ex. 7 at 90, 94, 96. This assertion is unsupported. And, in any case, BLM has the authority and obligation to condition or restrict oil and gas activity on leases within the Reserve to protect other resources and mitigate adverse environmental effects. *See* 42 U.S.C. § 6506a(b), (k)(3); 43 C.F.R. § 3152.2(b). BLM's asserted limitation is inconsistent with this broad authority.

BLM asserts that an alternative without infrastructure in special areas would be inconsistent with the Project's purpose and need. Ex. 7 at 90. The purpose of the Project—"to construct the infrastructure necessary to allow the production and

transportation to market of federal oil and gas resources under leaseholds in the northeast area of the [Reserve], consistent with the proponent's federal oil and gas lease and unit obligations," *id.* at 25—does not, on its face, preclude an alternative prohibiting infrastructure in special areas. BLM fails to explain otherwise. BLM also asserts that because the Teshekpuk Lake Special Area is "only an administrative boundary," impacts within the boundary "would not necessarily be greater" than those outside the boundary. *Id.* at 89, 90. BLM fails to acknowledge that the boundary was set because Congress and the Secretary recognized explicitly the need to provide "maximum protection" to surface resources located within that boundary. 42 U.S.C. § 6504(a); 43 C.F.R. § 2361.0-5(f); 42 Fed. Reg. 28,723 (June 3, 1977). This recognition alone provides ample basis for considering an alternative that treats land open to oil and gas development within special areas differently than land outside of special areas. BLM suggests that a seasonal-only drilling alternative would not be economically feasible. Ex. 7 at 90, 92. Yet, BLM provides no analysis to support this assertion; instead explaining that seasonal-only drilling was not feasible for a different project. *Id.* at 90.

## II. Plaintiffs are likely to suffer irreparable harm without an injunction.

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

This winter, ConocoPhillips plans to develop a new gravel mine and begin constructing the road to the Willow Project. This would involve building an ice-road to the gravel mine site, constructing eight ice pads, excavating at the gravel mine, hauling gravel, and installing the gravel along the road alignment. Ex. 9 at 1-2. The gravel source is within the 0.5-mile setback for the "biologically sensitive" Ublutuoch (Tiŋmiaqsiuġvik) River. Ex. 7 at 97; Ex. 4 at 10. Ice-road construction began earlier this week, CR 51 at 6, with gravel mining beginning February 12, 2021, Ex. 24 ¶12.

### A. This winter's activities will cause immediate and irreparable harm to Plaintiffs' members.

Noise and activity associated with construction will directly affect caribou and Plaintiffs' members' subsistence hunting. As BLM's own analysis indicates, construction activities like those planned for this winter will displace caribou from important winter subsistence use areas near Nuiqsut. Mining requires blasting, producing the loudest sound levels projected for the Willow Project. Ex. 7 at 57. Thus, "[n]oise would be greatest during winter construction . . . around the mine site." *Id.* The sound from blasting would not dissipate to ambient levels for more than 100 miles. *Id.* at 47-48, Tbl. 3.6.3. "This human activity and noise would disturb and displace caribou from around the mine site during all periods of human activity." *Id.* at 57.

Ice and gravel road construction is also likely to affect caribou. *Id.* at 74 ("All Project roads would likely affect [caribou] crossing patterns to some extent."). Roads and associated ground traffic and human activity deflect and delay caribou movement. *Id.* at 73. Caribou are least likely to cross roads when traffic exceeds 15 vehicles per hour, and during construction traffic rates will exceed this. *Id.* at 57 (expecting 15.5 to 81.7 vehicles per hour).

The gravel mining, traffic, and road construction will all take place within high density caribou winter habitat. Ex. 6 at 6, Map 3-22; Ex. 7 at 20. Consistent with its high caribou habitat value, the area where construction is planned is also a high subsistence-use area. Ex. 7 at 83, Fig. 3.16.6.

BLM's analysis shows that caribou displacement in the area will affect hunter success, and that industrial activity will directly displace hunters from high value hunting areas, likely harming subsistence activities. *Id.* at 72 ("Impacts to resource availability would occur year-round," "would be higher during winter construction," and subsistence use of the area is "highest during winter"); *see also* Ex. 4 at 41 ("Even a temporary disruption of these communities' harvest patterns would have negative effects for subsistence users."); *id.* at 27 ("Subsistence hunters would likely avoid development areas). The noise and disturbance from the mine, traffic, and construction will extend across a large area, and disturbance to caribou anywhere in this area can deflect caribou migration routes and therefore

affect hunting. *See, e.g.*, Ex. 21 at 61 (noting that development near Teshekpuk Lake could deflect or divert caribou hunted in and near Nuiqsut).

