Nos. 21-35085 & 21-35095

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, et al, *Plaintiffs/Appellants*,

v.

BUREAU OF LAND MANAGEMENT, et al., *Defendants/Appellees,*

and

CENTER FOR BIOLOGICAL DIVERSITY, et al, *Plaintiffs/Appellants*,

v.

BUREAU OF LAND MANAGEMENT, et al., *Defendants/Appellees*

---

Appeal from the United States District Court for the District of Alaska
Nos. 3:20-cv-290 & 3:20-cv-308 (Hon. Sharon L. Gleason)

---

# FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR INJUNCTION PENDING APPEAL

---

JEAN E. WILLIAMS
*Acting Assistant Attorney General*
ANDREW C. MERGEN
KEVIN MCARDLE
CAITLIN CIPICCHIO
RICKEY TURNER
ERIKA B. KRANZ
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3379
erika.kranz@usdoj.gov

Of Counsel:

MICHAEL GIERYIC
*Attorney*
Office of the Regional Solicitor
U.S. Department of the Interior

**TABLE OF CONTENTS**


LIST OF EXHIBITS ..... vii

GLOSSARY ..... viii

INTRODUCTION ..... 1

STATEMENT OF THE CASE ..... 2

A. The National Petroleum Reserve in Alaska ..... 2

B. The Willow Project and Winter 2021 Construction ..... 3

C. Analyses of the Willow Project ..... 4

D. Proceedings below ..... 5

STANDARD OF REVIEW ..... 6

ARGUMENT ..... 8

I. Plaintiffs' lack of urgency provides important context for their requests for an extraordinary remedy in this Court. ..... 8

II. Plaintiffs fail to carry their burden of showing that they are entitled to an injunction pending appeal. ..... 9

A. Plaintiffs are not likely to succeed on the merits of their appeal. ..... 10

1. Both Plaintiffs' NEPA claims are barred by the statute of limitations applicable to such claims. ..... 10

2. BLM took a hard look at the effects of the Willow Project. ..... 16

a. SILA is unlikely to succeed on the merits of its "hard look" arguments. ..... 16

b. BLM adequately considered greenhouse gas emissions. ..... 19

3. BLM considered a reasonable range of alternatives. ..... 22

4. SILA fails to show that the Service's BiOp violates the ESA ..... 25

B. Plaintiffs have not demonstrated a likelihood of irreparable harm while this appeal is pending. ..... 27

1. SILA has not shown a likelihood of irreparable injury related to its NEPA claim. ..... 28

2. SILA has not shown a likelihood of irreparable injury related to its ESA claim ..... 29

3. CBD has not shown a likelihood of irreparable injury ..... 31

4. CBD's "bureaucratic momentum" argument fails ..... 33

C. Balance of Equities ..... 34

CONCLUSION ..... 35

CERTIFICATE OF COMPLIANCE ..... 36

## TABLE OF AUTHORITIES

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......... 10

*Animal Welfare Institute v. Martin*,
623 F.3d 19 (1st Cir. 2010) .......... 30

*Boardman v. Pacific Seafood Group*,
822 F.3d 1011 (9th Cir. 2016) .......... 29, 33

*Center for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ("*Liberty*") .......... 19–21, 25

*Doe #1 v. Trump*,
957 F.3d 1050 (9th Cir. 2020) .......... 7

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) .......... 34

*E. Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) .......... 34

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1975) .......... 30

*Headwaters, Inc. v. BLM*,
914 F.2d 1174 (9th Cir. 1990) .......... 22

*Humane Society v. Gutierrez*,
523 F.3d 990 (9th Cir. 2008) .......... 30

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976) .......... 22

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) .......... 7

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060 (9th Cir. 2012) .......... 22

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ....................................................................................29

*Marble Mountain Audubon Society v. Rice*,
914 F.2d 179 (9th Cir. 1990) .......................................................................11

*Moapa Band of Paiute Indians v. Dep't of Interior*,
747 F.2d 563 (9th Cir. 1984) .......................................................................11

*Munaf v. Geren*,
553 U.S. 674 (2008) ......................................................................................9

*National Wildlife Federation v. NMFS*,
422 F.3d 782 (9th Cir. 2005) .......................................................................30

*National Wildlife Federation v. NMFS*,
886 F.3d 803 (9th Cir. 2015) .......................................................................29

*Northern Alaska Environmental Center v. Department of the Interior*,
983 F.3d 1077 (9th Cir. 2020).....................................................................20

*Northern Alaska Environmental Center v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006) .........................................................................2

*Northern Plains Resource Council v. Surface Transportation Board*,
668 F.3d 1067 (9th Cir. 2011).....................................................................18

*Northwest Environmental Defense Center v. Bonneville Power Admin.*,
117 F.3d 1520 (9th Cir. 1997).....................................................................22

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
762 F.2d 1374 (9th Cir. 1985).......................................................................9

*Pacific Coast Federation of Fishermen's Ass'ns v. Gutierrez*,
606 F. Supp. 2d 1195 (E.D. Cal. 2008).......................................................30

*Pac. Radiology Oncology, LLC v. Queens Medical Ctr.*,
810 F.3d 631 (9th Cir. 2015) .......................................................................27

*Park Village Apartment Tenants Ass' n v. Mortimer Howard Trust*,
636 F.3d 1150 (9th Cir. 2011).....................................................................27

*Tennessee Valley Authority v. Hill*,
437 U.S. 153, 180 (1978) ........ 34

*Texaco P.R., Inc. v. Dep't of Consumer Affairs*,
60 F.3d 867 (1st Cir. 1995) ........ 8

*United States v. Oakland Cannabis Buyers' Co-operative*,
532 U.S. 483 (2001) ........ 34

*Westlands Water District. v. Department of the Interior*,
376 F.3d 853 (9th Cir. 2004) ........ 7, 22, 24

*Winter v. NRDC*,
555 U.S. 7 (2008) ........ 7, 9

**Statutes and Court Rules**

8 U.S.C. § 2401(a) ........

Endangered Species Act
16 U.S.C. § 1536(a)(2) ........ 5, 29

Naval Petroleum Reserves Production Act ("NPRPA"),
Pub. L. No. 94-258, 90 Stat. 303 (1976) ........ 2

Department of the Interior Appropriations Act for Fiscal Year 1981,
Pub. L. No. 96-514, 94 Stat. 2957 (1980) ("1980 Rider") ........ 2, 10 13–15

42 U.S.C. § 6506a(a) ........ 13

42 U.S.C. § 6506a(i) ........ 14

42 U.S.C. § 6506a(j) ........ 14

42 U.S.C. § 6506a(k) ........ 14

42 U.S.C. § 6506a(n)(1) ........ 2, 10, 11, 13, 14

**Regulations**

50 C.F.R. § 402.13(a) ........ 5

50 C.F.R. §§ 402.14(a)–(b) .......... 5

50 C.F.R. § 402.14(g)(8) .......... 25

**Legislative Materials**

126 Cong. Rec. S29485 (1980) .......... 15

126 Cong. Rec. S29489 (1980) .......... 15, 16

126 Cong. Rec. S31196 (1980) .......... 15

S. Rep. No. 96-985 (1980) .......... 15

H.R. Rep. No. 96-1147 (1980) .......... 15

**Other Authorities**

Notice of Intent to Prepare an Environmental Impact Statement for the Willow Master Development Plan Oil and Gas Prospect, Alaska. 83 Fed. Reg. 38,725-26 (August 7, 2018) .......... 4

Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 84 Fed. Reg. 44,976, 45,002-03 (August 27, 2019) .......... 26

Notice of Availability of the Willow Master Development Plan Final EIS, 85 Fed. Reg. 49,677 (August 14, 2020) .......... 5, 10

16A Charles A. Wright, et al., *Federal Practice and Procedure* § 3954 (5th ed.) .......... 6

## LIST OF EXHIBITS

| | |
|---|---|
| Federal Exhibit 1 | Willow Master Development Plan Final Environment Impact Statement (August 2020) (excerpts) |
| Federal Exhibit 2 | Willow Master Development Plan Record of Decision (October 2020) (excerpts) |
| Federal Exhibit 3 | National Petroleum Reserve-Alaska Final Integrated Activity Plan/ Environmental Impact Statement (November 2012) (excerpts) |
| Federal Exhibit 4 | National Petroleum Reserve-Alaska Final Integrated Activity Plan Record of Decision (2013) (excerpts) |
| Federal Exhibit 5 | National Petroleum Reserve-Alaska Final Integrated Activity Plan Record of Decision (2020) (excerpts) |
| Federal Exhibit 6 | Biological Opinion for Willow Master Development Plan (October 16, 2020) (excerpts) |
| Federal Exhibit 7 | Willow Master Development Plan Draft Environment Impact Statement (August 2020) (excerpts) |

**GLOSSARY**

| | |
|---|---|
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| CBD | Center for Biological Diversity (and other Plaintiffs/Appellants in No. 21-35095) |
| Conoco | ConocoPhillips Alaska, Inc. |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FEIS | Willow Master Development Plan Final Environment Impact Statement (August 2020) |
| GHG | Greenhouse gas |
| Interior | U.S. Department of the Interior |
| MMPA | Marine Mammal Protection Act |
| NEPA | National Environmental Policy Act |
| NPR-A | National Petroleum Reserve in Alaska |
| NPRPA | Naval Petroleum Reserves Production Act |
| Service | U.S. Fish and Wildlife Service |
| SILA | Sovereign Iñupiat for a Living Arctic (and other Plaintiffs/Appellants in No. 21-35085) |
| Willow Project | Conoco's Willow Master Development Plan |

## INTRODUCTION

The Bureau of Land Management ("BLM") spent years studying the environmental effects of the Willow Master Development Plan ("Project" or "Willow Project"), including consulting with the United States Fish and Wildlife Service ("Service") regarding the Project's effects on protected species. The Project involves the construction of infrastructure that will be used for production and transport of oil and gas in the northeastern part of the National Petroleum Reserve in Alaska ("NPR-A" or "Petroleum Reserve"), pursuant to federal leases held by Intervenor-Defendant-Appellee ConocoPhillips Alaska, Inc. ("Conoco").

Months after the BLM published its final environmental impact statement for the Project, two sets of Plaintiff environmental groups—led, respectively by Sovereign Iñupiat for a Living Arctic (collectively, "SILA") and the Center for Biological Diversity (collectively, "CBD")—filed suit and unsuccessfully sought a preliminary injunction of the Project.[1] SILA and CBD have now sought emergency relief, asking the Court to enjoin the Project during the pendency of its appeal. The Court should reject those requests, because Plaintiffs' own delay in filing their lawsuits and seeking injunctive relief undermines their plea for urgency, and indeed renders their National Environmental Policy Act ("NEPA") claims untimely. And Plaintiffs have also not otherwise satisfied the requirements for the extraordinary remedy of injunction pending appeal.

[1] The Federal Defendants in these consolidated appeals have prepared this single opposition in response to the arguments raised in both sets of Plaintiffs' motions. This opposition is accompanied by a motion for extra words.

## STATEMENT OF THE CASE

### A. The National Petroleum Reserve in Alaska

The nearly 23 million acres that comprise the NPR-A were originally designated a naval petroleum reserve by executive order in 1923. *Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006). In 1976, Congress enacted the Naval Petroleum Reserves Production Act ("NPRPA"), Pub. L. No. 94-258, 90 Stat. 303, giving the area its current name and placing it under the jurisdiction of the Secretary of the Interior. 90 Stat. 303. In response to a 1979 oil crisis and reflecting a desire to quickly move from federal to private oil development, Congress amended the NPRPA in 1980, directing the Secretary to undertake "an expeditious program of competitive leasing of oil and gas in the [NPR-A]." Department of the Interior Appropriations Act for Fiscal Year 1981, Pub. L. No. 96-514, 94 Stat. 2957, at 2964–65 (1980) ("1980 Rider"). Consistent with that directive, the 1980 Rider also provided that "[a]ny action seeking judicial review of the adequacy of any program or site-specific environmental impact statement . . . concerning oil and gas leasing in the [NPR-A] shall be barred unless brought in the appropriate District Court within 60 days after notice of the availability of such statement is published in the Federal Register." 42 U.S.C. § 6506a(n)(1).

In November 2012, BLM issued an Integrated Activity Plan/Environmental Impact Statement—a holistic plan that covers the entire Petroleum Reserve and addresses the "nation's need for production of more oil and gas through additional leasing in the NPR-A, and to protect surface values consistent with the exploration

and development of oil and gas." Fed-Ex.3 at AR268917.[2] The 2013 Record of Decision for that plan opened 11.8 million acres of the NPR-A for oil and gas leasing, subject to numerous lease stipulations and best management practices that impose requirements on lessees when constructing facilities and conducting oil and gas operations. Fed-Ex.4 at AR271559, AR271562–63, AR271596–650.

### B. The Willow Project and Winter 2021 Construction

Conoco holds leases in the Petroleum Reserve for the purpose of developing the oil and gas resources therein. Fed-Ex.1 at AR182396. At issue in this case is Conoco's proposed Willow Project—an oil and gas development project—and BLM's and the Service's analyses of its effects. The Project involves the construction of up to five drill sites, a central processing facility, an operations center pad, up to 37.0 miles of gravel roads, ice roads, one to two airstrips, up to 385.5 miles of pipelines, and a gravel mine, as well as the transportation modules for hauling project materials to the Project area. *Id.* The Project includes a large number of mitigation measures intended to avoid or minimize the Project's environmental harms, many of which were developed through the NEPA process in response to public and agency comments. *See* Fed-Ex.1 at AR182697–99. Construction of the Willow Project is scheduled to take place over the next nine years. Fed-Ex.2 at AR186063. The Project itself is projected to continue for approximately 30 years.

---

[2] Both SILA and CBD have provided this court with voluminous, yet incomplete, exhibits. Those exhibits are cited as "SILA-Ex.[number]" and "CBD-Ex.[number]"; where additional pages will inform the court's decision, the Federal Defendants have provided them, cited as "Fed-Ex.[number]."

Only a handful of activities are planned for the winter 2021 season, which will end in April or May 2021. Construction in the Petroleum Reserve typically occurs only in the winter. *See* Fed-Ex.1 at AR182406. The planned construction activities this winter include (1) constructing ice roads, (2) gravel mining, and (3) extending an existing gravel road by 2.0 to 2.8 miles. *See* CBD-Ex.9. In total, the gravel mine and road will affect 24–30 acres of tundra this year. *See id.*; CBD-Ex.24 at 4, 9. Before the district court's order imposing a brief injunction, Conoco had planned to begin gravel mining on or around February 12, 2021.

Only these limited winter 2021 construction activities are at issue in Plaintiffs' present motions and in their appeals from the district court's denial of their requested preliminary injunction. *See* SILA-Ex.27 at 5 n.16.

