Jeremy C. Lieb
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
jlieb@earthjustice.org

Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs-Appellants Center for Biological Diversity et al.*

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC *et al.*,<br>and<br>CENTER FOR BIOLOGICAL DIVERSITY *et al.*,<br>*Plaintiffs-Appellants,*<br>v.<br>BUREAU OF LAND MANAGEMENT *et al.*,<br>*Defendants-Appellees*,<br>and<br>CONOCOPHILLIPS ALASKA, INC.,<br>*Intervenor-Defendant-Appellee.* | **No. 21-35085 &<br>No. 21-35095<br>(consolidated)**<br><br>On Appeal from the United States District Court for the District of Alaska<br><br>No. 3:20-cv-00290-SLG<br>No. 3:20-cv-00308-SLG<br><br>Hon. Sharon L. Gleason |

**PLAINTIFFS-APPELLANTS CENTER FOR BIOLOGICAL DIVERSITY *ET AL.*'S REPLY IN SUPPORT OF EMERGENCY MOTION PER CIRCUIT RULE 27-3 (RELIEF NECESSARY BY FEBRUARY 20, 2021)**

## TABLE OF CONTENTS

INTRODUCTION ..... 1

ARGUMENT ..... 1

I. CBD Plaintiffs are likely to succeed on the merits of this appeal. ..... 3

A. The Reserves Act's statute of limitations does not apply here. ..... 3

B. BLM's failure to adequately disclose and analyze the effects of greenhouse gas emissions violated NEPA. ..... 7

C. BLM's failure to consider reasonable alternatives violated NEPA. ..... 9

II. CBD Plaintiffs are likely to suffer irreparable harm during the pendency of this appeal without an injunction. ..... 10

A. This winter's activities will cause immediate and irreparable harm to CBD Plaintiffs' members. ..... 11

B. Gravel mining and road construction will cause irreparable harm to recreational, research, and aesthetic interests. ..... 14

C. The gravel road will make it more difficult for BLM to reach a different decision. ..... 15

III. The balance of equities and public interest favor a preliminary injunction. ..... 15

CONCLUSION ..... 19

CERTIFICATE OF COMPLIANCE ..... 20

## TABLE OF AUTHORITIES

### CASES

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ....................................................12, 14, 15, 16, 19

*Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*,
179 F.3d 725 (9th Cir. 1999) ..........................................................................2

*Cascadia Wildlands v. Scott Timber Co.*,
715 F. App'x 621 (9th Cir. 2017) ....................................................................2

*Center for Biological Diversity v. Bernhardt* (*CBD*),
982 F.3d 723 (9th Cir. 2020) ...........................................................7, 8, 9

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ........................................................................4

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ..................................................................16, 17

*Fed. Trade Comm'n v. Enforma Nat. Prod., Inc.*,
362 F.3d 1204 (9th Cir. 2004) ........................................................................2

*Flores v. Barr*,
977 F.3d 742 (9th Cir. 2020) ..........................................................................2

*Indep. Living Ctr. of S. Cal. v. Shewry*,
543 F.3d 1050 (9th Cir. 2008) ........................................................................2

*Kent v. Dulles*,
357 U.S. 116 (1958)..........................................................................................4

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ........................................................................17

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
547 U.S. 71 (2006)............................................................................................4

*N. Alaska Envtl. Ctr. v. Hodel*,
803 F.2d 466 (9th Cir. 1986) ........................................................................17

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018) ....................................................................3

*People of State of California ex rel Younger v. Andrus*,
608 F.2d 1247 (9th Cir. 1979) ................................................................ 4-5

*Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*,
472 F.3d 1097 (9th Cir. 2006) ..................................................................2

*Se. Alaska Conservation Council v. U.S. Forest Serv.*,
413 F. Supp. 3d 973 (D. Alaska 2019) .....................................................16

*Sierra Club v. Trump*,
963 F.3d 874 (9th Cir. 2020) ..................................................................14

**STATUTES**

42 U.S.C. § 6506a(n)(1).............................................................3, 4, 5, 6

43 U.S.C. § 1349(c) ......................................................................................3

Pub. L. No. 96-514, 94 Stat. 2964 (Dec. 12, 1980). .....................................5, 6

