Case No. 21-35085 (Consolidated with Case No. 21-35095)

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, et al.,
Plaintiffs-Appellants,

v.

BUREAU OF LAND MANAGEMENT, et al.,
Defendants-Appellees,

and

CONOCOPHILLIPS ALASKA, INC.,
Intervenor-Defendant-Appellee.

---

On Appeal from the United States District Court
for the District of Alaska
Case No: 3:20-CV-00290-SLG

---

# REPLY IN SUPPORT OF EMERGENCY MOTION UNDER CIRCUIT RULE 27-3(a)
# (RELIEF REQUESTED BY FEBRUARY 19, 2021)

---

Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501

Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org
bbrisson@trustees.org
blitmans@trustees.org

*Counsel for Plaintiffs-Appellants*

UPDATE RE: CIRCUIT RULE 27-3 CERTIFICATION

I, Bridget Psarianos, certify the following facts to be true, pursuant to Circuit Rule 27-3(a)(3):

1. I am an attorney for Plaintiffs-Appellants Sovereign Iñupiat for a Living Arctic, Alaska Wilderness League, Defenders of Wildlife, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society (collectively "SILA"). I have personal knowledge of the matters stated herein and, if called as a witness, could competently testify thereto. I submit this declaration to clarify the date by which SILA requests relief under its Emergency Motion Under Circuit Rule 27-3 for a Stay Pending Appeal based on events since I submitted my Circuit Rule 27-3 Certification with the motion.

2. In its February 5, 2021 emergency motion, SILA requested relief from this Court by February 12, 2021, the date on which ConocoPhillips Alaska, Inc. (ConocoPhillips) planned to begin gravel mining and construction activities. On February 6, 2021, the District Court issued an order partially granting and partially denying SILA's Motion for Injunction Pending Appeal. CPAI-Ex. 4 at 10–11. Recognizing the likelihood of irreparable harm, the District Court enjoined ConocoPhillips from breaking ground at the Willow mine site or carrying out any road construction activities "through February 20, 2021, or until the Ninth Circuit

rules on any motions for an injunction pending appeal in that Court, whichever occurs first.” *Id*. at 10–11. As a result, SILA respectfully requests a ruling no later than February 19, 2021, in order to provide this Court with additional time to consider and resolve SILA’s motion prior to ConocoPhillips beginning blasting activities.

I declare under penalty of perjury that the foregoing is true.

Dated: February 11, 2021

*s/ Bridget Psarianos*
Bridget Psarianos
Attorney for Plaintiffs-Appellants

## TABLE OF CONTENTS

TABLE OF CONTENTS ........ iii
TABLE OF EXHIBITS ........ IV
ARGUMENT ........ 1
I. WINTER CONSTRUCTION WILL CAUSE IRREPARABLE HARM. ........ 1
II. SILA IS LIKELY TO SUCCEED ON THE MERITS. ........ 6
A. SILA Is Likely to Succeed on the Merits of Its NEPA Claims. 6
*1. SILA's claims are not time barred.* ........ 6
*2. BLM did not adequately consider Willow's impacts.* ........ 10
B. The Willow BiOp violates the ESA. ........ 13
III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR AN INJUNCTION. ........ 15
CONCLUSION ........ 17

## TABLE OF EXHIBITS

| Exhibit | Dist. Ct. AR/Doc. # | Date | Description |
|---|---|---|---|
| 31 | BLM AR 271937–40, AR 271944–46 | Aug. 2020 | GMT-1 Final Supplemental Environmental Impact Statement |
| 32 | FWS AR000677–78, AR000723–24, AR000744–47, AR000750–51, AR000764–66 | Oct. 19, 2020 | Excerpts of U.S. Fish and Wildlife Service, Biological Opinion for Willow Master Development Plan (Oct. 2020) [BiOp]. |
| 33 | 14-1 | Dec. 18, 2021 | Declaration of Bridget Psarianos in Support of Motion for Expedited Consideration |
| 34 | 1 | Nov. 17, 2020 | Complaint for Declaratory and Injunctive Relief |
| 35 | N/A | 1982 | Naval Petroleum Reserves Production Act, 42 U.S.C. §§ 6501–6508 (1982) |
| 36 | FWS AR003979–86 | Apr. 2004 | Detecting Denning Polar Bears with Forward-Looking Infrared (FLIR) Imagery |

## ARGUMENT

Appellants Sovereign Iñupiat for a Living Arctic et al. (collectively, "SILA") are likely to succeed on the merits of their appeal and have met the requirements for injunctive relief.