Any disruption in subsistence food sources is an irreparable harm. *See District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 43 (D.D.C. 2020) ("Going without food is an irreparable harm."); Ex. 21 at 43, Tbl. 3-49 (noting 25% of Nuiqsut household members "at times did not have enough to eat"); *id.* at 51, Tbl. 3-55 (53% of Nuiqsut residents who reported difficulty in getting the foods necessary to eat healthy meals attributed the deficiency to not being "able to get enough subsistence foods."). Disruption to caribou harvest is especially significant because "[c]aribou is the most important overall subsistence resource," Ex. 21 at 6-7. It is a particularly important subsistence resource during the winter because relatively few other resources are available during this period. Ex. 23 at 41, Tbl. E.16.7 (showing fewer resources in winter); *id*. at 43, Fig. E.16.10 (showing caribou as second highest-use resource during winter).

Plaintiffs' members hunt in the area where this winter's activities are planned. Ex. 13 ¶36 ("We hunt caribou where the mine is going to be located. That area, like the whole Willow Project area, is part of our traditional use areas. I worry that all the noises and activities from the mine will affect caribou migrations through that area."). The displacement, predicted by BLM's own analysis, will have a direct effect on Plaintiffs' members individually, *id.* ¶10, as well as to their

role as members of an interdependent community. *Id.* ¶31 ("The industrial development at Alpine and extending out with other projects into the Reserve has affected our cultural camp at the Nigliq Channel and on the Colville River. Both areas have been changed by oil and gas development activities. I am concerned that Willow and the expanded oil and gas leasing with the revised Integrated Activity Plan (IAP) will only make these impacts worse"); *see also id.* ¶¶7, 8, 58; *see also* Ex. 21 at 27.

The noise from the mine will also directly disturb Plaintiffs' members. Ex. 13 ¶36 ("This mine is very concerning to me because we've experienced the impacts before from [gravel mining] between Nuiqsut and Meltwater. The blasting there cracked house windows and broke water and sewer pipes in the permafrost. Some elders got post-traumatic disorder from the blasting, and they got agitated before blasting started."). Blasting will reach 59 decibels in Nuiqsut, or 24 decibels higher than the ambient sound level in the area. Ex. 23 at 8-9. Courts have found lesser increases in noise will establish irreparable harm. *See, e.g.*, *Davis v. Mineta*, 302 F.3d 1104, 1115-16 (10th Cir. 2002) (finding noise level increases of 10-20 decibels demonstrated irreparable harm), *abrogated on other grounds by Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016).

An injunction from this Court blocking authorization of construction pending adjudication of the appeal is necessary to forestall irreparable harm to caribou and Plaintiffs' members from the planned activities this winter.

### B. Gravel mining and road construction will cause irreparable harm to recreational, research, and aesthetic interests.

Construction would extend from previously developed areas into wholly undeveloped areas, Ex. 7 at 21; Ex. 9 at 4, Fig. ES.2, and will irreparably harm Plaintiffs' members' ability to enjoy the undisturbed character of the Reserve and its wildlife. Ex. 13 ¶¶11-12, 29, 31-32, 58, 60; Ex. 14 ¶¶8, 10, 16, 20, 22-26; Ex. 15 ¶¶15-16, 25, 27-28; Ex. 16 ¶¶18-20; Ex. 17 ¶¶ 13-14; Ex. 18 ¶¶10-12; Ex. 19 ¶¶15-17.

As one member explains, "[i]f Willow's development moves forward, I would reconsider my plans to visit the Reserve. Certainly my trip to observe birds in the Teshekpuk Lake Special Area would be impacted by Willow because I would very likely hear the sounds of Willow's construction and operation." Ex. 14 ¶22; *see also id.* ¶10 ("Willow's expansion of industrial activity . . . [will] harm my ability to continue to recreate and view wildlife in the Reserve."). And as another explains, "[d]evelopment will displace and harm the birds, caribou, bears, wolves, and wolverines I personally enjoy observing and writing about in the Reserve. Willow's development will make it harder for me to continue to document and enjoy these species both professionally and personally in their natural habitat."

Ex. 15 ¶27; *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) (finding that declarant described the connection between healthy salmon populations and his use and enjoyment of the river); *see also Landwatch v. Connaughton*, 905 F. Supp. 2d 1192 (D. Or. 2012) (Plaintiff and its members' aesthetic, recreational, and educational interest in area would be harmed by degraded water quality and harm to fish.).