**C. Analyses of the Willow Project**

Before authorizing the Project, BLM analyzed its environmental effects in accordance with NEPA, and the Service evaluated its potential to adversely affect protected species in accordance with the Endangered Species Act ("ESA").

In response to Conoco's request, on August 7, 2018, BLM issued a Notice of Intent to Prepare an Environmental Impact Statement for the Willow Master Development Plan Oil and Gas Prospect, Alaska. 83 Fed. Reg. 38,725-26. BLM provided an extended scoping period to facilitate additional engagement with the Community of Nuiqsut, and published its Draft EIS in August 2019. Fed-Ex.1 at AR182391. In response to subsistence-related concerns raised during the public period for the Draft EIS, Conoco amended its application to incorporate a new

module delivery option (via an ice bridge across the Colville River), as well as other modifications to its project design; BLM published a Supplement to the Draft EIS in March 2020 analyzing those changes. *Id.* at AR182392. After another public comment period, *id.* at AR182393, BLM on August 14, 2020 issued a Notice of Availability of the Final EIS ("FEIS"). 85 Fed. Reg. 49,677. On October 26, 2020, then-Secretary Bernhardt signed the ROD adopting Alternative B of the FEIS (Conoco's proposed project) as modified by Module Delivery Option 3 (the Colville River Crossing). Fed-Ex.2 at AR186073.

Under Section 7 of the ESA, BLM was also required to ensure that the Project is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). To fulfill that duty, BLM in March 2020 requested consultation with the Service regarding the potential effects of the Willow Project on ESA-listed species, including the polar bear, and on any designated critical habitat. *See* 50 C.F.R. §§ 402.13(a), 402.14(a)–(b). The Service issued its Biological Opinion ("BiOp") in October 2020, concluding that the Willow Project is not likely to jeopardize the continued existence of the polar bear or adversely modify its designated critical habitat. SILA-Ex.7 at FWSAR764–66.

### D. Proceedings below

SILA filed suit on November 17, 2020, challenging both the NEPA and ESA analyses for the Project, and moved for a preliminary injunction on December 23, 2020. CBD filed its suit on December 21, 2020, and moved for preliminary injunctive

relief on December 24, 2020. The district court denied those motions in a single order on February 1, 2021, holding that both Plaintiffs' NEPA claims were untimely and that SILA had failed to establish a likelihood of irreparable injury related to its ESA claim. SILA-Ex.27. SILA and CBD filed notices of appeal and motions for injunction pending appeal in the district court on February 2 and 3, 2021, respectively. On February 5, 2021, before the district court ruled on those motions, Plaintiffs filed their present motions for injunction pending appeal in this Court. The next day, the district court entered a limited injunction, delaying the start of gravel mining and gravel road construction until February 20, 2021 (or when this Court issues its ruling on the pending motions, whichever is earlier). ECF. No. 54 (No. 3:20-cv-290).

## STANDARD OF REVIEW

Contrary to SILA's assertion, Mot. at 5, the standard for reviewing a motion for injunction pending appeal is not "the same" as for reviewing a motion for preliminary injunction. Although those analyses bear "some[] resembl[ance]" to each other, "the differences in posture mean that the two tests are not identical." 16A *Federal Practice and Procedure* § 3954.

Two important aspects of the standard of review for the present motions are muddled in Plaintiffs' presentations. First, in weighing whether to grant Plaintiffs the "extraordinary relief" of an injunction pending appeal, the question of whether Plaintiffs are likely to succeed on the merits (or there are "serious questions" regarding the merits) is focused on the merits of their present appeals, not the underlying case. Those appeals are from the district court's denial of a preliminary

injunction. This Court will ultimately review those appeals "on the merits" for abuse of discretion by the district court. *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc), *overruled in part on other grounds by Winter v. NRDC*, 555 U.S. 7 (2008). So Plaintiffs must show not just that they have a likelihood of success on the merits of their underlying cases, but that they have a likelihood of showing that the district court abused its discretion by declining to preliminarily enjoin the project.

Second, and relatedly, the likelihood of irreparable harm that the Court must consider at this juncture is not the likelihood of harm from the project as a whole, nor even the likelihood of harm during the pendency of the underlying lawsuits. It is the likelihood that Plaintiffs will experience irreparable harm during the pendency of these appeals from the denial of the preliminary injunction. *See Doe #1 v. Trump*, 957 F.3d 1050, 1062 (9th Cir. 2020). Notably, this Court has already fast-tracked the appeals pursuant to Circuit Rule 3-3, with briefing to conclude under the current schedule by April 2021.[3]

Plaintiffs merits arguments will be reviewed pursuant to the deferential standard of the Administrative Procedure Act, under which agency action will be upheld unless "it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Westlands Water District v. Department of the Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)). Review is most deferential where a

[3] For purposes of the appeal from the denial of the preliminary injunction, the Court will consider all activities likely to occur during the pendency of the case, which the district court has indicated it intends to resolve quickly: "the Court could, if necessary, reach a decision on the merits prior to other construction activities occurring after May 1, 2021." SILA-Ex.27 at 5 n.16.

court reviews scientific judgments and technical analyses within the agency's expertise. *Id.* at 871.

## ARGUMENT

### I. Plaintiffs' lack of urgency provides important context for their requests for an extraordinary remedy in this Court.

This emergency motion is a product of Plaintiffs' tardiness. That tardiness—as explained below—is fatal to their NEPA claims generally, since they filed after the statute of limitations for those claims expired. But even setting that point aside, the chronology of this case reveals that Plaintiffs have failed to *act* as though what they *say* is true: that time is of the essence. Plaintiffs' delay in pursuing litigation and seeking preliminary relief is reason alone to deny the present motions. For "equity ministers to the vigilant, not to those who sleep upon their rights." *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 879 (1st Cir. 1995).

The EIS that Plaintiffs allege was deficient was published in August 2020. The SILA Plaintiffs waited some 95 days to file their complaint, and went another 36 days before filing a motion for preliminary injunction, on December 23, 2020. The CBD Plaintiffs—who characterize their filing as "prompt[]," Mot. at 2—were even more dilatory in filing their case, waiting 129 days before even filing their complaint.

Importantly, Plaintiffs were well aware of the likely construction schedule about which they now complain. The Draft EIS and FEIS both report that Conoco intended to begin construction in the first quarter of 2021. Fed-Ex.1 at 192406; Fed-

Ex.7 at AR167944[4]. Despite having that information, Plaintiffs did not seek relief in a timely matter.

Plaintiffs' delay before filing suit and seeking a preliminary injunction, the denial of which they have now appealed, "implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). Yet, having created an alleged emergency where none should have existed, Plaintiffs now seek the extraordinary relief of a last-second injunction pending appeal in this Court. That request should be denied.

## II. Plaintiffs fail to carry their burden of showing that they are entitled to an injunction pending appeal.

Like preliminary injunctive relief, an injunction pending appeal is an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008), granted only "upon a clear showing that the plaintiff is entitled to such relief," *Winter*, 555 U.S. at 22. Plaintiffs have not made that "clear showing" here.

Under the traditional four-factor inquiry, the movant has the burden of clearly establishing (1) that it is "likely to succeed on the merits"; (2) that it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) that "the balance of equities tips in [its] favor"; and (4) that "an injunction is in the public interest." *Id.* at 20. Failure to meet any of these burdens is grounds for denial. *Id.*[5]

---

[4] Construction activities in the NPR-A frequently occur during winter, when temporary ice roads can be used to cross the land without damaging the tundra. *See* Fed-Ex.1 at AR182406.