**REGULATIONS**

43 C.F.R. § 3135.1-5....................................................................................10

43 C.F.R. § 3150.0-3......................................................................................6

43 C.F.R. § 3160.0-3......................................................................................6

## INTRODUCTION

CBD Plaintiffs are likely to succeed on the merits of this appeal because the Reserves Act's statute of limitations, which the district court relied on to deny CBD Plaintiffs' motion for preliminary injunction, does not bar Plaintiffs' claims. In support of their motion for injunction pending appeal, CBD Plaintiffs have also demonstrated a likelihood of success on the underlying merits and have shown irreparable harm is likely from construction activities. In its order granting a partial injunction pending appeal, the district court agreed, finding sufficient harm and enough likelihood of success on at least one of the underlying claims to justify a temporary injunction. *See* CBD Ex. 26.[1] None of the arguments offered by the opposition support a conclusion that the statute of limitations applies here or provide a reason to deny a full injunction pending the resolution of this appeal.

## ARGUMENT

The opposing parties incompletely state the standards that apply to this Court's decision, suggesting this Court should defer to the district court's interpretation of the Reserves Act's statute of limitations. Fed. Resp. at 6-7; ConocoPhillips Resp. at 7-8. First, in deciding a motion for injunction pending appeal, this Court does not directly review any decision of the district court, it

---

[1] "CBD Ex." in this document refers to exhibits to CBD Plaintiffs' motion or this reply.

considers the relevant factors on its own. *See Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006). Of course, the requirement to show likelihood of success on the merits, or, alternatively, serious questions going to the merits along with a balance of hardships that tips sharply toward the plaintiffs, refers to the issues on appeal. *See Flores v. Barr*, 977 F.3d 742, 746 (9th Cir. 2020). A court deciding an injunction pending appeal should consider the standard of review on appeal in evaluating likelihood of sucess. And while this Court reviews some aspects of a district court's denial of a motion for preliminary injunction under an abuse of discretion standard, it reviews questions of law de novo. *Indep. Living Ctr. of S. Cal. v. Shewry*, 543 F.3d 1050, 1055 (9th Cir. 2008); *Fed. Trade Comm'n v. Enforma Nat. Prod., Inc.*, 362 F.3d 1204, 1211-12 (9th Cir. 2004); *see also Cascadia Wildlands v. Scott Timber Co.*, 715 F. App'x 621, 623 (9th Cir. 2017) (applying the same de novo standard of review to assess whether there were serious questions going to the merits warranting preliminary injunction). "Whether the Reserves Act's statute of limitations applies to bar CBD Plaintiffs' NEPA claims is therefore subject to de novo review on appeal. *See Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730 (9th Cir. 1999) ("The interpretation of a statute is a question of law reviewed de novo.").

The district court's preliminary injunction decision, as to CBD Plaintiffs, was based entirely on its interpretation of a statute, and thus did not make factual findings. In granting a partial injunction pending appeal, however, the district court found Plaintiffs demonstrated likely irreparable harm while the appeal is pending. CBD Ex. 26 at 5-8. Thus, to the extent this Court defers to the district court's factual determinations, *cf. Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822-23 (9th Cir. 2018) (applying a clear error standard to district court harm finding), that deference favors finding irreparable harm.

## I. CBD Plaintiffs are likely to succeed on the merits of this appeal.

### A. The Reserves Act's statute of limitations does not apply here.

Federal Defendants and ConocoPhillips fail to grapple with Congress's choice to use the word "leasing" in section 6506a(n)(1). As explained in CBD Plaintiffs' motion, the term refers to a specific and distinct action. CBD Mot. at 5-6. Had Congress intended section 6506a(n)(1) to apply to a broader set of actions—like the development plan approval here—it would have used different words, as it did in other statutes. *See, e.g.*, 43 U.S.C. § 1349(c) (Outer Continental Shelf Lands Act providing for review limitations for decisions to approve "a leasing program," "any exploration plan or any development and production plan"). Contrary to ConocoPhillips' assertion, ConocoPhillips Resp. at 10, while a "lease" (a contract) continues over time, "leasing" (the sale and issuance of the

contract) is a discrete action with an end point at which rights are conveyed to lessees. *See, e.g.*, *Conner v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988) (describing leasing as an agency action with a defined "point of commitment—when the leases are issued"). Congress's choice of the word "leasing" in section 6506a(n)(1) defines its scope and determines the outcome here.