### I. WINTER CONSTRUCTION WILL CAUSE IRREPARABLE HARM.

As SILA demonstrated, and the District Court subsequently found, SILA's members and supporters would suffer irreparable harm because ConocoPhillips' imminent construction activities would irreparably alter wetlands and the project area's natural setting, thereby harming SILA's interests. Appellants' Mot. for Inj. Pending Appeal at 6–9 ["Motion"]; CPAI-Ex. 4 at 5–8.[1] Specifically, ConocoPhillips Alaska, Inc.'s (ConocoPhillips) activities will permanently harm SILA's members' use of important subsistence areas, beginning this winter and continuing into the future. Mot.-Ex. 13 at 3, 6, 8–9 (describing winter use of the area for subsistence and impacts from industrial activities in winter); Mot.-Ex. 18 at 2–3, 5–6 (same). Appellees do not argue that the District Court erred in finding these activities would cause irreparable harm. Indeed, DOI admits harms from winter construction would be permanent. Federal Defs.-Appellees' Opp'n to Mot.

[1] The declarants the District Court references are declarants in both consolidated cases. CPAI-Ex. 4 at 6–8; Mot.-Ex. 13, 15, 20. Thus, SILA has also established a likelihood of irreparable harm.

for Inj. Pending Appeal at 28, 32 [“DOI”].

Appellees’ arguments that SILA failed to establish harm otherwise fail. Appellees improperly focus on the number of acres impacted by winter construction in relation to the project or region as a whole; however, the relevant focus of injunctive relief is the severity of the harm, not the magnitude. *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999). Contrary to Appellees’ assertions, SILA demonstrated harm to its members resulting from permanent harms from this winter’s construction, not the entire project. Mot. 6–9 (describing how the construction work will permanently alter important subsistence areas that are currently undeveloped); Mot.-Ex. 18 at 4 (describing uses of the Ublutuoch River and gravel mining area), 5–6 (describing impacts from winter exploration and gravel work).[2]

DOI cites no cases to support its claim that SILA must directly connect its merits arguments under the National Environmental Policy Act (NEPA) and harms

[2] Separately, DOI takes issue with Mr. Kunaknana not being a “member” of SILA. DOI 29, n.13. An organization without formal members can establish associational standing on behalf of individuals with indicia of membership. *Hunt v. Wash. State Apple Advert. Comm’n*, 432 U.S. 333, 343 (1977); *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003). SILA was formed and is run by Iñupiat individuals, including Nuiqsut residents like Mr. Kunaknana and Ms. Ahtuangaruak (a SILA board member), to represent individuals impacted by industry. Mot.-Ex. 19 at 3–6. Mr. Kunaknana possesses the required indicia of membership. The court should consider his declaration.

to wetlands and its members. DOI 28. As noted by DOI, SILA's requested relief must relate to the relief sought in the underlying complaint. *Id*. SILA's complaint seeks to vacate agency approvals for the Willow Master Development Plan (Willow). Ex. 34 at 63–64. SILA's merits arguments for its NEPA and Endangered Species Act (ESA) claims are connected to the relief sought in its lawsuit and via this injunction. *See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (requiring relationship between merits of PI motion and underlying challenge).[3] DOI also ignores that SILA's NEPA arguments relate directly to the agency's failure to adequately analyze the impacts to aquatic and other resources, such as wetlands; these harms are directly at issue.

Harm to polar bears is also likely. Mot. 9–11. ConocoPhillips obfuscates that its vehicles and heavy equipment would traverse critical habitat and potential denning habitat to reach the project site. Intervenor-Defendant-Appellee Opp'n to

[3] Even if this Court finds that SILA has not shown irreparable harm to polar bears, it may rule for SILA on the merits of the ESA claims and find irreparable harm to aquatic resources and SILA's interests in maintaining the area's undisturbed nature to enjoin the project because of the invalid biological opinion (BiOp). *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127–28 (9th Cir. 2012); *see, e.g., Alliance for Wild Rockies v. Marten*, 253 F. Supp. 3d 1108, 1111 (D. Mont. 2017) (granting injunction based on ESA procedural violation harming Plaintiffs' "recreational, scientific, spiritual, vocational and educational interests in viewing and utilizing the area in its undisturbed state").