Nor will mitigation ameliorate these impacts. Reclamation at the mine site would not commence for at least seven years, when construction has been completed, Ex. 23 at 35, and in the end, the goal of the reclamation plan is not to restore the area to its prior condition, but to create a new landscape. *Id.* at 31. Thus, the reclamation plan fails to provide any assurance that harm to the environment from the mine will not be irreparable.

### C. The gravel road will make it more difficult for BLM to reach a different decision.

Constructing a gravel road and associated mining also is likely to impair BLM's ability or willingness to give serious consideration to alternatives inconsistent with a permanent road and prohibitions on infrastructure in special

areas,[8] or to consider whether the Project should proceed at all in the event a court ultimately remands the decision to the agency for reconsideration.

The direct harms from road construction and mining alone justify an injunction; when combined with the effect of bureaucratic momentum, these two types of harm make the need for an injunction even more compelling. *See Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989) ("the harm at stake in a NEPA violation is a harm to the environment, not merely to a legalistic 'procedure'"); *see also Winter*, 555 U.S. at 35 (Breyer, J., concurring in part and dissenting in part) (the purpose of NEPA is to prevent agencies from moving forward with an action without adequate information about the environmental harms of the action). An injunction now would avoid this harm and ensure that reconsideration could change the outcome. *See CBD*, 982 F.3d at 734-35, 740; *cf. Davis*, 302 F.3d at 1115 n.7 (concluding that if first phase of work proceeds, "a serious risk arises that the analysis of alternatives required by NEPA will be skewed toward completion of the entire Project").

## III. The balance of harms tips sharply in Plaintiffs' favor.

"[W]hen environmental injury is 'sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.'"

[8] The permanent road construction planned for this winter would begin by cutting through a designated special area, Ex. 7 at 78, Fig. 2.4.1.

*Idaho Sporting Cong.*, *Inc. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000) (quoting *Amoco Prod. Co.*, 480 U.S. at 545). Because Plaintiffs have demonstrated a strong likelihood of success on the merits, this Court need not apply the "sliding scale" test. *See All. for the Wild Rockies*, 632 F.3d at 1135. Nevertheless, a preliminary injunction is also warranted under that standard because the balance of harms tips sharply in Plaintiffs' favor here. *See id.*

Irreparable environmental harm and harm to Plaintiffs is likely. *Supra* pp. 15-22. BLM will not be harmed at all by an injunction. Any countervailing harms to third parties from an injunction are limited; construction will take up to ten years and first production will likely not begin until the end of 2025. Ex. 7 at 34. A delay in initial construction activities pending appeal would not cause irreparable harm, particularly in light of the Project schedule. Financial harm resulting from a delay is not irreparable harm. *N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 471 (9th Cir. 1986); *cf. Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1093 (9th Cir. 2014) (explaining companies that presume permitting outcomes assume the risk of doing so). And, in any case, a "temporary delay of the economic benefit" in developing the Project does not outweigh the likely harms to be incurred by Plaintiffs. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766-67 (9th Cir. 2014).

## IV. A preliminary injunction advances the public interest.

The public interest favors granting this injunction. This Court recognizes "the public interest in careful consideration of environmental impacts before major federal projects go forward, and . . . [has] held that suspending such projects until that consideration occurs 'comports with the public interest.'" *All. for the Wild Rockies*, 632 F.3d at 1138 (citation omitted). Congress declared the public interest in all United States policies and laws being administered in compliance with NEPA "to the fullest extent possible." 42 U.S.C. § 4332. And the public also has an overarching interest in its government abiding by the laws and regulations governing it. *See, e.g.*, *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018); *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011). Allowing BLM to permit construction despite the legal infirmities underlying the Project and the irreparable harm it threatens to the Reserve and those who rely on it, would be counter to these interests.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court enjoin implementation of BLM's approval of ConocoPhillips' Willow Project, including construction activities now ongoing and planned for this winter, while appeal of the district court's denial of Plaintiffs' motion for preliminary injunction is pending.

Respectfully submitted this 5th day of February, 2021.

*s/ Jeremy Lieb*

Jeremy C. Lieb (Alaska Bar No. 1810088)
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE

*Attorneys for Plaintiffs-Appellants Center for Biological Diversity, Friends of the Earth, and Greenpeace, Inc.*

## STATEMENT OF RELATED CASES PURSUANT TO CIRCUIT RULE 28-2.6 AND FORM 17

**9th Cir. Case Number: 21-35095**

The undersigned attorney states the following:

[ ] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[x] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

*Sovereign Iñupiat for a Living Arctic et al. v. Bureau of Land Management et al.*, No. 21-35085 (9th Cir.) (consolidated).