[5] This Court has stated that an injunction may also be appropriate if the movant shows "serious questions" on the merits, but only if it carries its burden on the other

### A. Plaintiffs are not likely to succeed on the merits of their appeal.

#### 1. Both Plaintiffs' NEPA claims are barred by the statute of limitations applicable to such claims.

The district court determined that CBD's complaint and SILA's NEPA claim were both "quite likely" barred by the statute of limitations set forth in the 1980 Rider. As a result, the court determined that neither party had a likelihood of success (or raised serious questions) regarding their NEPA claims.

The limitations provision states: "Any action seeking judicial review of the adequacy of any program or site-specific [EIS] under [NEPA] concerning oil and gas leasing in the [NPR-A] shall be barred unless brought . . .within 60 days after notice of the availability of such [EIS] is published in the Federal Register." 42 U.S.C. § 6506a(n)(1). Plaintiffs do not dispute that they filed their complaints well more than 60 days after the August 14, 2020, Federal Register Notice of availability of the Willow Project FEIS.[6] Consequently, the district court correctly ruled that Plaintiffs' NEPA claims are time-barred.

Plaintiffs argue that the district court erred in concluding that the statute of limitations applies to their NEPA claims here, insisting that the 60-day time limit applies only to EISs evaluating the effects of leasing decisions, but not to EISs evaluating exploration or development resulting from those leases. Plaintiffs'

---

injunction factors and if the balance of hardships "tips sharply" in its favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). For the reasons explained below, Plaintiffs cannot satisfy either standard.

[6] SILA's complaint was filed 95 days after the notice; CBD filed its suit 129 days after the notice.

arguments rest on an unduly restrictive reading of the statute, and a cherry-picked presentation of the statutory context and legislative history.

As a preliminary matter, SILA's argument rests in large measure on the premise that there is a "strong presumption" in favor of judicial review of agency actions. SILA Mot. at 11. But Federal Defendants are not arguing that the federal decision challenged is *unreviewable*, simply that there is a deadline for such review that Plaintiffs failed to meet. Neither case that SILA cites addresses this situation, as both *Moapa Band of Paiute Indians v. Dep't of Interior*, 747 F.2d 563, 656 (9th Cir. 1984) and *Marble Mountain Audubon Society v. Rice*, 914 F.2d 179, 181 (9th Cir. 1990), addressed whether an agency action was reviewable at all (or was reviewable in the absence of certain conditions). Here, BLM agrees that the sufficiency of its FEIS may be challenged, but Congress has set a strict deadline for the filing of any such challenges in order to provide for an expeditious program of competitive leasing of oil and gas in the Petroleum Reserve, and Plaintiffs have failed to meet that deadline here.

The text of the statute confirms as much. The limitations period applies to "any action seeking judicial review" of an EIS "concerning oil and gas leasing." 42 U.S.C. § 6506a(n)(1). Plaintiffs insist that this provision applies only to EISs regarding actual leasing decisions, and not to EISs concerning activities that are conducted pursuant to oil and gas leases. But the statute itself does not support such a cramped reading. First, the phrase "concerning oil and gas leasing," cannot be fairly read to apply only to lease sale decisions. Even under SILA's proffered definition of the word "concerning"—"relating to" or "regarding"—the review of an EIS about exploration

and development work, which is conducted *pursuant to* an oil and gas lease, is plainly a review "relating to" "oil and gas leasing."[7]

The statute's application of the limitations period to judicial review of "site-specific" EISs also points to an interpretation that encompasses exploration and development EISs. SILA's non-NPR-A citation notwithstanding, *see* SILA Mot. 12, Interior's practice has long been to address leasing decisions in a programmatic EIS, and then to address the resulting exploration and development (both of which involved more detailed plans and fine-grained review) through site-specific EISs or environmental assessments. *See, e.g. Northern Alaska Environmental Center v. Department of the Interior*, 983 F.3d 1077 (9th Cir. 2020) (applying the 60-day statute of limitations to what amounted to a challenge of the programmatic NPR-A Integrated Activity Plan). So the statute's express direction that site-specific EISs are subject to the limitations period indicates that Congress intended for the 60-day period to apply to EISs analyzing exploration and development activities conducted pursuant to leases as well as the leasing decisions themselves.

The Willow EIS that Plaintiffs challenge is a site-specific EIS drafted solely for the purpose of analyzing an oil and gas development project proposed pursuant to Conoco's oil and gas leases in the NPR-A. The EIS's evaluation of these lease-based

---

[7] CBD also cites the Merriam Webster definition of "concerning," but simply states that the definition is "synonymous with" "about." Mot. at 7. CBD does not address the actual *definition* that it cites.

activities constitutes implementation of the NPR-A leasing program and therefore falls within the plain language of Section 6506a(n)(1).

The remainder of the 1980 Rider further supports the district court's reading of the limitations provision. Congress directed Interior to conduct "an expeditious *program*" of privatization of oil and gas leasing and development in the Petroleum Reserve. 42 U.S.C. § 6506a(a) (emphasis added); Pub. L. No. 96-514, 94 Stat. 2964. The 1980 Rider itself is entitled "*Exploration* of [NPR-A]," (emphasis added) and it contemplates not just leasing, but also oil and gas production and the payment of royalties to the government. Pub. L. No. 96-514, 94 Stat. 2964–65. And quite obviously, production is the entire *point* of leasing—while leasing, exploration, and development are different phases of the program, the government does not enter leases without the expectation that a lessee will also seek to explore and, hopefully, produce on that lease.[8] Therefore, allowing litigants six years to challenge an EIS for exploration and development activities under a lease, *see* 28 U.S.C. § 2401(a), would make no sense and is completely at odds with the "expeditious program" that Congress mandated.

---

[8] While production is an outgrowth of leasing, lease status is also affected by production: leases are extended where "oil and gas is produced from the lease in paying quantities." *Id.* at 2964.

Relatedly, SILA is simply wrong in stating, Mot. at 14–15, that oil production was barred in the NRR-A until 2005. Among other things, the presence of language in the 1980 Rider that specifically contemplates oil production demonstrates that SILA's assertion is false.

SILA argues, Mot. at 13, that the Code section title, "Competitive leasing of oil and gas," shows that the statute of limitations applies only to leasing decisions. 42 U.S.C. § 6506a. In fact, SILA has inadvertently proved the opposite because that section—despite its title (which was created in 2005)—addresses not just leasing, but also exploration and development. *See, e.g.*, *id.* § 6506a(i) (regarding lease extensions or expirations depending on production); (j) (addressing unit agreements by which a field may be produced), (k) (exploration incentives). The limitations period in Section 6506a(n)(1) likewise covers exploration and production EISs because they "concern[] leasing" in the same way that all provisions under the broad "Competitive leasing of oil and gas" title also "concern[] leasing." Congress was not using the word "leasing" (or "exploration") to the strict exclusion of the other phases of a leasing program.

CBD points out that BLM's leasing regulation at 43 C.F.R. § 3130.2 mentions the 1980 Rider, but other BLM regulations regarding exploration do not. Mot. at 9 n.4. CBD fails to mention that the leasing regulation it cites is *specific to the NPR-A*, whereas the exploration and development regulations it cites are about onshore oil and gas activates in Alaska, or on federal lands, *generally*. There is nothing to make of the fact that these general regulations do not mention an NPR-A-specific statute of limitations.