ConocoPhillips and Federal Defendants argue that other words in the provision—"programmatic and site-specific"—expand the meaning of "leasing" to encompass different decisions, like development. Fed. Resp. at 10-11; ConocoPhillips Resp. at 13-15. But there is a better explanation for these terms. The argument ignores cases, CBD Mot. at 7-8, that show in 1980, agencies and courts used the term "site-specific" to refer to types of leasing EISs aimed at specific lease area decisions, as opposed to broad-scale planning level EISs addressing leasing. Congress is presumed to be aware of these interpretations. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (presuming Congress is aware of agency and court constructions of a term when it adopts a new statute using that term); *Kent v. Dulles*, 357 U.S. 116, 127-28 (1958) (interpreting narrowly a statutory provision "expressed in broad terms" based on Congress's presumed awareness of "prior administrative practice"). This gives meaning to the words without torturing the sentence to cover EISs other than those about leasing. *People of State of California ex rel Younger v. Andrus*, 608 F.2d

1247 (9th Cir. 1979). ConocoPhillips Response at 14 n.4, only provides a consistent example—it describes that EISs for lease sales can be programmatic; it does not suggest that they cannot in other circumstances be site-specific.

Federal Defendants' description of BLM's post-enactment practice of preparing only programmatic EISs for leasing decisions, Fed. Resp. at 12, sheds no light on what Congress intended. By contrast, Congress's directions to BLM in the 1980 rider support CBD Plaintiffs' interpretation. In the rider, Congress directed BLM to hold the first lease sale in the Reserve "only after publication of a final environmental impact statement if such is deemed necessary," Pub. L. No. 96-514, 94 Stat. at 2964 (Dec. 12, 1980), but it exempted the first two leasing decisions from this requirement if they were small, *id*. at 2965 (allowing first two lease sales to rely on just-completed BLM studies of the natural resource values of the Reserve if they were under two million acres). The provision's distinction between large-scale leasing decisions that would require an EIS and smaller-scale leasing decisions that, at least initially, would not, underscores that Congress's use of the terms "program and site-specific" refers to different types of leasing decisions and does not expand the definition of "leasing."

Federal Defendants' and ConocoPhillips' arguments that other words expand section 6506a(n)(1)'s application similarly fail. The phrase "concerning oil and gas leasing" may mean relating to or regarding or about leasing, Fed. Resp. at

11-12; ConocoPhillips Resp. at 13-14, but leasing is not exploring or developing or producing. Congress's use of the word "exploration" in the rider's title, Fed. Resp. at 13, is evidence that exploration, and development, are distinct from "leasing," not that Congress used the term "leasing" to encompass them. CBD Mot. at 6, 8.

Federal Defendants and ConocoPhillips hypothesize that, despite its choice of words, Congress could not have meant section 6506a(n)(1) to apply only to "leasing," because plaintiffs might challenge development projects years after BLM approves them. Fed. Resp. at 13; ConocoPhillips Resp. at 11. But, as CBD Plaintiffs explained, there is a different explanation that does not require ignoring Congress's choice of language in the statute: it is unnecessary to expedite challenges to development approvals because those decisions lead imminently to on-the-ground activities, harm to would-be plaintiffs, and thus quick challenges. CBD Mot. at 9. This case is an example.

Finally, though BLM's exploration and development regulations apply beyond the Reserve, Fed. Resp. at 14; ConocoPhillips Resp. at 15 n.5, they specifically implement the Reserves Act, 43 C.F.R. § 3150.0-3 (listing Reserves Act as authority); *id.* § 3160.0-3 (listing 1980 rider, 94 Stat. 2964, as authority), and their omission of provisions implementing section 6506a(n)(1), where the leasing regulations include it, supports CBD Plaintiffs' reading of the statute.

### B. BLM's failure to adequately disclose and analyze the effects of greenhouse gas emissions violated NEPA.

*Center for Biological Diversity v. Bernhardt* (*CBD*), 982 F.3d 723, 740 (9th Cir. 2020) sets out an agency's obligations to (1) quantify greenhouse gas emissions, globally, or (2) explain specifically why it could not *and* discuss the emissions' potential magnitude and nature. Despite acknowledging that the Willow Project "would affect both domestic and foreign energy consumption," CBD Ex. 7 at 106, BLM made no attempt to quantify foreign emissions, did not successfully explain why it could not, and declined to examine the potential magnitude or nature of these emissions. Federal Defendants' response does not distinguish *CBD* or justify these failures. Faced with the same arguments, the district court concluded, in granting a partial injunction pending appeal, that Plaintiffs "could well be likely to succeed on the merits" of this claim. CBD Ex. 26 at 5.