Mot. for Inj. Pending Appeal at 9–10 [“CPAI”]; *but see* Mot.-Ex. 7 at AR000726 (map of Willow overlaid on polar bear critical habitat). SILA also explained that the loss of one polar bear could affect the population. Mot. 10; *see also* DOI 29–30 (acknowledging injunctive relief is appropriate where loss of individual would be significant to the species as a whole), *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 886 F.3d 803, 819 (9th Cir. 2018) (explaining Court did not assume “harm to individual members of a species cannot be irreparable”).

DOI's arguments also misunderstand the U.S. Fish and Wildlife Service's (FWS) model and the record. DOI 30, n.15. The pages DOI cites do not contain the asserted 56% detection rate. FWS assumed dens with snow depths greater than 100 centimeters would be undetectable. DOI-Ex. 6 at AR000765. However, it does not follow that all other dens would be detectable. Weather conditions, conducting surveys in daylight hours, and snow cover all impact detection rates. Mot.-Ex. 6 at AR179242. Ambient weather conditions “appear to explain much of the detection failure rate.” *Id*. at AR179243.[4] Moreover, dens are unlikely to be detected where snow depths are 90 centimeters or greater, meaning FWS further underestimated

[4] The study SILA cites was authored by former research scientists with the U.S. Geologic Survey, and relies on studies conducted during their time with that agency. *Compare* Mot.-Ex. 6 at AR179233, AR179242–43 (citing Amstrup 2004), *with* Ex. 36 at AR003979 (Amstrup 2004 study authors' biographic information). DOI does not explain why these studies should not be treated as credible when the Biological Opinion (BiOp) also relies on studies by these scientists. DOI 30.

the likelihood that dens would be overlooked. *Id*. DOI also cites the median level of lethal take for construction (zero), while ignoring that the mean level of take resulting in the serious injury or death of a polar bear was actually 2.2 over the project life. DOI-Ex. 6 at AR000765. In sum, Plaintiffs have shown there is a likelihood of irreparable harm to wetlands and aquatic resources and polar bears, which will in turn harm SILA.

Appellees' arguments that SILA delayed this case are also disingenuous, contrary to the record, and do not undercut the harm at issue or the merits of SILA's timely request for injunctive relief. SILA's right to judicial review of Willow did not accrue until there was a final agency action — when the Bureau of Land Management (BLM) signed its Record of Decision (ROD) on October 26, 2020. 5 U.S.C. § 702; DOI-Ex. 2 at AR186073 (deeming ROD "final agency action"). SILA could not bring this litigation prior to a final agency action and promptly filed its challenge within weeks of the ROD. Ex. 34 at 64. BLM's two-month delay in issuing its ROD is not attributable to SILA. DOI 8–9; CPAI 5.

SILA actively sought information about the timing of any construction activities — which was highly uncertain since ConocoPhillips had not applied for or received key permits, such as the right-of-way permit. *See, e.g.*, Ex. 33 at 7–9 (emails to ConocoPhillips); Mot.-Ex. 9 (Corps permit issued in December); Mot.-

Ex. 11 (BLM application); Mot.-Ex. 12 (indicating BLM issued ConocoPhillips' right-of-way and authorized construction on January 20, 2021). Upon discovering ConocoPhillips intended to begin construction, SILA promptly moved for a preliminary injunction on December 23. Ex. 33 at 2–4. Appellees' arguments that SILA unreasonably delayed its lawsuit and motion for injunctive relief are not borne out and should not factor into the court's consideration of this motion.

## II. SILA IS LIKELY TO SUCCEED ON THE MERITS.

SILA is likely to succeed, and at least has raised "serious questions," on these claims. Mot. 11–21.

### A. SILA Is Likely to Succeed on the Merits of Its NEPA Claims.

#### *1. SILA's claims are not time barred.*

SILA's NEPA claim is not time barred. Contrary to Appellees' assertions, the cases SILA cites on the presumption in favor of review are applicable and counsel that prohibitions against judicial review should be narrowly construed. DOI 11; CPAI 15–16. Absent a "clear command" of the statute — not present here — this court should not foreclose review by extending the statute of limitations to this development decision. *Moapa Band of Paiute Indians v. U.S. Dep't of Interior*, 747 F.2d 563, 565 (9th Cir. 1984); *Love v. Thomas*, 858 F.2d 1347, 1355–56 (9th Cir. 1988). This is a question of law reviewed de novo. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 (2014).