**Signature:** *s/ Jeremy Lieb* **Date:** February 5, 2021

## CERTIFICATE OF COMPLIANCE

I certify that:

(i) This document uses proportionally spaced, 14-point, roman style font and therefore complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6); and

(ii) This document contains 5583 words, excluding items exempted by Federal Rule of Appellate Procedure 32(f). When divided by 280, the word length of this document does not exceed 20 pages in compliance with Circuit Rules 27-1(1)(d) and 32-3(2).

Dated: February 5, 2021

*s/ Jeremy Lieb*
Jeremy C. Lieb

## TABLE OF EXHIBITS

*Center for Biological Diversity et al. v. Bureau of Land Management et al.,*
No. 21-35095 (consolidated with No. 21-35085)

| **Exhibit No. (Dist. Court Doc. No.)** | **Description** |
|---|---|
| 1 (Doc. 9-1) | Alaska Wilderness League *et al.*, Comments on Willow Master Development Plan Draft Environmental Impact Statement (No. DOI-BLM-AK-0000-2018-0004-EIS) (Oct. 29, 2019) (excerpts) |
| 2 (Doc. 9-2) | Alaska Wilderness League *et al.*, Comments on Willow Master Development Plan Supplemental Draft Environmental Impact Statement (May 4, 2020) (excerpts) |
| 3 (Doc. 9-3) | J. Bordoff & T. Houser, *Navigating the U.S. Oil Export Debate*, Columbia SIPA, Center on Global Energy Policy (Jan. 2015) |
| 4 (Doc. 9-4) | Bureau of Land Management (BLM), National Petroleum Reserve-Alaska, Final Integrated Activity Plan/ Environmental Impact Statement (Nov. 2012) (excerpts) |
| 6 (Doc. 9-6) | BLM, National Petroleum Reserve in Alaska, Final Integrated Activity Plan and Environmental Impact Statement (June 2020) (excerpts) |
| 7 (Doc. 9-7) | BLM, Willow Master Development Plan, Final Environmental Impact Statement (Aug. 2020) (excerpts) |
| 8 (Doc. 9-8) | BLM, Willow Master Development Plan, Record of Decision (Oct. 26, 2020) |
| 9 (Doc. 9-9) | BLM, Willow DNA Proposed Action, https://eplanning.blm.gov/eplanning-ui/project/2003923/570 (Dec. 2, 2020) |

| | |
|---|---|
| 10 (Doc. 9-10) | P. Erickson, *U.S. again overlooks top CO2 impact of expanding oil supply . . . but that might change*, Stockholm Environment Institute (Apr. 30, 2016) |
| 11 (Doc. 9-11) | P. Erickson & M. Lazarus, *Impact of the Keystone XL Pipeline on Global Oil Markets and Greenhouse Gas Emissions*, 4 NATURE CLIMATE CHANGE 778 (2014) |
| 13 (Doc. 9-13) | Declaration Rosemary Ahtuangaruak |
| 14 (Doc. 9-14) | Declaration of Daniel Ritzman |
| 15 (Doc. 9-15) | Declaration of Jeffrey Scott Fair |
| 16 (Doc. 9-16) | Declaration of Richard G. Steiner |
| 17 (Doc. 9-17) | Declaration of Brendan Cummings |
| 18 (Doc. 9-18) | Declaration of Marcie E. Keever |
| 19 (Doc. 9-19) | Declaration of Timothy Donaghy |
| 20 (Doc. 9-20) | Natural Resources Defense Council & Earthjustice, Comments on Willow Master Development Plan Supplement to the Draft Environmental Impact Statement (May 4, 2020) |
| 21 (Doc. 41-1) | BLM, National Petroleum Reserve-Alaska, Final Integrated Activity Plan/ Environmental Impact Statement (Nov. 2012) (excerpts) |

| | |
|---|---|
| 23<br>(Doc. 41-3) | BLM, Willow Master Development Plan, Final Environmental Impact Statement (Aug. 2020) (excerpts) |
| 24<br>(Doc. 31-4) | Declaration of James I. Brodie (Ex. 2 to ConocoPhillips Alaska, Inc.'s Opposition to Motion for Preliminary Injunction) |
| 25<br>(Doc. 43) | Order Denying Motion For Preliminary Injunction (Feb. 1, 2021) |