As the district court correctly explained, the 1980 Rider is also best understood in its historical context. SILA-Ex.27 at 19. In between the NPRPA's 1976 enactment and 1980, the United States had experienced an energy crisis, with dramatic increases in oil prices. *Id.* (citing H.R. Rep. No. 96-1147, at 32–33 (1980)); *see generally*

https://en.wikipedia.org/wiki/1979_oil_crisis. The NPRPA had not allowed for private leasing; the 1980 Rider changed that, opening the Petroleum Reserve to private leasing and associated exploration and development, and marking a change in policy. Pub. L. No. 96-514, 94 Stat. 2964. The goal of the Rider, as is evident from its text and context, was to expedite leasing, exploration, and development, in order to harness this domestic source of energy.

Oddly, although SILA at first insists that Congress was concerned only about expediting "leasing" (as distinguished from exploration and production), SILA later acknowledges that "Congress was focused on accelerating the timeframe around leasing *and exploration*." Mot. at 14 (emphasis added). This admission aside, SILA still maintains that Congress was uniquely unconcerned about expediting *development*. As discussed above, nothing in the statute supports a carve-out for development activities under a lease, as those activities are equally part of the overall program that Congress wanted to expedite.

Although comments of individual legislators do not demonstrate the intent of Congress as a whole, the record here shows that the shared goal of expedited review was not artificially limited to *leasing decisions*. *See* SILA-Ex.27 at 20–21 (citing, *e.g.* 126 Cong. Rec. S29485, S29489, S31196 (1980) (individual statements emphasizing the need for expediting leasing, exploration, and development); S. Rep. No. 96-985, at 34 (1980) & H. Rep. No. 96-1147, at 32–33 (1980) (indicating an intent to quickly shift from federal to private exploration and development)). Plaintiffs provide no

competing evidence that legislators took a more limited view of the scope of the limitations period.[9]

For all of these reasons, although the question whether the NPRPA's 60-day limitations period applies to an EIS regarding development is a matter of first impression in this Court, Plaintiffs have not shown a likelihood of prevailing on that issue (or raised serious questions about its application). The text indicates, and the context and legislative history confirm, that the limitations period applies to this kind of EIS, and both Plaintiffs' NEPA claims are thus untimely.

### 2. BLM took a hard look at the effects of the Willow Project.

Although the Court may dispose of the NEPA claims (which constitute the entirety of CBD's motion and part of SILA's motion) on the ground that those claims are time barred (or at least likely to be time barred), Plaintiffs also have not demonstrated that they are likely to otherwise prevail on the merits of those claims.

#### a. SILA is unlikely to succeed on the merits of its "hard look" arguments.

SILA is unlikely to prevail on its argument that BLM failed to take the requisite "hard look" at the Willow Project's impacts.

---

[9] CBD, for instance, cites the testimony of Senator Stevens as purported evidence that the provision is focused on leasing along. Mot. at 9. The Senator, however, stated that the need for the bill was to "no longer delay efforts which would increase the domestic supply of our oil and gas and lessen our reliance on imports." 126 Cong. Rec. S29489 (1980). Plainly the Senator was concerned with quick *production*.

First, BLM adequately analyzed the aquatic impacts of bridges and culverts. SILA's contrary argument (Mot. at 16) presents an incomplete picture of BLM's analysis. The FEIS includes descriptions of the proposed bridges for the Willow Project, including the number of bridges in each alternative, the length of the bridges, their clearance above 100-year design-flood elevation or highest documented flood elevation, and corresponding construction details. SILA-Ex.1 at AR182484–85; Fed-Ex.1 at AR182377, 182400. The FEIS describes the potential effects of all in-water structures on surface waters, including on suspended sediment, turbidity, backwater, riverbed erosion, sediment deposit, and changed morphology, SILA-Ex.1 at AR182484–85. The Water Resources Technical Appendix to the FEIS provides a more detailed explanation of the potential impacts to streams from bridges. Fed-Ex.1 at AR185533–35. SILA does not actually explain what additional information would be needed to refine this analysis, nor how additional information and analysis would help the agency make a more informed decision.

Similarly, SILA argues that BLM failed to respond to EPA's comments about water resources. As a threshold matter, SILA mischaracterizes EPA's comments when it says EPA stated that BLM "severely lacked site-specific information necessary to analyze impacts." SILA Mot. at 17 (citing SILA-Ex.1 at AR183180). EPA's cited comments are a series of recommendations for some additional analysis in the FEIS. And BLM responded to each of those comments. SILA-Ex.1 at AR183180. In particular (although it is difficult to discern which comment SILA is even attempting to highlight) in response to an EPA comment, BLM included in Appendix E to the

FEIS the Ocean Point Technical Memorandum, which describes estimated discharge at Ocean Point (where the Colville River Crossing is located). Fed-Ex.1 at AR185538–44.

SILA also argues that there is something wrong with BLM's acknowledgement that there would be future monitoring of aquatic impacts. Mot. at 16. SILA's argument is premised in large part on BLM's adoption of a requirement that Conoco "provide annual surveillance of bridge, culvert, and pipeline river-crossings to confirm that structures are functioning properly and provide maintenance as required." SILA Mot. at 16 (citing SILA-Ex.1 at AR182932); *see also* SILA-Ex.2 at AR186081–82. SILA insists that the surveillance requirement demonstrates that BLM could not adequately assess Conoco's bridge plans. That is incorrect. Even though there were not yet final design details for each bridge, culvert, and pipeline crossing, BLM established mandatory design criteria for those features and rationally concluded that those criteria will minimize the likelihood of adverse effects. SILA-Ex.2 at AR186081–83; *see also* Fed-Ex.1 at AR182481–82 (discussing proposed mitigation that was ultimately adopted). This is not a mere plan to develop a plan that might run afoul of *Northern Plains Resource Council v. Surface Transportation Board*, 668 F.3d 1067, 1085 (9th Cir. 2011). It is a plan that was in place at the time of BLM's decision.

SILA incorrectly insists that the EIS contained "little to no information" about the gravel roads to be constructed as part of the Willow Project, SILA Mot. at 17, ignoring the significant amount of information in the FEIS regarding roads and infrastructure. The FEIS depicts and details in numerous places the total length of

roads, the amount of gravel for those roads, and the location of the roads. *See, e.g.*, Fed-Ex.1 at AR182375–76, AR182754, AR182755, AR182756, AR183232, AR183242, AR183277. As to specifics on drill pads, the EIS analyzes a range of possible numbers of wells per pad and sizes of pads, and the associated impacts of each pad. SILA-Ex.1 at AR182398, AR182410; Fed-Ex.1 at AR182444–59 (describing effects on soils, including the potential for wells to heat surrounding soils). This information was adequate for BLM to take a hard look at the impacts of the Willow Project—indeed, SILA indicates no specific impact it believes has gone unstudied.

In short, BLM did not "lack[] critical information" regarding impacts to water resources from the proposed bridges (SILA Mot. 16), but instead provided that information in the FEIS, satisfying NEPA's requirement to "carefully consider[] detailed information concerning significant environmental impacts" and to provide the public with "relevant information."