Federal Defendants do not dispute that BLM failed to quantify emissions from foreign oil consumption, and do not argue that, in the absence of such quantification, it met the basic requirement to "estimate the magnitude of such emissions" and provide a "thorough discussion of how foreign oil consumption might change the carbon dioxide equivalents analysis." *CBD*, 982 F.3d at 740. The Court, therefore, need look no further to conclude that CBD Plaintiffs have demonstrated likelihood of success on the merits.

Federal Defendants wrongly assert that that the *CBD* decision is inapposite because BOEM concluded that building the Liberty project would reduce greenhouse gas emissions. Fed. Resp. at 19-20. As explained in CBD Plaintiffs' motion, the Court's decision did not hinge on that counterintuitive prediction. CBD Mot. at 11 n.6. Instead, the foundation of the Court's holding is that "[e]missions resulting from the foreign consumption of oil are surely a 'reasonably foreseeable' indirect effect of drilling," and BOEM's omission of these effects from its analysis violated NEPA. *CBD*, 982 F.3d at 738. BLM's omission here did the same. And as in *CBD*, BLM's omission of foreign consumption in its analysis likely substantially understated the Project's net greenhouse gas emissions. *See id.* at 738-39 (citing studies, also in the record here, showing that models predict significantly higher emissions when foreign consumption is included).

Finally, Federal Defendants' assertion that the FEIS here provided an adequate explanation of BLM's failure to consider foreign emissions, Fed. Resp. at 21, is also wrong. Across the discussions Federal Defendants' cite, the FEIS relies solely on the same unsupported assertions about emissions from foreign consumption that the court in *CBD* rejected: that the agency lacked reliable data or methods. *Compare* Fed. Resp. at 21 (citing statements referencing uncertainty and

lack of data); *with CBD*, 982 F.3d at 737-38 (rejecting functionally identical explanations). *See also* CBD Mot. at 11-12.

**C. BLM's failure to consider reasonable alternatives violated NEPA.**

BLM violated NEPA by failing to consider reasonable alternatives that would change the layout and footprint of the Project by eliminating infrastructure in special areas or eliminating permanent roads. Notably, Federal Defendants do not even defend BLM's repeated justification asserted in the record that ConocoPhillips' rights under its leases precluded BLM from considering alternatives that require different configurations of drill sites or otherwise limit ConocoPhillips' plans. *See* Fed. Resp. at 22-24; CBD Mot. at 14. Alone, this omission supports a conclusion that BLM's justification was arbitrary; in any event, none of Federal Defendants' other defenses are successful.

In the only responsive argument, Federal Defendants assert that an alternative without infrastructure in the Teshekpuk Lake Special Area could not meet the purpose and need of the Project because there are leases and oil in the special area. Fed. Resp. at 23. But the purpose of the Project is not to construct every well in each location that ConocoPhillips proposes, nor to maximize all oil production; it is "to construct the infrastructure necessary to allow the production and transportation to market of federal oil and gas resources under leaseholds in the northeast area of the [Reserve]," CBD Ex. 7 at 25. Nothing in this purpose and

need statement is inconsistent with BLM considering an alternative that would prohibit infrastructure, including drill sites, within a special area.

To support the argument that a winter-only drilling alternative would be economically infeasible, Federal Defendants point to a single comment response where BLM asserted, without support, that the winter drilling season would be too short. Fed. Resp. at 24 (citing AR183012). Federal Defendants also argue, nonsensically, that this alternative would be infeasible because the short duration of the drilling season could extend the life of the Project beyond ConocoPhillips' ten-year lease term. *Id.* In fact, the Project is already scheduled to last much longer than ten years, CBD Ex. 7 at 28, and producing leases may be renewed, 43 C.F.R. § 3135.1-5.