Appellees' arguments that the statute of limitations encompasses development decisions because such actions are taken pursuant to leases would override the plain language. DOI 11–13; CPAI 10. The plain language indicates Congress only time barred challenges "concerning oil and gas leasing." 42 U.S.C. § 6506a(n)(1). Had Congress intended to encompass other stages in the statute of limitations, it could have expressly referenced those stages in that provision, as it did elsewhere in the statute. Mot. 13. Appellees do not confront this statutory language or rebut the canon that Congress is "presumed to act intentionally and purposely when it includes language in one section but omits it in another." *Estate of Bell v. Comm'r*, 928 F.2d 901, 904 (9th Cir. 1991). DOI's argument that Congress did not use the word "leasing" to exclude other stages, DOI 14, ignores that Congress was aware of all the stages of oil and gas and specifically referred to them in the statute when it intended to do so. Here, Congress chose not to reference to those later stages in the statute of limitations; this choice must be given meaning.

Appellees' arguments that "leasing" encompasses all oil and gas stages merely because ConocoPhillips holds a lease would effectively rewrite the statute and eviscerate Congress' decision to use the verb "leasing," not the noun "lease." *Cf. Coal. for Clean Air v. EPA*, 971 F.2d 219, 224–25 (9th Cir. 1992) (indicating

verb tense is evidence of intent); DOI 11–13; CPAI 10, 13. The verb "leasing" is defined as the act of "grant[ing] by lease" and the noun "lease" refers to the "contract by which one conveys real estate." WEBSTER'S NEW ENCYCLOPEDIC DICTIONARY 1044 (2002). The act of granting a lease only occurs once, at the first stage of oil and gas, when the agency holds a sale and issues leases. Congress' use of a verb instead of a noun shows Congress' intent to refer to only the action of leasing — not to extend the provision to anything relating to a lease.

DOI also cites a number of provisions in the Naval Petroleum Reserves Production Act (NPRPA) to argue Congress wanted the statute of limitations to apply more broadly. DOI 14. But much of this language was not adopted until 2005, when Congress repealed the general prohibition on production and development and adopted a number of provisions specific to production. Pub. L. 109-58 § 347 (2005); DOI 14. *Compare* 42 U.S.C. § 6506a(i)–(k), *with* 42 U.S.C. §§ 6504(a), 6508 (1982) (Ex. 35). Regardless, those provisions reinforce Congress recognized the different oil and gas stages and could have referred to them in the statute of limitations.

Appellees' arguments that "site-specific" and "programmatic" references expand the provision to encompass later stages are not based on any indication that Congress interpreted the language that way; they are based on statements about

subsequent agency actions, which shed no light on Congress' intent. DOI 12; CPAI 13–14.

Appellees also point to nothing in the legislative history that would override the plain language of the statute. DOI 14–16; CPAI 16–18; *see also* Mot. 15 (explaining statements of individual legislators are disfavored to discern congressional intent). The legislative history shows Congress' goal was to privatize the formerly government-led exploration program and expedite lease sales, Mot. 13–14, but that does not indicate Congress inadvertently excluded development decisions from the statute of limitations. Additionally, Congress did not rescind the general prohibition on production and development until 2005. 42 U.S.C. § 6504(a) (1982) (Ex. 35). Appellees' arguments would render that general prohibition superfluous; it would not make sense for Congress to maintain that provision if it was simultaneously opening the entire Reserve to all oil and gas activities. Mot. 15 (discussing how Congress is presumed to act with awareness of its prior legislation and courts avoid interpretations that render provisions superfluous).

There is no clear command sufficient to overcome the presumption in favor of judicial review or to foreclose the court's timely review here; the statute of limitations does not apply here.

### 2. *BLM did not adequately consider Willow's impacts.*

BLM failed to take a hard look at impacts because the agency lacked critical project design and baseline information. An agency cannot take a hard look at impacts when it does not have site-specific information about the project and project area. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.* (*STB*), 668 F.3d 1067, 1084–85 (9th Cir. 2011). DOI's record citations underscore BLM lacked critical information about baseline conditions and project design, and never took a hard look at impacts to aquatic resources. DOI points to a handful of cursory and generalized summaries — at times merely a paragraph — that do not include a site-specific analysis of how Willow's components would alter hydrology or cause other impacts. DOI 17 (citing AR182484–85, 182377, 192400, 185533–35). Generalized summaries of the potential impacts of bridges, like restricted flow and turbidity changes, is not a hard look at the impacts of *this* proposal, involving seven bridges and over 200 culverts. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (stating NEPA requires an agency has "available, and will carefully consider, detailed information concerning significant environmental impacts").