**b. BLM adequately considered greenhouse gas emissions.**

CBD argues that BLM violated NEPA by failing to adequately analyze the Willow Project's effects on global greenhouse gas ("GHG") emissions, attempting to equate this case with *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) ("*Liberty*"). But *Liberty* is inapposite. In that case, this Court rejected an analysis in which the agency concluded that not approving an offshore-oil production facility would actually *increase* global GHG emissions. The agency had estimated that emissions would increase under the "no action" alternative because, in the absence of

the project, foreign production—in areas with comparatively weaker environmental protection standards—would rise to meet demand not filled by the project. This Court explained that this "perplexing[]" and "counterintuitive" conclusion ran afoul of economic principles—that building the project would increase worldwide oil supply, causing prices to drop, and consumption to increase. *Id.* at 736–37. In the absence of a satisfactory explanation as to why this result was reasonable, the Court held that it could not uphold the decision even given the deferential standard of review, as "[a]n agency acts arbitrarily and capriciously when it reaches a decision that is 'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* at 739 (citation omitted).

CBD insists that "BLM conducted the same analysis here." Mot. at 11. That is incorrect. Critically, unlike the agency in *Liberty*, BLM did not conclude (or assume) that the project would actually *reduce* global emissions. Instead, BLM concluded the opposite:

> The absence of the Project itself would not lead directly to emissions. Therefore, for ease of comparison to the action alternatives, GHG emissions in the No Action Alternative are assigned a baseline value of zero in the EIS, reflecting the status quo and current GHG emissions trends in the absence of the Project.

CBD-Ex.7 at 41–42. In other words, the Project's emissions are all analyzed as *additional*, beyond this zero baseline.[10]

---

[10] BLM did analyze, as part of its study of the Project's indirect effect, the Project's displacement of energy that would otherwise be produced by other sources. That analysis shows that BLM still concluded that the Project would result in a net increase in emissions, *see* CBD-Ex.7 at 43–44, in contrast to the analysis at issue in *Liberty*.

Additionally, in *Liberty*, this Court criticized the agency for neither providing a quantitative estimate of the expected foreign increase in consumption and emissions as a result of that project, or a convincing explanation why it was unable to do so, and it accordingly declined to defer to the agency's decision to omit that analysis, 982 F.3d at 737–38, 740. But here, BLM's analysis here meets NEPA's requirements, as BLM adequately explained why it could not perform a reliable quantitative estimate of downstream GHG emissions abroad. BLM specifically explained that it could not extend the modeling of foreign oil markets and price to global GHG emissions estimates because of "uncertainty and lack of reliable data" for a number of crucial factors for that analysis. CBD-Ex.23 at 18, 19. Such an analysis would require "detailed data on proportional consumption changes and the most likely energy substitutions." Fed-Ex.1 at AR183508. Calculating global GHG emissions estimates would also require nonexistent data on "emissions from refineries, natural gas systems, [and] coal processing." *Id.* An estimate of downstream GHG emissions based on foreign consumption would also require unavailable, detailed data and information on "emissions factors specific to the energy substitutes for all countries worldwide," as "the GHG emissions rates for even the same class of fuels can vary significantly from country to country." *Id.* So not only does BLM's analysis here not include the counterintuitive conclusion about no-action effects that drew the Court's attention in *Liberty*, BLM's explanation of the limits of its ability to quantify foreign emissions scenarios goes well beyond the explanation that this Court found deficient in *Liberty*.

And while CBD points out that BLM had access to reports about the general effects of increasing domestic oil supply on foreign consumption, CBD does not argue that these general studies contained sufficient data that would have allowed BLM to make quantitative estimates of the effects of such consumption. Mot. at 12. BLM's determination that it lacked reliable data on necessary factors to conduct a quantitative analysis is entitled to deference. *See Kleppe v. Sierra Club*, 427 U.S. 390, 412–14 (1976).

### 3. BLM considered a reasonable range of alternatives.

CBD also argues that BLM failed to consider a reasonable range of alternatives to the proposed action. The argument fails because BLM's selection of alternatives allowed for informed decision-making and satisfied NEPA's rule of reason.

In an EIS, an agency "need not consider an infinite range of alternatives, only reasonable or feasible ones." *Westlands Water District*, 376 F.3d at 868; *see also Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1180 (9th Cir. 1990). An agency need not "consider alternatives which are infeasible, ineffective, or inconsistent" with the agency's objectives, *id.;* its consideration of alternatives is dictated by the "nature and scope of the proposed action," *Northwest Environmental Defense Center v. Bonneville Power Admin.*, 117 F.3d 1520, 1538 (9th Cir. 1997) (citation omitted); *see also League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Service*, 689 F.3d 1060, 1071 (9th Cir. 2012).

As CBD acknowledges, the purpose of the Proposed Action is "to construct the infrastructure necessary to allow the production and transportation to market of

federal oil and gas resources under leaseholds in the northeast area of the NPR-A, consistent with the proponent's federal oil and gas lease and unit obligations." CBD-Ex.7 at 25. The need for BLM's action is to respond to Conoco's request for authorizations under the NPRPA to conduct oil and gas development in the NPR-A. *Id.* CBD does not challenge the scope of the Project purpose, but instead argues that BLM incorrectly rejected other options that Plaintiffs proposed, specifically (1) an option that would prohibit permanent infrastructure in the Teshekpuk Lake and Colville River Special Areas, and (2) an option that would allow drilling only during the winter season and would include no permanent roads. Mot. at 14–15. CBD's argument lacks merit for two reasons.

First, as to the first proposed alternative, BLM explained in response to comments that the purpose and need of the Project could not be met without infrastructure in the Teshekpuk Lake Special Area because two of the drill sites are within that Special Area within an area that is available to oil and gas leasing. Fed-Ex.1 at AR183012. And, at "the development stage, the siting of oil and gas facilities is largely dependent on the location of the subsurface resources to be extracted." *Id.* In any event, BLM explained, effects of infrastructure in the Teshekpuk Lake and Colville River Special Areas were not necessarily any greater than they would be elsewhere. *Id.* at AR183096. Additionally, the designation of these Special Areas does not prohibit Petroleum-Reserve related activities in them, but does require that activities be conducted in a way that offers maximum protection, consistent with

NPRPA requirements. *See id.* at AR183226.[11] BLM explained that the overall footprint of infrastructure in Special Areas was "scrutinized to minimize development and impacts" within those areas. *Id.* at AR183013. Indeed, the Willow Project includes just one mile of road and pipeline through the former Colville River Special Area, which totaled 2.4 million acres, and the Project includes setbacks along the River to protect Arctic peregrine falcon nesting habitat. *Id.* at 183225–26.

Second, as to CBD's second proposal, that Conoco be limited to winter-only drilling, BLM explained that drilling only during the winter season would reduce drilling to approximately two months per year. *Id.* at AR183012.[12] This would significantly affect the economic feasibility of the Willow Project, which BLM may consider when determining whether an alternative is reasonable. *Id.* Indeed, agencies are not required to consider alternatives that are "speculative" or infeasible. *Westlands Water Dist.*, 376 F.3d at 868. BLM also explained that winter-only drilling would also affect the leases granted to Conoco as "leases are subject to a limited term of years," and such a short drilling season would extend the life of the project (and its associated impacts) for decades, perhaps beyond the term of the lease. *Id.*

---

[11] In December 2020, BLM finalized an update to the 2013 Integrated Activity Plan. The new Plan extended the protections of the Colville River Special Area to the entire Petroleum Reserve and so eliminated the special designation. Fed-Ex.5 at AR287108.

[12] The ice road season in NPR-A is only about 4 months, and a drill rig would have to be mobilized across newly constructed ice roads, rigged up, drilled, and demobilized in that time period. *Id.*

In sum, BLM provided a reasonable explanation as to why it rejected Plaintiffs' proposals as infeasible or contrary to the Project's purpose and need. Nothing more was required.