## II. CBD Plaintiffs are likely to suffer irreparable harm during the pendency of this appeal without an injunction.

Federal Defendants and ConocoPhillips argue that the harm caused by this winter's planned activities is speculative and not sufficiently severe nor irreparable. Fed. Resp. at 31-33; ConocoPhillips Resp. at 19-25. These arguments fail. CBD Plaintiffs have demonstrated a number of ways in which they will be irreparably harmed, immediately and over time, by permanent road construction and mining activities planned this winter—any one of which is sufficient to support an injunction pending appeal. As the district court concluded, "[t]here is a

strong likelihood of irreparable environmental consequence once blasting operations commence." CBD Ex. 26 at 9.

### A. This winter's activities will cause immediate and irreparable harm to CBD Plaintiffs' members.

Defendants do not deny that the mine, traffic, and construction, and associated noise, will extend across a large area, and that disturbance to caribou anywhere in this area can deflect the migration route of caribou and therefore affect a hunt that takes place anywhere "downstream" of this deflection. CBD Mot. at 17-18. Indeed, Federal Defendants concede that construction activities will deflect caribou. Fed. Resp. at 32. ConocoPhillips attempts an attack on the evidence CBD Plaintiffs cite regarding caribou deflection, but contrary to its claim, ConocoPhillips Resp. at 21, BLM's conclusions in the EIS about such deflection relate primarily to impacts from road and associated construction activities like those at issue here, and not only from the Project as a whole. *See* CBD Ex. 4 at 20-21; CBD Ex. 7 at 56-57, 72-74.

Federal Defendants also do not dispute that this winter's activities will take place in an area where caribou hunting occurs. CBD Ex. 13 ¶¶10, 11, 36; CBD Ex. 23 at 14, 39. That winter harvests of caribou are lower than at other times of the year does not make disturbance to these hunts "negligible." ConocoPhillips Resp. at 22. Rather, as CBD Plaintiffs have explained, caribou are particularly important

during the winter precisely because they are still available during this period, unlike many other subsistence resources. CBD Mot. at 18.

Though Federal Defendants acknowledge impacts to subsistence hunting would be harmful, they claim that one of CBD Plaintiffs' declarants, Ms. Ahtuangaruak, has not evinced an intent to return to the mine site this winter to hunt nor explained how this winter's activities will affect her subsistence activities. Fed. Resp. at 32. Ms. Ahtuangaruak has identified affected areas as places she and her family use, but because hunting can only take place wherever the caribou are present, she cannot identify now, with certainty, the precise locations where such hunting will occur. It is irreparable harm, however, to remove this affected area from the range of otherwise available nearby hunting opportunities. As the district court explained:

> Even though Ms. Ahtuangaruak does not state specifically when she will visit the area where the mine or the gravel road are located, she lives, hunts, and harvests in the area. As soon as ConocoPhillips begins its blasting operations, Ms. Ahtuangaruak will immediately be deprived of her ability to "view, experience, and utilize" the affected areas in their undisturbed state.

CBD Ex. 26 at 7-8 (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Thus, Ms. Ahtuangaruak "has demonstrated that she will be likely irreparably injured once the mining activities start." CBD Ex. 26 at 7; *see also id.* at 8 (finding that CBD Plaintiffs have established that "at least one of

Plaintiffs' members will likely be irreparably injured absent immediate injunctive relief."). Federal Defendants' argument that worry is not a harm, Fed. Resp. at 32, is merely misdirection. That Plaintiffs' members are worried about these harms only emphasizes how significant they would be to those members; it does not undercut the record evidence showing harm is likely. *See* CBD Mot. at 18-19.

ConocoPhillips, on the other hand, disputes any subsistence harm, and attempts to undermine BLM's own data showing the importance of subsistence foods in Nuiqsut, claiming that the data are more than 10 years old, and arguing that all villages in the North Slope face food limits. ConocoPhillips Resp. at 23. But ConocoPhillips provides no information to counter BLM's data, and the FEIS itself relies on a previous EIS containing this data. CBD Ex. 28 at 3 (citing BLM's 2012 Final Integrated Activity Plan/EIS public health assessment). Although there may be many causes of food insecurity, which is widespread throughout the North Slope, this does not diminish the irreparable harm that is likely to result from this winter's activities. And, as the district court's finding regarding the harm to Ms. Ahtuangaruak makes clear, ConocoPhillips is just wrong that the harm is only to viewing of the area and not to caribou hunting and subsistence uses. ConocoPhillips Resp. at 25.