BLM also points to a handful of charts and maps summarizing the project components as evidence it took a hard look at the impacts of the bridges, culverts, roads, pads, and other project elements. DOI 17–19 (citing AR182377,

AR182375–76, AR182755–56, AR183232, AR183242, AR183277). Summarizing Willow's total infrastructure is not the same as analyzing its impacts. This is not the type of site-specific, detailed analysis of impacts required by NEPA. *Robertson*, 490 U.S. at 349; *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1102–04 (9th Cir. 2016).

DOI's claim that SILA has not shown anything BLM should have done differently attempts to pin BLM's NEPA obligations on the public. The purpose of NEPA is to ensure the agency has all the relevant information about a project to understand the impacts before it makes decisions — not after. *STB*, 668 F.3d at 1085. That did not occur here. For example, BLM's analysis of this project is starkly contrasted by its analysis for other smaller projects, where it has engaged in at least some additional in-depth analysis of the project components. *See, e.g.*, Ex. 31 at AR271937–40 (analyzing the impacts of a single 7.6-mile road segment for a project by quantifying and addressing the likely impacts in light of the site-specific baseline conditions); Ex. 31 at AR 271944–46 (providing details regarding each bridges' design, including information on the number of pilings and elevation, quantification of peak discharges, carrying capacity, and more). BLM never engaged in such analysis here, despite Willow having many more miles of roads and far more water crossings.

DOI concedes that BLM did not have final design details for the project, yet claims this was not a "plan for a plan" analogous to that at issue in *STB*. DOI 18. DOI instead points to "design criteria" and claims those would minimize impacts. DOI 18 (citing AR182481–82). DOI's assertions are contrary to the record and only underscore there were not yet final design details for the project — just high-level design principles to guide future design. For instance, one such criteria states, "As appropriate, consider both 1) snow- and ice-impacted conditions and 2) ice-free conditions in the hydraulic design of bridges, culverts, and pipeline river crossings…. Based on the available information, develop designs that would perform satisfactorily during the design event." DOI.-Ex. 1 at AR182481. This was a plan for a plan analogous to the *STB* case because the agency did not have detailed project designs or key site-specific baseline information necessary to do a meaningful analysis of the project.

DOI's argument that BLM responded to EPA's concerns by adding a technical memorandum addressing the unknown discharge at Ocean Point does not alter that BLM never obtained key baseline information or took a hard look at Willow's impacts. What BLM calls an analysis of the discharge at Ocean Point is only a hypothetical analysis of a "synthetic data set" based on information from a wholly different area because, as BLM stated, there was "no flow data available"

for this actual location. Fed-Ex. 1 at AR185538–44.

Overall, BLM lacked key project design and baseline information and approved Willow without taking a hard look at its impacts, violating NEPA.

### B. The Willow BiOp violates the ESA.

Contrary to DOI's assertion, DOI 25–26, a revised sentence in the ESA regulations does not affect the Ninth Circuit's holding in *Center for Biological Diversity v. Bernhardt* (*CBD*) and its applicability here. 982 F.3d 723 (9th Cir. 2020); Mot. 20–21. SILA does not argue FWS must ignore beneficial effects of MMPA compliance or that BLM must provide "additional demonstration of binding plans" for implementation. DOI 25–26. SILA instead demonstrates FWS lacked the specific, detailed information it needs to assess Willow's effects under the ESA and consistent with *CBD*. Mot. 18–21; *see also* 16 U.S.C. § 1536(a)(2), (b)(4). Appellees do not rebut these arguments, and the revised regulation did not alter this statutory requirement.

DOI wrongly asserts FWS did not rely on future MMPA mitigation measures to reach its no-jeopardy and no-adverse-modification determinations, arguing that future MMPA processes merely "bolstered" its conclusions. DOI 26. This is contrary to the BiOp, which specifies BLM's commitment to future MMPA compliance is a key part of the proposed action considered by FWS. Ex. 32 at AR000677–78 (describing BLM's commitment to require MMPA compliance),

AR000750–51 (stating BLM's commitment to ensure MMPA compliance is the "[m]ost important" factor limiting impacts). FWS's effects analysis and no-jeopardy and no-adverse modifications determinations hinged on future, unspecified MMPA mitigation measures. Ex. 32 at AR000723–24 (explaining MMPA's program for managing bear deterrence "reduces the need for lethal take"), AR000744–47 (explaining MMPA process); *see also* Ex. 32 at FWS AR000764 (no-jeopardy determination explicitly premised on effects of proposed action, including protective measures providing significant minimization of impacts, most importantly MMPA compliance), AR000765–66 (explaining MMPA compliance ensures against adverse modification of critical habitat). MMPA compliance was a core component of the BiOp. DOI's post-hoc rationale is inconsistent with the BiOp and should be rejected. *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 50 (1983).