### 4. SILA fails to show that the Service's BiOp violates the ESA.

SILA has also failed to show a likelihood of success on its challenge to the Service's conclusion in the BiOp that the Project is not likely to jeopardize the polar bear or adversely affect its critical habitat.

Citing *Liberty* SILA argues that the Service impermissibly relied on mitigation measures as a basis for its "no jeopardy" conclusion. Mot. at 19. But *Liberty*—which held that the Service cannot rely on yet-to-be developed and approved Marine Mammal Protection Act ("MMPA") mitigation for a no jeopardy determination—does not assist SILA for two reasons.

First, the Service's analysis in *Liberty* was governed by ESA consultation regulations that were superseded in 2019, and which do not apply to the Service's BiOp in this case. *Liberty* did not interpret the new regulations, which explicitly require the Service to consider future mitigation measures incorporated into the proposed action, without any "additional demonstration of binding plans." 50 C.F.R. § 402.14(g)(8) (effective October 28, 2019). As explained in the preamble, the ESA requires the Service to consider the effects of the proposed action *in its entirety*, including aspects of the proposed action with adverse or beneficial effects.

Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 84 Fed. Reg. 44,976, 45,002-03 (August 27, 2019).

Second, and importantly, the Service did not rely on future MMPA mitigation for its no-jeopardy determination. SILA variously points out that the Service "summarizes" and "states" the availability of mitigation measures, but SILA does not show that the Service *relied on* the presence of these measures for its determination. SILA cannot do so because the Service's "no jeopardy" determination is based *only* on the following: (1) the location of the project as the vast majority of the action area is located far from the coast and in areas of low polar bear abundance; (2) the timing of activities as many activities would occur only during summer when very few bears would be present; (3) mitigation measures built into the proposed action itself such as minimum flight altitudes, and plans to avoid attracting bears; (4) required den surveys; (5) required one-mile operational exclusion zone around any detected dens; and (6) sophisticated modeling indicating >84% probability of zero take of denning bears occurring over the 30-year life of the Willow Project. SILA-Ex.7 at FWSAR764. After already concluding "no jeopardy," the Service *also* acknowledged the Willow Project's additional protective measures like future compliance with the substance and standards of the MMPA, which only bolstered the Service's previous "no jeopardy" conclusion. *Id.*

The same is true for the Service's conclusion that the Project is not likely to adversely affect polar bear critical habitat. As the BiOp explains, MMPA mitigation measures "provide further assurance" that there will be no adverse modification of

sea ice habitat The Service similarly stated that the MMPA measures provide "assurance" that (as the Service had already found) the effects on barrier island habitat will be "minor and temporary." *Id.* at FWSAR765–66. The Service's statement that the MMPA measures increased its confidence in its prior no-jeopardy and no-adverse-modification conclusions does not constitute improper reliance on those measures as the *basis* for its conclusions.

Accordingly, SILA's assertion that the Service unlawfully relied on future compliance with MMPA mitigation measures is simply wrong.

* * *

Plaintiffs have not shown a likelihood of success on the merits, and their motions should be denied on that basis alone.

**B. Plaintiffs have not demonstrated a likelihood of irreparable harm while this appeal is pending.**

To satisfy the irreparable-harm prong of *Winter* for purposes of their motions for injunction pending appeal, Plaintiffs must show that there is a likelihood of irreparable harm *during this appeal*, and those harms have to be related to the merits arguments Plaintiffs raise in their underlying suits. *See Pac. Radiology Oncology, LLC v. Queens Medical Ctr.*, 810 F.3d 631, 635–36 (9th Cir. 2015) (movant must "establish a relationship between the injury claimed of in the party's motion and the conduct asserted in the complaint."); *see also Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150 (9th Cir. 2011) (injunction overbroad if not "relating to" plaintiff's actual legal claims).

### 1. SILA has not shown a likelihood of irreparable injury related to its NEPA claim.

To show a likelihood of irreparable harm for purposes of this motion related to its NEPA claim, SILA must show that some aspect of construction that will take place during the appeal has a likelihood of irreparably injuring one or more of its members. SILA does not meet this bar. SILA is correct that the gravel mining and gravel road construction that is slated to take place this winter will permanently remove or alter some wetlands. However, only a relatively small part of the Project's total effects on wetlands will occur as a result of this winter's activities (which involves the construction of up to 2.8 miles of gravel road, less than 8% the Project's total planned gravel roads).

Moreover, SILA's concerns about wetlands in its argument regarding irreparable injury is not mirrored in its merits argument—SILA generally argues that BLM lacked unspecified information, but mentions wetlands just a single time. *See* Mot. at 18. SILA does not specifically argue that the BLM has failed to consider some important aspect of the Willow Project's effects with regard to wetland fill—indeed, the FEIS contains a detailed description of the expected effects on wetlands from both roads and the gravel mine site. *See* SILA-Ex.1 at AR18501–02.

SILA also does not establish that the construction activities *this winter* will directly affect any of its members. One SILA "supporter" states that he is "worried about how [the Willow gravel] mine will impact us and the health of fish downstream," SILA-Ex.18 at 4, as well as "concerned" and "worried" about health

effects from road construction and effects on caribou movement, *id.* at 4–7.[13] But he does not state that he intends to visit the area of this winter's construction and does not establish that the construction will actually harm him. The other declaration that SILA cites also includes no specific statements that that construction activities *this winter* will likely cause injury to that declarant. *See* SILA-Ex.13; Mot. at 8. Non-specific statements about concerns about construction generally or the Project as a whole fall short of the requirement that groups "must demonstrate immediate threatened injury" to their members. *Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1022 (9th Cir. 2016).

### 2. SILA has not shown a likelihood of irreparable injury related to its ESA claim.

Consistent with ESA Section 7's purpose of "insur[ing]" that agency action is "not likely to jeopardize the continued existence of any [listed] *species*," 16 U.S.C. § 1536(a)(2) (emphasis added), demonstrating irreparable harm caused by a Section 7 violation requires showing harm to a listed species as a whole—not to individual members of a species. *National Wildlife Federation v. NMFS*, 886 F.3d 803, 819 (9th Cir. 2015) (while "[s]howing an extinction-level threat to listed species is not required," plaintiffs nonetheless must demonstrate "a definitive threat of future harm" to the species). Issuance of an injunction based on harm to individuals of a species is therefore appropriate only where "the loss of those individuals would be significant

[13] SILA cites no law allowing this Court to consider the claims of harm to its "supporters," and we are aware of none. The Supreme Court has directed that standing of an environmental group is based on direct harms to groups' "members." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992).

for the species as a whole." *Pacific Coast Federation of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1210 n.12 (E.D. Cal. 2008) (emphases omitted).[14]

As such, there is a mismatch between SILA's Section 7 claims and the alleged danger that it hopes to avoid by obtaining an injunction pending appeal. SILA focuses on the Service's findings that some aspects of the Willow Project could affect polar bears and claims that the Service has overestimated the ability of Conoco to detect bear dens before initiating winter operations.

But SILA does not show that there is a likelihood of harm to polar bears as a species, particularly during this year's winter activities. SILA points out ways that the Willow Project could possibly could disturb denning bears, and that some Project activities are in polar bear critical habitat. SILA insists that its preferred experts—and not the Service—are correct about the efficacy of den-detection technology, and that the Project will thus likely disturb more polar bear dens than the Service predicts. Mot. at 10. SILA provides no reason that this Court should discard the Service's expert opinion, developed through a sophisticated study and years of experience.[15]

---

[14] Other courts have similarly required that plaintiffs making a showing of species-level harm where the asserted injury arises from a Section 7 violation. *See, e.g.*, *Animal Welfare Institute v. Martin*, 623 F.3d 19 (1st Cir. 2010); *Humane Society v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008); *National Wildlife Federation v. NMFS*, 422 F.3d 782, 796 (9th Cir. 2005); *Fund for Animals v. Frizzell*, 530 F.2d 982, 986–87 (D.C. Cir. 1975).