ConocoPhillips also questions whether noise from the mine will cause irreparable harm by attempting to distinguish the planned mine from previous

mining. ConocoPhillips Resp. at 23-24. It does not demonstrate, though, that any of the differences it claims—smaller shot size and slightly greater distance from the community—make irreparable harm unlikely in this case.

### B. Gravel mining and road construction will cause irreparable harm to recreational, research, and aesthetic interests.

Defendants do not deny that a permanent road and associated industrial impacts will destroy the natural setting of the area, nor that construction would extend from previously developed areas into wholly undeveloped areas (though ConocoPhillips misleadingly refers to construction in other previously developed areas). CBD Mot. at 20-21. Instead, Federal Defendants and ConocoPhillips claim that because the area that will be permanently destroyed this winter is relatively small when compared to the entire area of the Reserve, the harm to Plaintiffs is minimal. Fed. Resp. at 32-33; ConocoPhillips Resp. at 19-20; *see also id.* at 21 (arguing that because activity is already occurring at a different project, any harm to Plaintiffs from additional development is "exceedingly minor."). Yet, this loss is real and irreparable and is not mitigated by the existence of other places in the Reserve that are still undeveloped. *See Sierra Club v. Trump*, 963 F.3d 874, 895 (9th Cir. 2020); *Alliance for the Wild Rockies*, 632 F.3d at 1135.

As the district court affirmed, this type of injury constitutes irreparable harm. CBD Ex. 26 at 6. "Here, once ConocoPhillips begins blasting to remove the overburden at the mine site . . . the landscape will be irreparably altered." *Id.* at 7.

And despite Federal Defendants' assertion to the contrary, Fed. Resp. at 32-33, CBD Plaintiffs have provided evidence from several members who testify to harm from this change to their recreational, research, and aesthetic uses of the region, including to their use of nearby or adjacent areas. *See* CBD Mot. at 20-21.

### C. The gravel road will make it more difficult for BLM to reach a different decision.

Federal Defendants and ConocoPhillips do not dispute that this year's activities involve destruction to the environment which cannot be undone. Instead, Federal Defendants claim that this year's activities are only a portion of the overall destruction that will result by the time construction is complete, and merely assert that the agency will still be able to engage in a good faith evaluation of alternatives, should this case result in a remand. Fed. Resp. at 33. This response glosses over the impact that a partially constructed road will have on BLM's willingness to adopt alternatives without the road or deny approval for the Project altogether. It will not preclude such outcomes, but it will affect BLM's choices and that is harm supporting an injunction here.

## III. The balance of equities and public interest favor a preliminary injunction.

Because CBD Plaintiffs have demonstrated a strong likelihood of success on the merits, this Court need not apply the "sliding scale" test. *See All. for the Wild Rockies*, 632 F.3d at 1135. Nevertheless, a preliminary injunction is warranted

even if Plaintiffs only raise serious questions because the balance of harms tips sharply in Plaintiffs' favor. *Id.*

The government, of course, cites no harm to it, nor could it. For its part, ConocoPhillips states it will terminate most of this winter's construction jobs if an injunction is issued. ConocoPhillips Resp. at 25. Any ConocoPhillips decision to terminate its employees is a product of its choice to proceed in the face of controversy. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1093 (9th Cir. 2014) (explaining companies that presume permitting outcomes "become largely responsible for their own harm") (internal quotation omitted). Further, ConocoPhillips acknowledges that construction for the Willow Project is only "a small portion of industrial construction activity in this area of the . . . Reserve during winter 2021," and that over 500 people remain employed in construction in other ConocoPhillips' development sites, ConocoPhillips Ex. 1 ¶¶10-11, thereby mitigating much of the harm it complains of. *See Se. Alaska Conservation Council v. U.S. Forest Serv.*, 413 F. Supp. 3d 973, 986 (D. Alaska 2019) (considering how other projects would defray any economic losses).

In addition, it is unclear how much ConocoPhillips has actually invested in this winter's activities to date, or how much it may be able to recover if an injunction is issued. ConocoPhillips Resp. at 25; ConocoPhillips Ex. 9 ¶19 (admitting some expenditures could be applied to future work and failing to

provide an estimate of how much will be lost); ConocoPhillips Ex. 8 ¶¶23-25 (claiming delay will harm ConocoPhillips' economic interests while failing to offer specific evidence supporting this assertion or quantifying the loss). And even if ConocoPhillips has spent the full $4 million it asserts it has spent so far this winter, ConocoPhillips Resp. at 25, based on a declaration saying it will be spent by February 14th, ConocoPhillips Ex. 1 ¶9, such a financial impact is not irreparable harm. *N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 471 (9th Cir. 1986); *cf. Drakes Bay Oyster Co.*, 747 F.3d at 1092-93.