That other aspects of the project may reduce impacts, DOI 26, does not eliminate FWS's obligation to ensure that the mitigation measures it relies upon in making its determinations are specific and reasonably certain to occur. Indeed, similar facts were presented in *CBD* and rejected. 982 F.3d at 744 (den detection surveys, polar bear interaction plan required under MMPA); *id.* at 748 (explaining FWS relied on three factors for its no adverse modification finding, including

MMPA compliance).

In sum, SILA has shown a likelihood of success or, at a minimum, raised serious questions going to the merits.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR AN INJUNCTION.

SILA's likely success on the merits and the irreparable harms it will suffer strongly tip the equities and public interest in favor of an injunction. Arguments concerning lost revenues from rents, royalties, taxes, lost jobs, and project delays fail because they relate to full-project development — which ConocoPhillips has not approved. Mot. 23;[5] DOI 34; CPAI 6–7, 27–28; Arctic Slope Regional Corporation Amicus Br. Ex. A 4, 7–10 [“ASRC”]; State of Alaska Amicus Br. 4–8 [“SOA”]; North Slope Borough Amicus Br. 7–8 [“NSB”]. Only the harms during the period the injunction would be in place are considered, not total project expenditures and all future revenues. *League of Wilderness Defenders v. Connaughton*, 752 F.3d 755, 765–66 (9th Cir. 2014).[6]

---

[5] ConocoPhillips stated that the impact of a delay this winter on its overall Willow schedule is “unknowable.” CPAI-Ex. 8 at 14.

[6] ConocoPhillips' investments in the leases, exploration, engineering, and permitting will not be lost if an injunction is granted, CPAI 29; it will maintain this information.

Regarding expenditures this winter, ConocoPhillips now asserts it has spent $4 million on winter construction that is largely unrecoverable. CPAI 25; CPAI-Ex. 1 at 5.[7] Last month, ConocoPhillips stated it had committed to spend $1.9 million on winter construction, some of which could be transferred to a subsequent season. SILA-Ex. 24 at 12. ConocoPhillips does not reconcile these contrary statements nor provide evidence supporting either figure. ConocoPhillips also made these expenditures after SILA filed it Notice of Appeal and Motion for an Injunction Pending Appeal in the District Court. CPAI-Ex. 1 at 3, 5; *cf. Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1093 (9th Cir. 2014) (explaining companies that presume permitting outcomes assume the risk). Regardless, these temporary economic impacts do not overcome SILA's irreparable harm. Mot. 23.

ConocoPhillips asserts that because the impacted area is small, and other areas are protected, the balance of equities does not favor injunctive relief. CPAI 6, 19–20. This argument should be rejected because SILA's members' interests and uses are tied to this particular undeveloped area near Nuiqsut; displacing those uses by permanently destroying this area is irreparable harm. Mot. 8–9; CPAI-Ex. 4 at 6–8; *see All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135, 1137 (9th Cir. 2011) (rejecting arguments regarding magnitude of harm and availability of other

[7] Some of the identified expenditures are for equipment that can be used in the future. CPAI-Ex. 2 at 5 (identifying culvert and hose purchases).

areas and concluding that balance of equities favored an injunction).

Arguments that the public interest disfavors an injunction because the NPRPA prioritizes development, DOI 34; CPAI 26–27; SOA 3; NSB 7, fail to recognize that the NPRPA also mandates protection of Reserve values and uses, 42 U.S.C. §§ 6503(b), 6504(a), 6506a(b), and ignores the public interest in ensuring compliance with NEPA and the ESA, Mot. 22–23. Enjoining a project until the legally required analysis occurs "comports with the public interest." *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009).

## CONCLUSION

This Court should grant SILA's motion for an immediate injunction pending a final decision on the merits of this appeal.

Respectfully submitted this 11th day of February, 2021.

s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Brian Litmans (AK Bar No. 0111068)
Trustees for Alaska
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org

sbostrom@trustees.org
bbrisson@trustees.org
blitmans@trustees.org

Counsel for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE

I certify that this Emergency Motion Under Circuit Rule 27-3 contains 3, 485 words, excluding the items exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f). It is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a). The brief's type size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6).

Signature: *s/Bridget Psarianos* Date: February 11, 2021

## CERTIFICATE OF SERVICE

I certify that I served all counsel of record a complete copy of this motion and exhibits via ECF or email today.

Signature: *s/Bridget Psarianos* Date: February 11, 2021