[15] On this point, SILA erroneously states that the Service's analysis assumed that den-detection technology would detect 74% of dens. In fact, the analysis was based on data suggesting that technology would detect 74% of dens *less than 100cm deep*, and that 76% of dens are *less than 100cm* deep, meaning the Service's overall assumed detection rate in the Service's analysis was 56%. *See* Fed-Ex.6 at FWSAR794–97. In any event, the Service's analysis is based on data that is newer than that proffered by SILA.

Moreover, SILA fails to report that the Service's best estimate is that *zero* takes of denning cubs will occur *over the entire 30-year life of the Project*. SILA-Ex.7 at FWSAR797 (reporting an 84% chance of this outcome). And for the timeline at issue in this appeal—a single winter of construction—the Service estimates "a mean level of take of ~0.15 cubs each year *and a median of 0*" *for each of the first nine years of construction*. *Id.* at FWSAR797 (emphasis added).

SILA also does not establish that, even if some very unlikely lethal take related to undetected dens occurs this winter, it would have a perceptible impact on the species as a whole. Nor has SILA argued that there will be effects on non-denning polar bears this winter could impact the species, and indeed SILA could not credibly advance such an argument: with respect to effects on non-denning bears, the Service estimates that up to two bears may experience non-lethal injuries during the entire Project life. *Id.* at FWSAR764. SILA presents no contrary expert analysis demonstrating that adverse effects on individual bears this winter (if any) are likely to have an adverse impact on the species as a whole.

**3. CBD has not shown a likelihood of irreparable injury.**

CBD makes an effort to establish a link between Project activities slated to occur this winter and harm to one or more of its members, but, like SILA, the link is too tenuous to justify the extraordinary remedy of an injunction.

CBD alleges irreparable harm from blasting noise that it alleges will disturb caribou near the mine site and ice and gravel road construction that it says will affect the movement of caribou. By extension, CBD argues, these impacts on caribou will

affect Plaintiffs' members who hunt in the Project area. Mot. at 16–18. But while BLM acknowledges that blasting noise will disturb caribou and displace them from around the mine site, blasting is a limited activity, and CBD does not show that its alleged injuries from this activity are *irreparable,* i.e., more than temporary. The same is true for traffic on ice and gravel roads—a stay is not needed to preserve the status quo because, if Plaintiffs' underlying suits are successful and the Project does not go forward, that traffic will not continue.

And while BLM recognizes that disruption to subsistence food sources would be a potential irreparable injury, CBD has failed to establish that its members are likely to be affected by any disruptions to caribou movements. CBD's declarant attests that she has in the past hunted near the mine location, but does not evince an intent to return, nor explain how this winter's activities will affect her subsistence activities. Indeed, blasting will occur during winter, when hunting levels are reduced. *See* Fed-Ex.1 at AR185775. The declarant does not mention hunting caribou in winter, but largely espouses "worry," and not a likelihood of effects this winter. *See* CBD-Ex.13 at 17–18. That is not enough to demonstrate a likelihood of irreparable injury.

CBD also relies on a second declarant, who says she has plans to visit the Teshekpuk Lake Special Area to observe birds in 2022, and believes Willow Project activities will impair her ability to do so. Mot. at 20; CBD-Ex.14. But none of this winter's construction will be in the Teshekpuk Lake Special Area. *See* CBD-Ex.9. Putting aside that defect in CBD's argument, the possibility that the limited work that will eventually occur in the Special Area might affect birds that the declarant would

like to observe is entirely speculative. The Special Area is enormous—*see* Fed-Ex.1 at AR182385—and the declarant does not state that she has planned travels that will take her to the vicinity of the Willow Project, which will affect a very small portion of that Area.

The same problems apply to CBD's third cited declarant, who does not mention a concrete plan to visit the Teshekpuk Lake area in the future, let alone the vicinity of the Willow Project. *See* CBD-Ex.15 at 7 (mentioning a plan to visit the Petroleum Reserve, which encompasses almost 23 million acres).

Simply put, CBD has failed to "demonstrate immediate threatened injury," *Boardman*, 822 F.3d at 1022 (internal quotation marks omitted), that will be felt by its members as a result of this winter's construction activities.

**4. CBD's "bureaucratic momentum" argument fails.**

CBD also argues that an injunction is warranted because if this winter's construction is allowed to occur, that activity will make it more difficult for BLM to assess alternatives if this lawsuit results in a remand. Mot. at 21–22. But CBD's argument does not acknowledge how small this year's activities are in proportion to the Project as a whole. This year will, at most, result in a 2.8-mile extension of an existing gravel road, whereas the entire Project involves 37 miles and several other facilities. *See* CBD-Ex.9. And this winter is just the first of nine years of planned construction activities. CBD does not show that this incremental step toward Project construction would impair BLM's ability to engage in a good-faith evaluation on remand—indeed it would not.

### C. Balance of Equities

For their NEPA claims, Plaintiffs must further prove that a preliminary injunction would serve the public interest that the balance of equities is in their favor; when the government is a party, the analyses of the public interest and balance of equities merge, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citation omitted). The Court need not reach these elements unless Plaintiffs have made the requisite showing of likelihood of success on the merits and irreparable injury: *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778–79 (9th Cir. 2018).

Plaintiffs' environmental concerns notwithstanding, Congress has made oil and gas development in the Petroleum Reserve a priority, and BLM's decision here addresses Conoco's development of its previously-issued federal oil and gas lease. Fed-Ex.1 at AR182369. "Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute." *United States v. Oakland Cannabis Buyers' Co-operative*, 532 U.S. 483, 497 (2001); *see also Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978) ("Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought.").

Additionally, an injunction could have the effect of delaying revenue to the State of Alaska, North Slope Borough, and Federal Defendants in the form of royalties and state and local taxes associated with the Willow Project. Fed-Ex.2 at AR186063. Indeed, an injunction that lasts the duration of this appeal—even if this Court is able to reach a decision on the preliminary injunction appeal in just a few

months—would effectively delay construction for a year, because work at these initial stages must occur in the winter.

Plaintiffs have not shown that their allegations of harm—general and unlinked to immediate activities as they are—outweigh these considerations, particularly where they have not established that the authorization of these limited construction activities violated the law.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motions for an injunction pending appeal should be denied.

Respectfully submitted,

s/ Erika B. Kranz
JEAN E. WILLIAMS
*Acting Assistant Attorney General*
ANDREW C. MERGEN
KEVIN MCARDLE
CAITLIN CIPICCHIO
RICKEY TURNER
ERIKA B. KRANZ
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice

Of Counsel:

MICHAEL GIERYIC
*Attorney*
Office of the Regional Solicitor
U.S. Department of the Interior

February 10, 2021
DJ# 90-1-4-16188 & 90-1-4-16215

## CERTIFICATE OF COMPLIANCE

This motion response contains 9,300 words, excluding the items exempted by Cir. R. 27-1(1)(d). The type size and typeface comply with Fed. R. App. P. 27(d)(1)(E).

This motion response is accompanied by an unopposed motion to file a single overlength response to two motions.

s/ Erika B. Kranz
ERIKA B. KRANZ

Counsel for Federal Defendants