The other harms cited by ConocoPhillips and Amici focus on future revenue and jobs that may be generated by development and production beyond this winter's activities. *See* ConocoPhillips Resp. at 27-28; ConocoPhillips Ex. 6 at 3-10; ConocoPhillips Ex. 5 at 6-9. Only harm during the period of the injunction is relevant. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014)) (determining the court "must consider only the portion of the harm that would occur while the preliminary injunction is in place"); *see also* CBD Mot. at 23.

Finally, contrary to Federal Defendants' and ConocoPhillips' assertions of delay, Fed. Resp. at 8-9; ConocoPhillips Resp. at 2-3, CBD Plaintiffs filed this lawsuit promptly. Though BLM issued its FEIS on August 14, 2020, it did not sign a ROD approving the project until October 26, 2020. CBD Ex. 8 at 11, 28.

Without the ROD, Plaintiffs could not know which alternative BLM would select and had no basis on which to challenge a decision BLM had not yet made. Nor did the general statement in BLM's FEIS that ConocoPhillips proposed to begin construction in the first quarter of 2021, Fed. Ex. 1 at 23 (AR 182406), or its reference to ice pad construction, *id.* at 54 (AR 183232), signal that permanent road construction and gravel mining would begin in February. Plaintiffs only learned of ConocoPhillips' specific construction plans for this winter in December 2020, shortly before this case was filed. CBD Ex. 9; CR (Case No. 20-cv-00290) 14-1. CBD Plaintiffs filed this case less than two months after BLM issued its ROD—a short time for reviewing and filing a challenge to a complicated administrative decision authorizing a project that will last for 30 years—and immediately sought preliminary relief, well before BLM even authorized permanent road construction for this winter on the morning of January 20, 2021. CBD Ex. 27.

A preliminary injunction also advances the public interest. Federal Defendants and ConocoPhillips suggest that even if BLM violated the law, an injunction would not further the public interest because Congress has prioritized oil and gas development in the Reserve. Fed. Resp. at 34; ConocoPhillips Resp. at 26-27. To the contrary, the statute does not promote drilling over resources protection, *see* CBD Mot. at 3-4, and there is no public interest in allowing

construction to go forward for a few months in the face of an illegal decision. *See All. for Wild Rockies*, 632 F.3d at 1138.

## CONCLUSION

For the foregoing reasons, CBD Plaintiffs request this Court enjoin all on-the-ground activity pursuant to BLM's authorization of the Willow Project, including gravel mining and road construction, while appeal of the district court's denial of Plaintiffs' motion for preliminary injunction is pending.

Respectfully submitted this 11th day of February, 2021.

*s/ Jeremy Lieb*
Jeremy C. Lieb (Alaska Bar No. 1810088)
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE

*Attorneys for Plaintiffs-Appellants Center for Biological Diversity, Friends of the Earth, and Greenpeace, Inc. in No. 21-35095*

## CERTIFICATE OF COMPLIANCE

I certify that:

(i) This document uses proportionally spaced, 14-point, roman style font and therefore complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6); and

(ii) This document contains 4,329 words, excluding items exempted by Federal Rule of Appellate Procedure 32(f). The length is consistent with the concurrently filed unopposed motion for leave to file overlength reply not exceeding 4,500 words.

Dated: February 11, 2021

*s/ Jeremy Lieb*
Jeremy C. Lieb

## TABLE OF EXHIBITS

*Center for Biological Diversity et al. v. Bureau of Land Management et al.*,
No. 21-35095 (consolidated with No. 21-35085)

| Exhibit No. (Dist. Court Doc. No.) | Description |
|---|---|
| 26 (Doc. 53) | Order Re Motions for Injunction Pending Appeal (Feb. 6, 2021) |
| 27 | Bureau of Land Management (BLM), Corrected Right-of-Way Grant FF097428 Issued (Jan. 20, 2021) |
| 28 (Doc. 24) | BLM, Willow Master Development Plan, Final Environmental Impact Statement (Aug. 2020) (excerpts) |